Dan Stormer, Esq. [S.B. # 101967]
Acrivi Coromelas, Esq. [S.B. #298305]
Brian Olney, Esq. [S.B. #298089]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
acoromelas@hadsellstormer.com
bolney@hadsellstormer.com

Attorneys for Plaintiff
KENO V. THOMAS

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

KENO V. THOMAS,

Plaintiff,

v.

STARZ ENTERTAINMENT, LLC; MICHAEL THORNTON; and DOES 1 through 20, inclusive,

Defendants.

Case No.: CV15-09239 CAS (AFMx)

[Assigned to the Honorable Christina A. Snyder – Courtroom 5]

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

DATE: June 6, 2016
TIME: 10:00 a.m.
CRTRM: 5

Complaint filed: October 29, 2015
Discovery Cut-Off: None Set
Motion Cut-Off: None Set
Trial Date: None Set

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES .......... iii

I. INTRODUCTION .......... 1

II. SUMMARY OF FACTUAL ALLEGATIONS .......... 2

A. Mr. Thomas Was a Standout Employee at Starz .......... 2

B. Mr. Thomas Had a Long History of Advocating on Behalf of Women and Minorities at Starz, Which Suffers from a Severe Lack of Diversity .......... 2

C. Mr. Thomas Speaks Out Concerning Unlawful Practices at Starz .......... 3

D. Mr. Thomas Refuses an Order to Personally Participate in Unlawful Practices .......... 4

E. Starz Retaliates Against Mr. Thomas, Excluding Him From Meetings and Important Communications .......... 5

F. Mr. Thomas is Fired in Retaliation for Complaining About Racial and Gender Discrimination, For Whistleblowing Regarding Starz's Unlawful Practices, and For Refusing to Personally Participate in Unlawful Activity .......... 5

III. ARGUMENT .......... 5

A. Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6) .......... 5

B. Mr. Thomas States a Claim for Violation of § 1102.5(c) .......... 6

1. The Corporations Code Sections Thomas Cites Apply to Starz .......... 6

2. Mr. Thomas Satisfies Each Element of the Laws He Identifies .......... 7

3. Mr. Thomas Pleads with the Particularity Required by Rule 9(b) .......... 9

4. The "Safe Harbor" Provision of the PSLRA Does Not Apply to Any of the Laws on which Mr. Thomas Bases his Claim .......... 10

C. Thomas States A Claim Under Labor Code § 1102.5(b) .......... 11

1. Legal Standard Governing Claims Under § 1102.5(b) ............ 11

2. Mr. Thomas Disclosed A Violation Arising From Chang's Threatened Misappropriation of Trade Secrets .......... 12

3. Mr. Thomas Disclosed A Violation Arising From Maffei's Manipulation of the Comcast-Charter Deal .............. 14

D. Mr. Thomas States A Claim for Intentional Infliction of Emotional Distress ........................................................ 18

1. The California Workers Compensation Act Does Not Bar Mr. Thomas's IIED Claim, Which Arises from Unlawful Discrimination ............................................ 18

2. Mr. Thomas Alleges Outrageous Conduct ............................... 21

IV. CONCLUSION ........................................................................ 24

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Aguilera v. Target Corp.*
No. EDCV 15-2186-DOC (DTBx), 2015 U.S. Dist. LEXIS 168416 (C.D. Cal. Dec. 16, 2015) .......... 20

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) .......... 6

*Barefield v. Board of Trs. of Cal. State Univ., Bakersfield*
500 F. Supp. 2d 1244 (E.D. Cal. 2007) .......... 20

*Barsell v. Urban Outfitters, Inc.*
No. CV 09- 02604, 2009 U.S. Dist. LEXIS 123475 (C.D. Cal. July 1, 2009) .......... 22, 24

*Bejarano v. Int'l Paper Co.*
No. 1:13-cv-01859-AWI-GSA, 2015 U.S. Dist. LEXIS 8021 (E.D. Cal. Jan. 23, 2015) .......... 20

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) .......... 6

*In re Calpine Corp. Sec. Litigation*
288 F. Supp. 2d 1054 (N.D. Cal. 2003) .......... 9

*Decker v. GlenFed, Inc.* (*In re GlenFed, Inc. Sec. Litig.*)
42 F. 3d 1541 (9th Cir. 1994) .......... 9, 10

*Golden State Transit Corp. v. Los Angeles*
773 F. Supp. 204 (C.D. Cal. 1991) .......... 16

*Gonero v. Union Pac. R.R. Co.*
No. 09-200920, 2009 U.S. Dist. LEXIS 100962 (E.D. Cal. Oct. 16, 2009) .......... 21, 23

*Graves v. Johnson Control World Services*
No. C-05-1772 SC, 2006 U.S. Dist. LEXIS 13677 (N.D. Cal. Mar. 13, 2006) .......... 22

*Hartzman v. Wells Fargo & Co.*
No. 1:14CV808, 2016 U.S. Dist. LEXIS 18733 (M.D.N.C. Feb. 17, 2016) .......... 12

*Hattox v. State Farm Mut. Auto. Ins. Co.*
No. 12cv2597-AJB (KSC), 2013 U.S. Dist. LEXIS 10440 (S.D. Cal. Jan. 25, 2013) .......... 19

*Jelincic v. Xerox Corp.*
No. C-04-2930 (EMC), 2004 U.S. Dist. LEXIS 20523 (N.D. Cal. Oct. 1, 2004) .......... 20

*Kirzhner v. Silverstein*
No. 09-cv-02858-CMA-BNB, 2011 U.S. Dist. LEXIS 106139 (D. Colo. Sep. 20, 2011) .......... 16

*Latif v. M&C Hotel Interests, Inc.*
No. CV 12-509 CAS (FFMx), 2012 U.S. Dist. LEXIS 35503 (C.D. Cal. Mar. 14, 2012) .......... 20

*Lopez v. Smith*
203 F.3d 1122 (9th Cir. 2010) .......... 24

*Mediondo v. Centinela Hospital Medical Ctr.*
521 F.3d 1097 (9th Cir. 2008) .......... 7

*Montgomery v. De Simone*
159 F.3d 120 (3d Cir. 1998) .......... 16

*Morris v. Mass. Electric Construction Co.*
No. CV 15-7804 DMG (GJSx), 2015 U.S. Dist. LEXIS 149017 (C.D. Cal. Nov. 3, 2015) .......... 20, 21

*Onelum v. Best Buy Stores L.P.*
948 F. Supp. 2d 1048 (C.D. Cal. 2013) .......... 20

*Onie v. Conners* (*In re Cutera Sec. Litig.*)
610 F.3d 1103 (9th Cir. 2010) .......... 11

*Provenz v. Miller*
102 F.3d 1478 (9th Cir. 1996) .......... 8

*Reed v. Linehan* (*In re Soporex, Inc.*)
463 B.R. 344 (Bankr. N.D. Tex. 2011) .......... 14, 15

*Ronconi v. Larkin*
253 F.3d 423 (9th Cir. 2001) .......... 9

*S. Cal. Institute of Law v. TCS Education System*
No. CV 10-8026 PSG (AJWx), 2011 U.S. Dist. LEXIS 39827 (C.D. Cal. Apr. 5, 2011) .......... 14, 18

*In re STEC Inc. Sec. Litigation*
No. SACV 09-1304 JVS (MLGx), 2011 U.S. Dist. LEXIS 75093 (C.D. Cal. June 17, 2011) .......... 11

*Skelly v. Dockweiler*
75 F. Supp. 11 (S.D. Cal. 1947) .......... 15

/ / /

*Slayton v. Am. Express Co.*
604 F.3d 758 (2nd Cir. 2010)....................11

*Smith v. Wade*
461 U.S. 30 (1983)....................16

*Thibeaux v. GEO Grp., Inc.*
No. 13-CV-291-BEN (MDD), 2014 U.S. Dist. LEXIS 165480 (S.D. Cal. Nov. 24, 2014)....................20

*Tone v. Wal-Mart Stores, Inc.*
No. 14cv2643-LAB (DHB), 2015 U.S. Dist. LEXIS 102823 (S.D. Cal. Aug. 3, 2015)....................20

*United States v. Smith*
389 F.3d 944 (9th Cir. 2004)....................18

*Zayed v. Apple Computers*
No. C 94091787 JW, 2006 U.S. Dist. LEXIS 20132 (N.D. Cal. Apr. 4, 2006)....................22

**STATE CASES**

*Accardi v. Superior Court of Ventura Cnty.*
17 Cal. App. 4th 341 (Ct. App. 1993)....................19, 22, 24

*Aguilar v. Atlantic Richfield Co.*
25 Cal. 4th 826 (Cal. 2001)....................22

*Alcorn v. Anbro Engineering, Inc.*
2 Cal. 3d 493 (Cal. 1970)....................21, 23

*America Master Lease LLC v. Idanta Partners, Ltd.*
225 Cal. App. 4th 1451 (Cal. Ct. App. 2014)....................15, 17

*Bancroft-Whitney Co. v. Glen*
64 Cal. 2d 327 (Cal. 1966)....................14

*Berg & Berg Enterprises, LLC v. Boyle*
178 Cal. App. 4th 1020 (Cal. Ct. App. 2009)....................16

*Casey v. U.S. Bank National Association*
127 Cal. App .4th 1138 (Cal. Ct. App. 2005)....................16

*Central Valley General Hospital v. Smith*
162 Cal. App. 4th 501 (Cal. Ct. App. 2008)....................13, 14

*City of Moorpark v. Superior Court*
18 Cal. 4th 1143 (Cal. 1998)....................16, 19

*Fisher v. San Pedro Peninsula Hospital*
214 Cal. App. 3d 590 (Cal. Ct. App. 1990)....................22

*Green v. Ralee Eng'g Co.*
19 Cal. 4th 66 (Cal. 1998) ..... 16

*Hager v. Cty. of L.A.*
228 Cal. App. 4th 1538 (Cal. Ct. App. 2014) ..... 13

*Janken v. GM Hughes Electrics*
46 Cal. App. 4th 55 (Cal. Ct. App. 1996) ..... 23, 24

*Jones v. Dep't of Corrs. & Rehab.*
152 Cal. App. 4th 1367 (Cal. Ct. App. 2007) ..... 20

*Kovatch v. Cal. Casualty Management Co.*
65 Cal. App. 4th 1256 (Cal. Ct. App. 1998) ..... 22, 23

*McVeigh v. Recology S.F.*
213 Cal. App. 4th 443 (Cal. Ct. App. 2013) ..... passim

*Miklosy v. Regents of University of California*
44 Cal. 4th 876 (Cal. 2008) ..... 20, 21

*Mize-Kurzman v. Marin Community. College District*
202 Cal. App. 4th 832 (Cal. Ct. App. 2012) ..... passim

*Murray v. Oceanside Unified School District*
79 Cal. App. 4th 1338 (Cal. Ct. Appl. 2000) ..... 22

*In re Muszalski*
52 Cal. App. 3d 500 (Cal. 1975) ..... 12, 19

*Nazir v. United Airlines*
178 Cal. App. 4th 243 (Cal. Ct. App. 2009) ..... 19

*ReadyLink Healthcare v. Cotton*
126 Cal. App. 4th 1006 (Cal. Ct. App. 2005) ..... 13

*Remillard Brick Co. v. Remillard-Dandini Co.*
109 Cal. App. 2d 405 (Cal. Ct. App. 1952) ..... 15

*Rojo v. Kliger*
52 Cal. 3d 65 (Cal. 1990) ..... 22

*Shoemaker v. Myers*
52 Cal. 3d 1 (Cal. 1990) ..... 20

*Silvaco Data Systemv. Intel Corp.*
184 Cal. App. 4th 210 (Cal. Ct. App. 2010) ..... 13

*Soukup v. Law Offices of Herbert Hafif*
39 Cal. 4th 260 (Cal. 2006) ..... 17

/ / /

*Spahn v. Guild Indus. Corp.*
94 Cal. App. 3d 143 (Cal. Ct. App. 1979) .................................................. 15

*Vacanti v. State Compensation Insurance Fund*
24 Cal. 4th 800 (Cal. 2001) .................................................. 18, 19


**FEDERAL STATUTES**


15 U.S.C.
§ 78c(a)(37) .................................................. 8
§ 78m(b)(2) .................................................. 8
§ 78m(b)(5) .................................................. passim
§ 78u-5(c)(1) .................................................. 11

17 C.F.R.
§ 240.13b2-1 .................................................. passim

FED.R.CIV.PROC.
Rule 8(a)(2) .................................................. 6
Rule 9(b) .................................................. 9

Private Securities Litigation Reform Act of 1995 (PSLRA) .................................................. 10, 11


**STATE STATUTES**


CAL. BUS. & PROF. CODE
§ 17200 .................................................. 18

CAL. CIV. CODE
§ 3426.1(b)(2) .................................................. 13
§ 3426.2(a) .................................................. 13

CAL. CORP. CODE
§ 102(a) .................................................. 6
§ 2254 .................................................. passim
§ 2255(b) .................................................. passim
§ 2260 .................................................. 6

CAL. LAB. CODE
§ 309 .................................................. 16
§ 1102.5(b) .................................................. passim
§ 1102.5(c) .................................................. passim


**MISCELLANEOUS**


10 WITKIN, SUMMARY OF CAL LAW: CORPORATIONS
§ 90 (10th ed.) .................................................. 15

Chin et al., CAL. PRACTICE GUIDE: EMPLOYMENT LITIGATION
(THE RUTTER GROUP 2015) .................................................. 19

# I. INTRODUCTION

This action is brought by Keno Thomas against Defendants Starz Entertainment, LLC and Michael Thornton (collectively "Defendants") for retaliating against and firing Mr. Thomas in violation of state and federal law. As the only African-American senior executive at Starz, Mr. Thomas worked hard to diversify the ranks of white male executives and to curb the worst practices of a corrupt corporate culture. When ordered to engage in illegal activity himself, he refused. Starz reacted to Mr. Thomas's advocacy and whistleblowing with retaliation, harassment, and termination.

On February 29, 2016, this Court granted in part and denied in part Defendants' motion to dismiss. The Court dismissed Mr. Thomas's whistleblower claims under Cal. Labor Code §§ 1102.5(b) and (c) with leave to amend on the narrow ground that Mr. Thomas did not cite in his Complaint the specific laws Defendants violated. As a result, the Court did not reach the adequacy of Mr. Thomas's factual allegations. The Court also dismissed Mr. Thomas's IIED claim with leave to amend.

Defendants again seek to dismiss each of these claims, but their motion should fail. As to Mr. Thomas's claim for violation of § 1102.5(c), by their express terms sections 2254 and 2255(b) of the California Corporations Code apply to foreign corporations such as Starz; the safe harbor provision of the PLSRA for certain forward looking statements does not apply to any aspect of Mr. Thomas's claim; and Mr. Thomas adequately pleads with particularity every element of the laws he asserts as predicates for this claim.

Defendants' attacks on Mr. Thomas's § 1102.5(b) claims similarly fail. Mr. Thomas adequately disclosed unlawful conduct arising from Derek Chang's violation of the UTSA, which prohibits the type of threatened misappropriation present here. Mr. Thomas similarly disclosed Gregory Maffei's breach of his fiduciary duty to Charter Communications, which supports Mr. Thomas's claim because § 1102.5(b) claims may be based upon violations of common law rules. Each disclosure is adequate because neither involved publicly available information.

As to Mr. Thomas's IIED claim, Mr. Thomas respectfully requests that this Court

reconsider the portion of its February 29 order holding that this claim is preempted by the Workers' Compensation Act, a conclusion that runs counter to federal and state case law and leading authorities recognizing that claims arising from unlawful discrimination are not preempted. Defendants' other attack is unavailing because Mr. Thomas adequately alleges Defendant's outrageous misconduct. Defendants' motion should be denied.

## II. SUMMARY OF FACTUAL ALLEGATIONS

Keno Thomas is a fifty-eight year old African-American man with more than thirty years of experience in the cable and satellite television industry. FAC ¶ 14. He joined Starz in 2004 as its Senior Vice President of Sales and Affiliate Marketing, and remained in this position until his unlawful termination in 2014. Id. ¶ 14.

### A. Mr. Thomas Was a Standout Employee at Starz

Mr. Thomas was an exemplary employee at Starz. During his tenure with the company, Mr. Thomas received only praise regarding his performance, and always met or exceeded his performance standards and revenue goals, earning the maximum bonus possible every year. Id. ¶ 15. In recognition of his strong performance and management skills, Mr. Thomas was given increasing responsibilities. In fact, Mr. Thomas ultimately assumed management responsibility for Starz's best performing distributors, which accounted for nearly half (45%) of the company's total annual revenue. Id. ¶ 15. In recognition of his standout performance, Mr. Thomas was repeatedly named to prestigious industry lists by *Cablefax*, a national trade publication. Id. ¶ 16.

### B. Mr. Thomas Had a Long History of Advocating on Behalf of Women and Minorities at Starz, Which Suffers from a Severe Lack of Diversity

From the beginning of his tenure with Starz and over the course of his ten years with the company, Mr. Thomas consistently used his position of authority to advocate for women and minority employees. Id. ¶¶ 19, 20, 21, 22, 23, 33, 40, 54, 56, 63, 76, 80, 81, 86, 91. Mr. Thomas's efforts were critical because Starz suffers from a severe lack of diversity. Specifically, Starz has a long history of racial discrimination against its minority employees, and an extreme lack of diversity within its management ranks. Id. ¶¶ 13, 19. In

fact, at the time of his unlawful termination, Mr. Thomas was the only senior-level African-American executive at Starz. FAC ¶ 13. At that time, the roughly 30 senior executives with the title of Vice President or above included just several women and only one person of color, Mr. Thomas, as Starz had recently terminated its only other minority senior executive and replaced him with a white male. Id. ¶ 13.

**C. Mr. Thomas Speaks Out Concerning Unlawful Practices at Starz**

In 2013 and 2014, Mr. Thomas spoke out against two unlawful practices at Starz. First, in January 2013, Starz announced the appointment of Derek Chang, a former Executive Vice President at DirecTV, to its Board of Directors. Id. ¶ 24. Mr. Thomas told Ed Huguez, his direct supervisor at the time, and Thornton, who later replaced Huguez as Mr. Thomas's boss, that he believed that Chang could use confidential information he had obtained from DirecTV, such as propriety information concerning its pricing and licensing fees, for his own benefit. Id. ¶¶ 24, 24(e). Chang was working to develop a consulting business at that time, and was actively soliciting clients to advise on topics involving the precise type of confidential information he had obtained from DirecTV and Starz. Id. ¶ 24(d). Adding to Mr. Thomas's concerns, Chang had a reputation as someone who would "sell out his own mother to get a deal done." Id. ¶ 24(e). Although they agreed that Chang could engage in such unlawful activity, Huguez and Thornton did nothing, and Thornton threatened to fire Mr. Thomas if he ever raised the issue again. Id. ¶ 24(f).

Mr. Thomas learned of a second unlawful incident at a lavish dinner on April 28, 2014 for senior Starz executives. Id. ¶ 26. In early 2014, Starz's carriage contract with Comcast, one of its major distributors, was set to expire. Id. ¶ 27. At the same time, Comcast and Time Warner Cable, another distributor, were seeking to merge. Id. ¶ 28. To satisfy the federal government's concerns that the merged company created by Time Warner and Comcast would have too large a market share, Comcast negotiated a deal with a third distributor, Charter Communications, to sell 1.4 million of its subscribers to Charter and spin-off an additional 3.5 million subscribers into a separate company Comcast and Charter would jointly own. Id. ¶ 28.

The Comcast-Charter deal was announced on April, 28, 2014, the same day as the Starz dinner. FAC ¶ 29. At the dinner, Thornton bragged that Gregory Maffei, who sits on Boards of Directors for Starz (as Chairman) and Charter, had hatched and executed a plot to manipulate the pending deal between Comcast and Charter for Starz's benefit. Id. ¶¶ 12(A), 26, 31. Specifically, Maffei contacted Comcast and demanded, as a hidden condition of the Comcast-Charter deal, that Comcast agree to Starz's one-sided terms and extend its carriage contract at a loss for Comcast and a great profit for Starz. Id. ¶ 31. Alarmed at what he had just heard, Mr. Thomas told Thornton that Maffei's actions might be unlawful. Id. ¶¶ 32-34. As was Thornton's practice, however, he declined to address the problem and threatened to fire Mr. Thomas for raising it. Id. ¶ 34.

**D. Mr. Thomas Refuses an Order to Personally Participate in Unlawful Practices**

In early 2014, during its negotiations with Starz over a new contract to replace the one expiring on August 31, 2014, DirecTV began removing Starz from its marketing packages. Id. ¶¶ 35-36. Mr. Thomas informed Thornton that this development would negatively impact Starz's revenue. Id. ¶¶ 36, 50. Thornton then directed Kara Tefft, Starz's Director of Finance, to order Mr. Thomas to falsify revenue figures and subscriber numbers for presentation to Starz's Board, which Tefft did at a meeting on September 4, 2014. Id. ¶ 51. At that meeting, Tefft ordered Mr. Thomas to artificially inflate revenue and subscriber figures and provide plausibly sounding explanations in a cash flow and budget impact analysis of the DirecTV extension for the fourth quarter 2014 through fiscal year 2015. Id. ¶ 51. Tefft explained that this fraud was necessary because Thornton and Starz's C.E.O. Chris Albrecht were concerned that the company's financial and operational performance "did not look good" and they desired to present a false picture of favorable financial projections resulting from the DirecTV extension to the Starz Board, while maintaining plausible deniability for these lies. Id. ¶ 51. Mr. Thomas understood that the information Tefft was directing him to falsify would later be input into Starz's revenue and subscriber budgets, approved by Albrecht, approved by the Board, and then published to the financial markets through public disclosures including SEC filings. Id. ¶

51. Mr. Thomas refused the order, reasonably believing that Tefft's directive violated numerous state and federal statutes. FAC ¶¶ 52-53.

**E. Starz Retaliates Against Mr. Thomas, Excluding Him From Meetings and Important Communications**

Following the April 28 dinner, Mr. Thomas became aware that Starz had begun retaliating against him for speaking out about racial and gender discrimination, for whistleblowing, and for his own refusal to break the law. For example, Thornton and other Starz executives began excluding Mr. Thomas from meetings and emails. Id. ¶¶ 39, 43, 45-47. Mr. Thomas also began experiencing bullying by Thornton. Id. ¶ 39. For example, during a June 4, 2014 meeting, Thornton relayed Albrecht's crude comment about a colleague's genitals, specifically, that he would make the man's "balls" shrivel back into his little "girly-man" body. Id. ¶ 40. After Mr. Thomas told Thornton he found the comment offensive, Thornton implied that he considered Mr. Thomas to be effeminate and walked away. Id. ¶ 40.

**F. Mr. Thomas is Fired in Retaliation for Complaining About Racial and Gender Discrimination, For Whistleblowing Regarding Starz's Unlawful Practices, and For Refusing to Personally Participate in Unlawful Activity**

Beginning in the summer of 2014, Mr. Thomas's health began to deteriorate in large part due to the stress caused by Starz's mistreatment of him. Id. ¶ 58. Mr. Thomas was forced to take a three week medical leave in September 2014, which Starz approved, to receive treatment for depression and anxiety. Id. ¶¶ 58-59. Mr. Thomas returned to work on October 7, 2014 and was terminated by Starz that same week. Id. ¶ 60. As a result of Thornton's misconduct, Mr. Thomas experiences physical and emotional injuries including chest pain, stomach pain, depression, anxiety, and insomnia. Id. ¶ 96. He continues to see a therapist, who has diagnosed him as suffering from clinical depression. Id. ¶ 61.

## III. ARGUMENT

**A. Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)**

Defendants move to dismiss Mr. Thomas's claims under Rule 12(b)(6). A properly pled complaint need provide only "[a] short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.PROC. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a court need not accept mere legal conclusions or conclusory statements, it must accept all well-pled factual allegations as true and draw all reasonable inferences in the non-moving party's favor. *Id*.; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a complaint contains factual matter sufficient to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," a motion under 12(b)(6) must fail. *Ashcroft*, 556 U.S. at 678.

**B. Mr. Thomas States a Claim for Violation of § 1102.5(c)**

Section §1102.5(c) proscribes retaliation against an employee for refusing to participate in unlawful activity. CAL. LAB. CODE § 1102.5(c). Mr. Thomas states a claim under this statute because he understood that falsifying corporate records would violate numerous state and federal laws, including California Corporations Code §§ 2254 and 2255(b), as well as Section 13(b)(5) of the Securities Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1 thereunder, 17 C.F.R. § 240.13b2-1. FAC ¶¶ 52-53.

**1. The Corporations Code Sections Thomas Cites Apply to Starz**

Defendants assert that Corporations Code §§ 2254 and 2255(b) do not apply to Starz because Starz is not incorporated in California. Defts' Mtn to Dismiss ("MTD") at 15-16. As immediately becomes clear upon reading even the first line of these statutes, however, §§ 2254 and 2255(b) *by their express terms* each apply to foreign corporations. *See* CAL. CORP. CODE §§ 2254, 2255(b) (each applying to directors, officers, and agents "of any corporation, domestic or foreign"); *see also* CAL. CORP. CODE § 102(a) (stating that the Corporations Code applies to all types of corporations "expressly included in a particular provision of this division."). The application of §§ 2254 and 2255(b) to Starz is further confirmed by the fact that Starz carries on business in California and keeps an office there. FAC ¶ 2. *See* CAL. CORP. CODE § 2260 ("In a prosecution for a violation of Section . . . 2254 [or] 2255 . . . , the fact that the corporation was a foreign corporation is

not a defense, if it was carrying on business or keeping an office therefor within this state.”).

**2. Mr. Thomas Satisfies Each Element of the Laws He Identifies**

Ignoring Mr. Thomas’s page and a half of detailed factual allegations, Defendants disregard Mr. Thomas’s claim as “just a single sentence” failing to “set forth the elements of the statutes.” MTD at 15. Of course, a complaint need not contain legal argument; that is what briefs are for. As Defendants surely must realize, a complaint need only contain “sufficient *facts* to support a cognizable legal theory.” *Mediondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (emphasis added). Here, Mr. Thomas alleges sufficient facts to satisfy every element of the legal theories he advances.

Corporations Code § 2255(b) prohibits and director, officer, and agent

> of any corporation, domestic or foreign, who, with intent to defraud, destroys, alters, mutilates or falsifies any of the books, papers, writings or securities belonging to the corporation or makes or concurs in omitting to make any material entry in any book of accounts or other record or document kept by the corporation[.]

Thus, § 2255(b) requires (1) falsification of any (2) corporate writing (3) with intent to defraud. Here, Mr. Thomas clearly states a violation of § 2255(b) by alleging that Tefft ordered him to (1) falsify the revenue and subscriber figures (2) in Starz’s cash flow and budget impact analysis (3) for the express purpose of hiding Starz’s disappointing financial and operating performance from its Board and investors. FAC ¶ 51.

California Corporations Code § 2254 prohibits directors, officers, and agents “of any corporation, domestic or foreign” from knowingly concurring in

> making, publishing or posting . . . (1) any written report, exhibit, statement of its affairs or pecuniary condition or notice containing any material statement which is false, or (2) any untrue or willfully or fraudulently exaggerated report, prospectus, account, statement of operations, values, business, profits, expenditures or prospects, or (3) any other paper or document intended to produce or give, or having a tendency to produce or give, the shares of stock in such corporation a greater value or a less apparent or market value than they really possess[.]

CAL. CORP. CODE § 2254. Thus, § 2254 is satisfied by allegations that an agent (1)

knowingly (2) concurred in making (3) any untrue document (4) intended to produce, *or having a tendency to produce*, an inflated value to the corporation's shares. Mr. Thomas satisfies every element of this statute. By directing Mr. Thomas to falsify revenue and subscriber figures for presentation to the Board and publication to investors, Thornton and Tefft sought to require Mr. Thomas to join them in (1) knowingly (2) concurring in making (3) an untrue document. The fourth element is satisfied because the intent to inflate the value of Starz's shares is evidenced by Albrecht's and Thornton's actual knowledge that the document would be falsified and their contents published. *See Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (actual knowledge establishes scienter). Intent is further evidenced by Albrecht's and Thornton's motivation to paper over the poor "optics" of Starz's disappointing financial and operational condition while maintaining plausible deniability, and publish this false information to the financial markets through public disclosures including SEC filings. FAC ¶ 51. Moreover, Mr. Thomas's allegations satisfy the fourth element of § 2254 even if this Court determines that he has not pleaded intent: at a minimum, false publications of inflated financial and operational performance "hav[e] a tendency to produce or give" Starz's shares a "greater value . . . than they really possess." CAL. CORP. CODE § 2254(a)(3).

Section 13(b)(5) of the Exchange Act provides in pertinent part that "[n]o person shall . . . knowingly falsify any book, record, or account described in [§ 13(b)(2)]." 15 U.S.C. § 78m(b)(5). Rule 13b2-1 similarly provides that "no person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account" maintained pursuant to § 13(b)(2)(A). 17 C.F.R. § 240.13b2-1. Section 13(b)(2)(A) in turn requires the making and keeping of "books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2). The Act broadly defines "records" as including "accounts, correspondence, memorandums, tapes, discs, papers, books, and other documents or transcribed information of any type, whether expressed in ordinary or machine language." 15 U.S.C. § 78c(a)(37).

Defendants' contention that Mr. Thomas does not identify the record at issue, or the false statements it contained, simply ignores his detailed allegations. MTD at 17. Mr. Thomas alleges that Tefft ordered him to falsify a document reflecting Starz's transaction, specifically, "a cash flow and budget impact analysis of the recently executed DirecTV extension that provided the projected negative impact on Starz's revenue and subscriber figures for fourth quarter 2014 and continuing through fiscal year 2015." FAC ¶ 51. Within this document, Tefft direct Mr. Thomas to "arbitrarily inflate the revenue figures and subscriber numbers" and "to provide plausible sounding explanation justifying those fabricated increases." Id. ¶ 51. Because Mr. Thomas clearly identifies the record at issue and the specific statements he was directed to falsify, he states a claim under § 1102.5(c) for violation of 15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1.

**3. Mr. Thomas Pleads with the Particularity Required by Rule 9(b)**

Mr. Thomas's allegations are sufficiently particular to satisfy Rule 9(b). *Contra* MTD at 13-16. Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake," but provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED.R.CIV.PROC. 9(b).

"To comport with Rule 9(b), the complaint must allege the time, place, and content of the alleged fraudulent representation or omission; the identity of the person engaged in the fraud; and the 'circumstances indicating falseness' or 'the manner in which [the] representations [or omissions at issue] were false and misleading.'" *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1074-75 (N.D. Cal. 2003) (quoting *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 42 F.3d 1541, 1547-48 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as recognized in Ronconi v. Larkin*, 253 F.3d 423, 429 n.6 (9th Cir. 2001)). Here, Mr. Thomas adequately alleges the time (September 4, 2014), place (Starz's offices where Mr. Thomas worked), the content of the fraudulent representation (artificially inflated revenue figures and subscriber numbers in a cash flow and budget impact analysis), and the identity of the person engaged in the fraud (Tefft, Thornton, Albrecht, and—they hoped—Mr. Thomas). Id. ¶ 51.

Mr. Thomas also adequately alleges circumstances indicating falseness. To satisfy this requirement, a plaintiff must do more than merely identify the false statement and make a conclusory allegation that it was false; the plaintiff "must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed*, 42 F.3d at 1548. In *GlenFed*, the Ninth Circuit explained that in "complicated" scenarios in which a statement appears untrue only in hindsight, "it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood." *Id.* Rather, the plaintiff must allege facts supporting "an explanation as to why the disputed statement was untrue or misleading *when made*." *Id.* at 1548-49 (emphasis in original). The court contrasted this scenario with more straightforward situations in which "the requisite particularity might be supplied with great simplicity." For example, allegations that a seller represented to a buyer that a house built on a landfill is "in perfect shape" demonstrate that the statement was false at the time it was made, because the statement "in perfect shape" is "at least arguably inconsistent" with the reality of being "built on a landfill." *Id.*

Here, Mr. Thomas's allegations present the simplest fraud of all because Tefft ordered Mr. Thomas to falsify revenue and subscriber information. FAC ¶ 51. This allegation demonstrates why, had he complied with her order, the revenue and subscriber information would have been "untrue or misleading when made": falsifying this information is precisely what Tefft ordered Thomas to do. This is not a case in which the falsity of the statement Tefft ordered Mr. Thomas to make became apparent only in hindsight, and no further allegations demonstrating falsity are required. *See id.* at 1548-49.

**4. The "Safe Harbor" Provision of the PSLRA Does Not Apply to Any of the Laws on which Mr. Thomas Bases his Claim**

Barely able to contain their excitement, Defendants assert that all of statutes Mr. Thomas identifies fail as predicates for his § 1102.5(c) claim because the document he was ordered to falsify included projections, thereby triggering the "safe harbor" provision of the Private Securities Litigation Reform Act of 1995 (PSLRA). MTD at 18-19. This

might pose a problem if the safe harbor actually applied to any aspect of Mr. Thomas's claim. However, it does not.

To begin with, the PSLRA provides a safe harbor only to a "private action arising under this chapter." 15 U.S.C. § 78u-5(c)(1). Because Corporations Code §§ 2254 and 2255(b) are entirely separate laws, the safe harbor does not apply to either of them.

Moreover, the safe harbor does not even apply to Mr. Thomas's allegations concerning § 13(b)(5) and Rule 13b-2. This is because the safe harbor applies only where a statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i); *Onie v. Conners (In re Cutera Sec. Litig.)*, 610 F.3d 1103, 1108 (9th Cir. 2010). Nothing in the FAC or the documents Defendants ask this Court to judicially notice reveal the presence of any "cautionary statement" accompanying the figures Mr. Thomas was ordered to falsify. This is fatal to Defendants' argument, because the safe harbor is an affirmative defense on which Defendants bear the burden. *In re STEC Inc. Sec. Litig.*, No. SACV 09-1304 JVS (MLGx), 2011 U.S. Dist. LEXIS 75093, at *26 (C.D. Cal. June 17, 2011) ("Defendants bear the burden of demonstrating that their statements are protected by the safe harbor." (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2nd Cir. 2010))). Because Defendants have failed to carry their burden showing that the requirements for the safe harbor were satisfied, their attack must fail.

### C. Thomas States A Claim Under Labor Code § 1102.5(b)

#### 1. Legal Standard Governing Claims Under § 1102.5(b)

Labor Code § 1102.5(b) prohibits employers from retaliating against their employees for disclosing information when "the employee has reasonable cause to believe that the information discloses a violation" of state or federal law. At the outset, it is important to note that, to prevail under §1102.5(b), the information disclosed need not actually constitute unlawful activity, so long as the "the employee has *reasonable cause to believe*" that it does. CAL. LAB. CODE § 1102.5(b); *McVeigh v. Recology S.F.*, 213 Cal.

App. 4th 443, 469 (Cal. Ct. App. 2013) ("An employee engages in protected activity under Labor Code section 1102.5, subdivision (b) when she discloses to a governmental agency reasonably based suspicions of illegal activity." (quotation marks and brackets omitted)); *cf. Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 87 (Cal. 1998) ("[A]n employee need not prove an actual violation of law; it suffices if the employer fired him for reporting his 'reasonably based suspicions' of illegal activity."). Mr. Thomas easily satisfies this standard.

**2. Mr. Thomas Disclosed A Violation Arising From Chang's Threatened Misappropriation of Trade Secrets**

Defendants assert that Mr. Thomas "did not 'disclose' anything that Starz did not already know," because Starz was already aware that Chang had switched sides in Starz's negotiations with DirecTV by leaving DirecTV to join the Starz Board. Defts' MTD at 6. There are several problems with this argument.

First, Defendants rely upon *Mize-Kurzman v. Marin Cmty.. Coll. Dist.*, 202 Cal.App.4th 832, 858 (Cal. Ct. App. 2012) for the proposition that a "disclosure" to a supervisor under § 1102.5(b) cannot include any information of which the supervisor was already aware. MTD at 6. Defendants misapprehend this case. In *Mize-Kurzman*, the court upheld a jury instruction that "reporting *publicly known* facts is not a disclosure protected by the California whistleblower statutes." *Id.* at 849 (emphasis added). *Mize-Kurman* provides no authority for Defendants' unsupported claim that disclosure of facts which are not publicly available, but which were already known to the supervisor, is not a "disclosure," because the court never considered or discussed this issue. *See In re Muszalski*, 52 Cal.App.3d 500, 504 (Cal. 1975) ("A case is not authority for propositions neither considered nor discussed in the opinion.").[1] In fact, California courts have

[1] *Mize-Kurzman* is questionable authority even for the issue it did consider. The court based its interpretation of "disclosure" on federal courts' interpretation of a federal whistleblowing statute, 202 Cal.App.4th at 858-59, which Congress subsequently rejected. *See Hartzman v. Wells Fargo & Co.*, No. 1:14CV808, 2016 U.S. Dist. LEXIS 18733, at *25-26 (M.D.N.C. Feb. 17, 2016). Overlooking this development, Defendants cite each of the federal cases relied on by *Mize-Kurzman* without acknowledging that they are no longer good law. *See* MTD at 6.

expressly *rejected* such a broad reading of *Mize-Kurman*. *See Hager v. Cty. of L.A.*, 228 Cal.App.4th 1538, 1551 (Cal. Ct. App. 2014). *Mize-Kurzman* offers Defendants no help because the FAC nowhere alleges that Chang's role in DirecTV's negotiations with Starz was publicly available information. *Mize-Kurman's* discussion of cases holding that disclosure to the supervisor about the supervisor's own wrongdoing is inapposite because the wrongdoing here alleged was Chang's, not Thornton's. *See* 202 Cal.App.4th at 859.

More important, the key facts demonstrating Chang's legal violation were not actually known to Thornton. The only fact Mr. Thomas alleges that Thornton knew prior to Mr. Thomas's disclosure was that Chang had switched sides during the negotiations, provoking concern. FAC ¶ 24(c). But as Defendants strenuously argue, this is not the fact demonstrating unlawful activity because "merely switching jobs with knowledge of trade secrets" does not constitute misappropriation of trade secrets. MTD at 7-8. The legal violation Mr. Thomas disclosed was based on numerous other facts, including Chang's plans to seek out clients to hire him as a consultant on topics directly related to the confidential information he had obtained from DirecTV and Starz. FAC ¶ 24(d). Nothing in the FAC indicates that Thornton had prior knowledge of this fact.

The actions Mr. Thomas alleges constitute misappropriation of trade secrets in violation of the California Uniform Trade Secrets Act ("UTSA"). This statute clearly proscribes a former employee from using "confidential information or trade secrets," such as those alleged in the FAC, which were "acquired in his or her former employment in competition with a former employer." *ReadyLink Healthcare v. Cotton*, 126 Cal. App. 4th 1006, 1017 (Cal. Ct. App. 2005) (holding that such actions violate the UTSA); *Silvaco Data Sys.v. Intel Corp.*, 184 Cal. App. 4th 210, 220 (Cal. Ct. App. 2010) (UTSA proscribes wrongful use of trade secrets); CAL. CIV. CODE § 3426.1(b)(2) (same).

It is well established that California law recognizes *threatened misappropriation* as a basis for liability. CAL. CIV. CODE § 3426.2(a); *Cent. Valley Gen. Hosp. v. Smith*, 162 Cal.App.4th 501, 524 (Cal. Ct. App. 2008). Defendants conflate threatened misappropriation with the "inevitable disclosure" doctrine. MTD at 7-8. Although

California law rejects the latter, the former remains a viable theory of liability. *See Cent. Valley*, 162 Cal.App.4th at 525 ("[T]hreatened misappropriation of trade secrets may be enjoined is the law of California despite the rejection of the inevitable disclosure doctrine by California courts.").

A plaintiff may establish threatened misappropriate by alleging facts demonstrating that "(1) trade secrets (2) are held by a defendant (3) who intends to improperly use or disclose some of those trade secrets." *Id.* at 528. "[T]hreatened misappropriation 'means a threat by a defendant to misuse trade secrets, manifested by words or conduct, where the evidence indicates imminent misuse.'" *S. Cal. Inst. of Law v. TCS Educ. Sys.*, No. CV 10-8026 PSG (AJWx), 2011 U.S. Dist. LEXIS 39827, at *21 (C.D. Cal. Apr. 5, 2011). Here, Chang's conduct of solicitation of clients in the cable and television industry to hire him to advise on the very issues for which he had obtained confidential information from DirecTV and Starz, combined with Chang's reputation as someone willing to "sell out his own mother" in pursuit of business, are more than sufficient to provide a "reasonable cause to believe" that this standard is satisfied. FAC ¶¶ 24(d), (e).

**3. Mr. Thomas Disclosed A Violation Arising From Maffei's Manipulation of the Comcast-Charter Deal**

The second violation of § 1102.5(b) arises from Mr. Thomas's allegations that he complained to Thornton about Maffei's use of his seats on the Boards of Charter and Starz to manipulate the Comcast-Charter negotiations to secure a separate sweetheart deal for Starz, which was not even a party to the Comcast-Charter deal. Id. ¶¶ 26-32, 34. Maffei's conduct constitutes a clear breach of his fiduciary duty to Charter by depriving it of a benefit to which Charter, and not Starz, was entitled.

As a director of Charter, Maffei owed Charter a fiduciary duty of loyalty requiring him to act in Charter's best interests in its negotiations with Comcast. *Bancroft-Whitney Co. v. Glen*, 64 Cal.2d 327, 345 (Cal. 1966) ("Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. . . . [T]hey stand in a fiduciary relation to the corporation and its stockholders."); *Reed v.*

*Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 371-72 & n.11 (Bankr. N.D. Tex. 2011) (discussing Delaware law). However, "as a clandestine part of the Charter/Comcast deal," Maffei negotiated a valuable benefit from Comcast–in the form of a carriage contract that would cause Comcast to lose money, while delivering a lucrative benefit to Starz–not for the benefit of Charter, but for the benefit of Starz. Id. ¶ 31. In other words, Maffei failed to act in Charter's best interests because he was negotiating for the benefit of a third party, Starz. The obvious inference from these facts, which must be drawn in Mr. Thomas's favor, is that the negotiations were not a win-win-win situation for Comcast, Charter, and Starz, but rather a zero-sum game in which any benefit Comcast paid Starz is a benefit it would have, but did not, pay Charter. Thus, by using his interlocking Board seats to divert a benefit to Starz, Maffei misappropriated Charter's assets, deprived Charter of a benefit that it should have received, and unjustly enriched Starz at Charter's expense, thereby rendering Starz liable for restitution.[2] *See Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1481-83 (Cal. Ct. App. 2014);[3] *see also Remillard Brick Co. v. Remillard-Dandini Co.*, 109 Cal App 2d 405, 419-20 (Cal. Ct. App. 1952) ("The law zealously regards contracts between corporations with interlocking directorates, will carefully scrutinize all such transactions, and in case of unfair dealing to the detriment of minority stockholders, will grant appropriate relief. Where the transaction greatly benefits one corporation at the expense of another . . . it will and should be set aside."); *Skelly v. Dockweiler*, 75 F.Supp. 11, 14 (S.D. Cal. 1947) ("[I]f [interlocking] directors should wrongfully and willfully use their powers to the prejudice of one of the corporations, their action . . . could be avoided, as in any other case of actual fraud.").

[2] As Starz's agent, Maffei's actions are imputable to Starz because it ratified his conduct by possessing knowledge of his actions and accepting the benefit of the sweetheart carriage contract, 10 WITKIN, SUMMARY OF CAL LAW: CORPORATIONS § 90 (10th ed.) ("Strictly speaking, directors are agents"); *Spahn v. Guild Indus. Corp.*, 94 Cal. App. 3d 143, 156-57 (Cal. Ct. App. 1979) (agent's liability is imputed to a principal when it ratifies his actions, meaning the principal "knows of the acts, and accepts the benefits which flow from them").

[3] In fact, Starz may be liable for disgorgement even if the benefit it received in the form of the sweetheart carriage contract did not cause Charter to suffer a corresponding loss in a benefit foregone. *See Am. Master Lease LLC*, 225 Cal. App. 4th at 1482.

Puzzlingly, Defendants cite *Mize-Kurzman* for the proposition that "[an] employee's report to the employee's supervisor about the supervisor's own wrongdoing is not a 'disclosure' and is not protected whistleblowing activity." MTD at 10. *Mize-Kurzman* in inapposite because the wrongdoing alleged here was Maffei's, not Thornton's. Maffei, not Thornton, sits on the Boards of Charter and Starz. FAC ¶¶ 12(a), 31. Maffei, not Thornton, "call[ed] Comcast and demand[ed] that, as a clandestine part of the Charter/Comcast deal, Comcast extend its Starz affiliate carriage deal at a loss for Comcast and at a great profit for Starz." Id. ¶ 31. And when Mr. Thomas complained to Thornton, *he complained about Maffei*. Id. ¶¶ 32, 34. Any knowledge by Thornton as to Maffei's misconduct does not obviate Mr. Thomas's disclosure because such information was hardly public knowledge. *See supra* at 12-13.

Mr. Thomas's complaint disclosed unlawful activity under § 1102.5(b). As Defendants concede, the common law of California and Delaware each provide bases for Maffei's fiduciary duty, which Maffei breached by diverting Charter's benefits to Starz. MTD at 12. Defendants assert, without citing any authority, that Maffei's breach of his common law duty cannot sustain a § 1102.5(b) claim because "a claim under Section 1102.5 requires violation of a statute and not merely breach of a common-law duty." MTD at 12. Of course, that is not what the statute actually says. Rather, § 1102.5(b) broadly covers violation of any state or federal statute, *rule*, or regulation. CAL. LAB. CODE § 1102.5(b). Maffei's tortious violation of his common-law fiduciary duty supports Mr. Thomas's § 1102.5(b) claim because there can be no dispute that a tort is the violation of a "common-law *rule*." *See City of Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1156 (Cal. 1998) (discussing common law "rules"); *Smith v. Wade*, 461 U.S. 30, 53 (1983) (discussing the "common-law rules" of ordinary tort law); *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998) (Roth, C.J., dissenting) (discussing the "Restatement of Torts / Common Law rule"); *Golden State Transit Corp. v. Los Angeles*, 773 F. Supp. 204, 211-12 (C.D. Cal. 1991) (discussing the "common law rule of torts"); *see also Kirzhner v. Silverstein*, No. 09-cv-02858-CMA-BNB, 2011 U.S. Dist. LEXIS 106139, at *33 (D.

Colo. Sep. 20, 2011) ("[T]he Court's previous order recognized that Kirzhner had a viable claim for breach of fiduciary duty based on the *common law rule* that directors of an insolvent corporation owe a fiduciary duty to the corporation's creditors.") (emphasis added); *Berg & Berg Enters., LLC v. Boyle*, 178 Cal. App. 4th 1020, 1045 (Cal. Ct. App. 2009) (recognizing the "common law rule" codified in § 309); *Casey v. U.S. Bank Nat. Ass'n*, 127 Cal. App. 4th 1138, 1144 (Cal. Ct. App. 2005) (recognizing California's "common law rule" for aiding and abetting breach of fiduciary duty); *accord Am. Master Lease*, 225 Cal. App. 4th at 1475.

There is no basis for excluding common law rules from the statute's reach. No court has ever held that § 1102.5(b)'s application to rules does not include violation of common law rules. Moreover, narrowing § 1102.5(b) in the manner Defendants suggest runs directly contrary to the broad policy embodied in this statute. Case law and legislative history each demonstrate that § 1102.5(b) applies broadly not simply to codified laws but broadly to unlawful "acts," "actions," and "wrongdoing." *See Green*, 19 Cal. 4th at 77 (stating § 1102.5(b) "reflects the broad public policy interest in encouraging workplace whistle-blowers to report *unlawful acts* without fearing retaliation") (emphasis added); *accord Soukup v. Law Offices of Herbert Hafif*, 39 Cal. 4th 260, 287 (Cal. 2006); *McVeigh*, 213 Cal. App. 4th at 471 (Section 1102.5(b) "should be given a broad construction commensurate with its broad purpose."); *id.* at 470 ("The Legislature finds and declares that unlawful *activities* of private corporations may result in damages not only to the corporation and its shareholders and investors, but also to employees of the corporation and the public at large. The damages caused by unlawful *activities* may be prevented by the early detection of corporate wrongdoing. The employees of a corporation are in a unique position to report *corporate wrongdoing* to an appropriate government or law enforcement agency." (quoting preamble to 2003 Amendment) (emphasis added)). Corporate misconduct is no less damaging to investors, employees, and the public at large simply because the corporation has violated a common-law rule rather than a codified rule. This Court should decline any Defendants' invitation to rewrite § 1102.5(b) to

narrow its reach in a manner directly contrary to the statute's text, history, or purpose.[4] At a minimum, even were the Court to adopt Defendants' construction of § 1102.5(b) as a matter of first impression, it should nevertheless find that Mr. Thomas states a claim because the aforementioned authorities provide for Mr. Thomas's "reasonable cause to believe" that Maffei's conduct violated the law. *See* CAL. LAB. CODE § 1102.5(b); *McVeigh*, 213 Cal. App. 4th at 469; *Green*, 19 Cal. 4th at 87.

**D. Mr. Thomas States A Claim for Intentional Infliction of Emotional Distress**

**1. The California Workers' Compensation Act Does Not Bar Mr. Thomas's IIED Claim, Which Arises from Unlawful Discrimination**

In its February 29, 2016 Order granting in part and denying in part Defendants' Motion to Dismiss Mr. Thomas's original Complaint, this Court held that Mr. Thomas's IIED claim was preempted by the Workers' Compensation Act (WCA). Order at 13. Plaintiff respectfully disagrees with this aspect of the Court's ruling, and requests that the Court exercise its discretion to reconsider this issue. *See United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) ("All rulings of a trial court are subject to revision at any time before the entry of judgment."). Here, the weight of authority makes clear that Mr. Thomas's IIED claim is *not* preempted because it arises from Defendants' unlawful discriminatory conduct.

In its February 29 Order, this Court concluded that *Vacanti v. State Comp. Ins. Fund*, 24 Cal. 4th 800 (Cal. 2001), bars consideration of the motives behind an employer's misconduct, and limits courts to analyzing the employers acts in isolation. Order at 15. This overstates the *Vacanti* Court's holding. Specifically, the *Vacanti* Court recognized an exception for "acts or motives" which do not "fall outside the risks encompassed within

[4] Should the Court conclude that, notwithstanding the broad legislative purpose underlying the statute, § 1102.5 claims are limited only to codified rules, Mr. Thomas requests leave to amend to allege that Maffei's breach of his fiduciary duty violates the statute that is California's Unfair Competition Law, Cal. Business & Professions Code § 17200. *See S. Cal. Inst. of Law v. TCS Educ. Sys.*, No. CV 10-8026 PSG (AJWx), 2011 U.S. Dist. LEXIS 39827, at *32 (C.D. Cal. Apr. 5, 2011) (unlawful business acts under § 17200 include violations of judicially made laws).

the compensation bargain." *Id.* at 811-12; *id.* at 819-20 (recognizing an "exception to the WCAB's jurisdiction" or "acts or motives" that do not "constitute a risk reasonably encompassed within the compensation bargain."); *id.*at 823 ("In addition to the acts themselves, the motive element of a cause of action may insulate that cause of action from the purview of the exclusive remedy provisions" where the employer's conduct fell outside the compensation bargain."); *see also id.* at 824 (holding claims preempted because "the acts and motives underlying" them "fall within the risk contemplated by the compensation bargain").

California courts have repeatedly held that unlawful discrimination falls outside of the compensation bargain. *See Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1153 (Cal. 1998) ("[T]he . . . 'compensation bargain' cannot encompass conduct, such as sexual or racial discrimination") (collecting cases); *Accardi v. Superior Court of Ventura Cnty.*, 17 Cal. App. 4th 341, 347, 352 (Ct. App. 1993) ("Discrimination in employment is *not* a normal incident of employment. . . . [A] claim for emotional and psychological damage, arising out of employment, is not barred where the distress is engendered by an employer's illegal discriminatory practices.") (emphasis in original). *Vacanti* does not abrogate this rule because it did not consider claims involving discrimination. *See In re Muszalski*, 52 Cal.App.3d at 504 ("A case is not authority for propositions neither considered nor discussed in the opinion.").

In further tension with this Court's reading of *Vacanti* is the fact that numerous state and federal *post-Vacanti* courts and the leading treatise on California employment law continue to recognize the viability of IIED claims arising from unlawful discrimination. *See* Chin et al., CAL. PRACTICE GUIDE: EMPLOYMENT LITIGATION (THE RUTTER GROUP 2015) ¶ 15:539 ("The exclusivity rule does not bar a suit for emotional distress damages attributed to . . . unlawful discrimination"); *id.* ¶¶ 15:539.2, 15:586 (same); *Hattox v. State Farm Mut. Auto. Ins. Co.*, No. 12cv2597-AJB (KSC), 2013 U.S. Dist. LEXIS 10440, at *17-19 & n.4 (S.D. Cal. Jan. 25, 2013); *Nazir v. United Airlines*, 178 Cal. App. 4th 243, 288 (Cal. Ct. App. 2009) ("Neither discrimination nor harassment

is a normal incident of employment."); *Tone v. Wal-Mart Stores, Inc.*, No. 14cv2643-LAB (DHB), 2015 U.S. Dist. LEXIS 102823, at *3-6 (S.D. Cal. Aug. 3, 2015); *Aguilera v. Target Corp.*, No. EDCV 15-2186-DOC (DTBx), 2015 U.S. Dist. LEXIS 168416, at *6 (C.D. Cal. Dec. 16, 2015); *Morris v. Mass. Elec. Constr. Co.*, No. CV 15-7804 DMG (GJSx), 2015 U.S. Dist. LEXIS 149017, at *4 (C.D. Cal. Nov. 3, 2015); *Latif v. M&C Hotel Interests, Inc.*, No. CV 12-509 CAS (FFMx), 2012 U.S. Dist. LEXIS 35503, at *10 n.1 (C.D. Cal. Mar. 14, 2012); *Bejarano v. Int'l Paper Co.*, No. 1:13-cv-01859-AWI-GSA, 2015 U.S. Dist. LEXIS 8021, at *33-34 (E.D. Cal. Jan. 23, 2015); *Barefield v. Board of Trs. of Cal. State Univ., Bakersfield*, 500 F. Supp. 2d 1244, 1275-76 (E.D. Cal. 2007); *Jelincic v. Xerox Corp.*, No. C-04-2930 (EMC), 2004 U.S. Dist. LEXIS 20523, at *13-17 (N.D. Cal. Oct. 1, 2004); *Onelum v. Best Buy Stores L.P.*, 948 F. Supp. 2d 1048, 1055 (C.D. Cal. 2013) (each concluding that IIED claims arising out of discrimination are not barred by the WCA).

To be sure, the plaintiff in *Miklosy v. Regents of University of California*, 44 Cal. 4th 876 (Cal. 2008), like Mr. Thomas, alleged claims for retaliation. *See id.* at 902 (holding that retaliation for whistleblowing does not exceed the risks inherent in the employment relationship). Critically, however, the plaintiff's whistleblower complaints in *Miklosy* did not concern discriminatory conduct, but focused instead upon unsafe conditions at plaintiffs' place of employment. *Id.*at 883. In support of its holding, the *Miklosy* Court relied upon *Shoemaker v. Myers*, 52 Cal. 3d 1 (Cal. 1990), which similarly involved whistleblower retaliation for complaints devoid of any discriminatory conduct. *See id.* at 7-8 (complaining of illegal using lay workers to perform the work of licensed medical professional).[5] There simply is no basis for the conclusion that *Miklosy* requires preemption of retaliation claims for complaining about unlawful discrimination.

[5] Only two cases cited by this Court involved allegations of discrimination: *Thibeaux v. GEO Grp., Inc.*, No. 13-CV-291-BEN (MDD), 2014 U.S. Dist. LEXIS 165480, at *8-9 (S.D. Cal. Nov. 24, 2014), and *Jones v. Dep't of Corrs. & Rehab.*, 152 Cal. App. 4th 1367, 1382 (Cal. Ct. App. 2007). Order at 16. Because these decisions provide only cursory treatment of the preemption issue and run counter to the overwhelming weight of authority, *see supra* at 19, they should not be followed. None of the cases Defendants cite—*Saba*, *Tobin* , or *Langevin*—involve unlawful discrimination. MTD at 19-21.

Ultimately, the issue of preemption here turns on whether this Court concludes that the salient aspect of Mr. Thomas's claim is that it arose from unlawful discrimination, and is like the myriad cases cited above that find that such discrimination is not preempted, or that it involved retaliation for complaints, and is more like *Miklosy*. *See* Order at 16. The Court should choose the former. Given that unlawful discrimination in the workplace is not an inherent part of the employment relationship, it is difficult to see why the result should be any different simply because an employee complains about discrimination happening to someone else. Moreover, courts have treated retaliation arising from unlawful discrimination as discrimination that is not a normal part of the employment relationship. *See Morris*, 2015 U.S. Dist. LEXIS 149017, at *4 (holding that unlawful discrimination and *retaliation* collectively constitute discrimination that "is not a normal part of the employment relationship").

Because Mr. Thomas's IIED claim arises from Thornton's unlawful discrimination, which is not a risk inherent in the employment relationship, Plaintiff respectfully requests that this Court reconsider its prior Order and hold that the WCA does not bar Mr. Thomas's claim.

**2. Mr. Thomas Alleges Outrageous Conduct**

Defendants next assert that Mr. Thomas has failed to allege "outrageous conduct." MTD at 22. "[W]hether defendants[‘] conduct was ‘outrageous' to support a claim for IIED is a question of fact, and therefore inappropriate for resolution at the motion to dismiss stage." *Gonero v. Union Pac. R.R. Co.*, No. 09-2009 WBS JFM, 2009 U.S. Dist. LEXIS 100962, at *28 (E.D. Cal. Oct. 16, 2009). Should it reach the issue, however, this Court should find that Defendants' argument lacks merit.

Courts have recognized an employer-employee relationship as substantially contributing to a determination that conduct was outrageous, particularly where, as here, the employer discriminates on the basis of race. *Alcorn v. Anbro Engineering, Inc.*, 2 Cal. 3d 493, 498 n. 2 (Cal. 1970).

Moreover, California courts have recognized an employer's discriminatory conduct

is sufficiently outrageous to assert a claim for Intentional Infliction of Emotional Distress. *See Kovatch v. Cal. Casualty Mgmt. Co.*, 65 Cal. App. 4th 1256, 1278 (Cal. Ct. App. 1998), *overruled in part on other grounds*, *Aguilar v. Atlantic Richfield Co.*, 25 Cal. 4th 826 (Cal. 2001); *Rojo v. Kliger*, 52 Cal.3d 65, 81 (Cal. 1990) ("[An] employer's discriminatory actions may [also] constitute . . . outrageous conduct under a theory of intentional infliction of emotional distress"); *Murray v. Oceanside Unified School Dist*., 79 Cal. App. 4th 1338, 1362 (Cal. Ct. App. 2000); *Fisher v. San Pedro Peninsula Hospital*, 214 Cal. App. 3d 590, 618 (Cal. Ct. App. 1990); *Accardi*, 17 Cal.App.4th at 353. Federal Courts are in accord. *See Graves v. Johnson Control World Servs*., No. C-05-1772 SC, 2006 U.S. Dist. LEXIS 13677, at *36 (N.D. Cal. Mar. 13, 2006) ("In this case, Graves has alleged illegal conduct motivated by improper racial discrimination, which, if substantiated, could theoretically rise to the level to sustain a claim for intentional infliction of emotional distress."); *Zayed v. Apple Computers,* No. C 94091787 JW, 2006 U.S. Dist. LEXIS 20132, *42 (N.D. Cal. Apr. 4, 2006); *Barsell v. Urban Outfitters, Inc.*, No. CV 09- 02604, 2009 U.S. Dist. LEXIS 123475, at *19-20 (C.D. Ca1. July 1, 2009). In *Kovatch*, the defendant harassed the plaintiff on the basis of his sexual orientation and threatened to fire him. The plaintiff then took medical leave to address the emotional and physical conditions arising from the harassment, after which the defendant terminated his employment. 65 Cal. App. 4th at 1262-65.

Here, Mr. Thomas's allegations of Defendants' unrelenting discriminatory conduct against him in retaliation for his complaints regarding Defendants' unlawful racial and gender discrimination are analogous to the claims asserted in the cases cited about and state sufficient facts to constitute outrageous conduct under California law. Mr. Thomas was ridiculed for hiring a racially diverse staff, bullied, and repeatedly threatened. FAC ¶¶ 20, 39.

On one occasion, Thornton made crude comments to Mr. Thomas about a colleague's genitals-that his "balls" would shrivel up inside his "girly-man" body, and them implied that Mr. Thomas was effeminate. Drawing all inferences in Mr. Thomas's

favor, this allegation suggests that Thornton perceived Mr. Thomas to be homosexual. Under California law, harassment based on perceived sexual orientation constitutes the outrageous behavior element of an IIED claim. *Kovatch*, 65 Cal. App. 4th at 1266, 1278.

Further, unlike the solitary threat of termination in *Kovatch*, and despite his impeccable record as a high-performing employee at Starz, Thornton threatened to terminate Mr. Thomas on at least five separate occasions. Id. ¶¶ 24(f), 34, 35, 38, 47. These included repeated threats to fire Mr. Thomas if he did not complete negotiations with DirecTV by August 31, 2014, id. ¶ 35, at the same time that Defendants set Mr. Thomas up to fail by excluding him from key emails and meetings regarding the negotiations, id. ¶¶ 39, 43, and withholding critical details regarding Starz's negotiating strategy, id. ¶¶ 45-47.[6]

Ultimately, Defendants' sustained abusive treatment of Mr. Thomas degraded his emotional well-being and overall health to such an extent that he was forced to take a three week medical leave to undergo treatment for depression and anxiety, for which he continues to require treatment. Id. ¶¶ 58, 61. Despite knowledge that their conduct had rendered Mr. Thomas susceptible to emotional distress, however, Defendants continued their discriminatory and harassing treatment of Mr. Thomas, and fired him the very week he returned. FAC ¶ 60. *See Alcorn*, 2 Cal. 3d at 498 & n. 3 ("Plaintiff's susceptibility [to emotional distress] has often been mentioned as significant in determining liability."); *Gonero*, 2009 U.S. Dist. LEXIS 100962, *29. Taken together, these allegations are more than sufficient to state "outrageous" misconduct under California law.

Citing *Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th 55, 80 (Cal. Ct. App. 1996), Defendants assert that the misconduct Mr. Thomas alleges involves mere personnel decisions which may not, as a matter of law, constitute "outrageous" conduct. MTD at 23.

[6] While several of the incidents described here occurred proximate to Mr. Thomas's whistleblowing activities, Plaintiff asserts that the FAC, viewed as a whole, supports the reasonable inference that all of the outrageous treatment he suffered was motivated at least in party by his longrunning outspokenness against Defendants' racial and gender discrimination and Thornton's apparent mistaken belief that Plaintiff is homosexual.

Courts have rejected this argument, however. In *Graves*, the defendant similarly argued that *Janken* bars IIED claims for personnel management decisions. 2006 U.S. Dist. LEXIS 13677, at *34. The court held otherwise, explaining that

> Defendant overstates the reach of the Court's decision in *Janken* to the extent that it argues that any decision affecting personnel management is not actionable under an intentional infliction of emotional distress theory, no matter what the motivation. That proposition is far too broad for the *Janken* decision to bear, and, in fact, courts considering intentional infliction of emotional distress claims have clearly ruled that such claims can be brought where the "distress is engendered by an employer's illegal discriminatory practices."

*Id.* at *35 (quoting *Accardi*, 17 Cal. App. 4th at 353); *accord Barsell*, 2009 U.S. Dist. LEXIS 123475, at *19-20. Because Mr. Thomas alleges extreme and sustained misconduct arising from Thornton's illegal discriminatory practices, he alleges "outrageous" conduct under California law.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion should be denied. Should this Court grant any portion of Defendant's Motion, Plaintiff requests leave to amend. This Court has not previously addressed the adequacy of Plaintiff's whistleblower claims, and amendment would not be futile. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2010) (en banc) (explaining that a district court should grant leave to amend unless "the pleading could not possibly be cured by the allegation of other facts").

Dated: May 9, 2016

Respectfully Submitted,

HADSELL STORMER & RENICK LLP

By: /s/ - Brian Olney
Dan Stormer
Acrivi Coromelas
Brian Olney
Attorneys for Plaintiff