Dan Stormer, Esq. [S.B. # 101967]
Cindy Pánuco, Esq. [S.B. #266921]
Brian Olney, Esq. [S.B. #298089]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Emails: dstormer@hadsellstormer.com
        cpanuco@hadsellstormer.com
        bolney@hadsellstormer.com

Robert Newman, Esq. [S.B. #86534]
ROBERT D. NEWMAN, ATTORNEY AT LAW
3701 Wilshire Blvd., Suite 208
Los Angeles, California 90010
Telephone:  (213) 487-7211
Facsimile: (213) 487-0242
Email: rnewman@rdnewmanlaw.com

Attorneys for Plaintiff
KENO V. THOMAS

**DISCOVERY MATTER**

[Additional counsel continued on next page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KENO V. THOMAS,<br><br>           Plaintiff,<br><br>      v.<br><br>STARZ ENTERTAINMENT, LLC;<br>MICHAEL THORNTON; and DOES 1<br>through 10, inclusive,<br><br>           Defendants. | Case No.: CV15-09239 CAS (AFMx)<br><br>[Assigned to the Honorable Christina A. Snyder – Courtroom 8D]<br><br>**JOINT DISCOVERY STIPULATION COMPELLING PRODUCTION OF DOCUMENTS OR, IN THE ALTERNATIVE, FOR PROTECTIVE ORDER**<br><br>Date:      April 4, 2017<br>Time:     10:00 a.m.<br>Crtrm:    H<br><br>**MATTER FOR DETERMINATION BY THE HONORABLE ALEXANDER F. MACKINNON**<br><br>Complaint filed:    October 29, 2015<br>Discovery Cut-Off:  August 29, 2017<br>Motion Cut-Off:   November 10, 2017<br>Trial Date:      March 6, 2018 |

1   [Additional counsel continued from previous page]

2

3   Eric J. Amdursky, Esq. [S.B. #180288]
    O'MELVENY & MYERS LLP
4   2765 Sand Hill Road Menlo Park, California 94025-7019
5   Telephone:  (650) 473-2600
    Facsimile:  (650) 473-2601
6   Email:  eamdursky@omm.com

7
    Daniel Petrocelli, Esq. [S.B. #97802]
8   Margaret L. Carter, Esq. [S.B. #220637]
9   Carly B. Epstein, Esq. [SB # 284775]
    O'MELVENY & MYERS LLP
10  400 South Hope Street, Los Angeles, California 90071
11  Telephone:  (213) 430-6000
    Facsimile:  (213) 430-6407
12  Emails: dpetrocelli@omm.com
13          mcarter@omm.com
            cepstein@omm.com
14
15  Attorneys for Defendants
    STARZ ENTERTAINMENT, LLC and
16  MICHAEL THORNTON

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTORY STATEMENTS ............................................................. 1

I.  Plaintiff's Introductory Statement ................................................ 1

    A.  Issues Before the Court ...................................................... 1

    B.  Factual Background ........................................................... 2

II.  Defendants' Introductory Statement ........................................... 4

DISPUTED DISCOVERY REQUESTS ...................................................... 7

I.  Plaintiff's Argument .................................................................... 7

    A.  ESI ................................................................................... 7

        1.  The Parties' Meet and Confer ................................... 7

        2.  Plaintiff's ESI Proposals .......................................... 8

            a.  Searches Related to Plaintiff's Termination and
                Resulting Claims (1-15) .......................... 10

            b.  Searches Related to Defendants' Witnesses (16-56) ............. 18

        3.  Legal Argument ....................................................... 27

    B.  Protective Order ............................................................... 31

II.  Defendants' Argument ............................................................... 39

    A.  The Court Should Not Modify The Stipulated Protective Order ............... 39

        1.  The Ninth Circuit Has Approved Two-Tier Protective Orders
            Like The One In Place In This Case ................................. 40

        2.  Plaintiff's Authorities Confirm That Two-Tier Protective Orders
            Should Issue To Protect Confidential Business Information ........... 43

3.     Courts Consistently Approve Two-Tier Protective Orders For Confidential Business Information Like That At Issue Here ........... 48

4.     Plaintiff's Suggested Burden-Shifting Is Unworkable .................... 51

B.     There Is No Basis For This Court To Order Seizure Of Individuals' iPhones and Email Accounts, Especially Without Providing Them A Chance To Object ................................................................... 53

C.     Consideration Of Specific ESI Search Criteria Is Premature Because Plaintiff Failed To Meet And Confer In Good Faith ................. 56

D.     Plaintiff's Requested ESI Searches Are Not Proportionate Or Designed To Lead To Relevant Documents .......................................... 59

1.     Time Period Limitations ................................................. 61

2.     Custodians ....................................................................... 64

3.     Search Terms ................................................................... 72

CONCLUSIONS ............................................................................................... 76

I.     Plaintiff's Conclusion .......................................................................... 76

II.    Defendants' Conclusion ....................................................................... 76

# INTRODUCTORY STATEMENTS

## I.    Plaintiff's Introductory Statement

### A.    Issues Before the Court

This motion concerns two issues: (1) the parameters of ESI searches to implement Plaintiff's First Set of RFPs, and (2) the terms of a protective order.  The Parties have met and conferred for two months on these issues but remain in dispute.

Following the exchange of numerous ESI proposals, Plaintiff sent Defendants his most recent ESI proposal on February 13, 2017.  This proposal reduced the number of custodians by half and incorporated Defendants' request to break up broad ESI searches into a larger number of narrowly tailored searches focusing on discrete issues and specific custodians.  Defendants have rejected Plaintiff's proposal but have provided no counterproposal or even a date certain by which one would be forthcoming.  Moreover, even though Defendants have objected to all of Plaintiff's ESI requests as imposing an undue burden and not proportional to the needs of this case, they have provided none of the information Plaintiff has repeatedly requested, such as custodian-specific email counts, necessary to assess this objection.  Defendants' strategy of slow-walking the meet and confer process and withholding critical information is not a good faith negotiation and has forced Plaintiff to seek relief from this Court.

The Parties have also been unable to reach an agreement as to the terms of a protective order for this case.  While Plaintiff has agreed that some protective order may be entered in this case, he is unable to agree to Defendants' specific demand for a two-track designation scheme including an extremely restrictive "Highly Confidential" designation preventing counsel from sharing such documents with deposition witnesses or with Plaintiff himself.  Defendants have failed to show good cause for imposing such a restrictive protective order in this employment case.  Even though Plaintiff served his RFPs more than two months ago, Defendants refuse to identify the documents they wish to designate, preferring to leave themselves the latitude to apply the Highly Confidential designation however they choose.  Finally, Defendants have resisted all reasonable

1   compromises aimed at mitigating the likely disruption this designation would have on

2   this case.  Accordingly, Plaintiff seeks a Court order setting a more reasonable protective

3   order in this case.

4   **B.    Factual Background**

5         As more fully set forth in the Second Amended Complaint (Ex. 25), this action

6   arises from the unlawful retaliatory termination of Plaintiff Keno Thomas, a then-fifty-

7   eight-year-old African-American man with more than thirty years of experience in the

8   cable and satellite television industry.  Mr. Thomas joined Defendant Starz in 2004 as its

9   Senior Vice President of Sales and Affiliate Marketing, and remained in this position

10  until his unlawful termination in 2014 in retaliation for (1) refusing to falsify financial

11  documents, (2) whistleblowing regarding unlawful conduct used to negotiate a major

12  contract, and (3) his long-standing advocacy on behalf of women and minorities.

13        Mr. Thomas was an exemplary employee at Starz.  During his tenure with the

14  company, Mr. Thomas received only praise regarding his performance, always met or

15  exceeded his performance standards and revenue goals, and was given management

16  responsibility for Starz's best performing distributors, which accounted for nearly half

17  (45%) of the company's total annual revenue.  Then Michael Thornton became Mr.

18  Thomas's direct supervisor in August 2013, and everything changed. Ex. 25 ¶¶ 14-18.

19  Thornton Disapproves of Mr. Thomas's Advocacy on Behalf of Women and Minorities

20        From the beginning of his tenure with Starz and over the course of his ten years

21  with the company, Mr. Thomas consistently used his position of authority to advocate

22  for women and minority employees at Starz, which suffers from a severe lack of

23  diversity. Specifically, Starz has a long history of racial discrimination against its

24  minority employees, and an extreme lack of diversity within its management ranks.

25  Shortly after becoming his supervisor, however, Thornton made clear his disapproval of

26  Plaintiff's activities and the diverse nature of Plaintiff's team. Ex. 25 ¶¶ 19-23.

27  Mr. Thomas Speaks Out Concerning an Unlawful Major Contract at Starz

28        On April 28, 2014, Thornton announced at a lavish company dinner that he and

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS                    -2-

Gregory Maffei, who sits on Boards of Directors for Starz (as Chairman) and Charter Communications, had extended Starz's carriage contract with Charter well ahead of schedule and on highly favorable terms.  As Thornton explained the mechanics of the deal, Mr. Thomas understood that Maffei had used illegal tactics to ram through the contract in a manner that went well beyond accepted tactics in high-stakes business negotiations.  Alarmed at what he had just heard, Mr. Thomas told Thornton that Maffei's actions might be unlawful.  As was Thornton's practice, however, he declined to address the problem and threatened to fire Mr. Thomas for raising it.  Mr. Thomas subsequently blew the whistle to several other individuals. Ex. 25 ¶¶ 28-44, 48, 57.

Mr. Thomas Refuses an Order to Falsify Company Documents

In early 2014, during its negotiations with Starz over a new contract to replace the one expiring on August 31, 2014, DirecTV began removing Starz from its marketing packages.  Mr. Thomas informed Thornton that this development would negatively impact Starz's revenue.  Thornton then directed Kara Tefft, Starz's Director of Finance, to order Mr. Thomas to falsify revenue figures and subscriber numbers for presentation to Starz's Board, which Tefft did at a meeting on September 4, 2014. At that meeting, Tefft ordered Mr. Thomas to artificially inflate revenue and subscriber figures and provide plausibly sounding explanations in a cash flow and budget impact analysis of the DirecTV extension for the fourth quarter 2014 through fiscal year 2015.  Tefft explained that this fraud was necessary because Thornton and Starz's C.E.O. Chris Albrecht were concerned that the "optics" of the company's financial and operational performance "did not look good" and they desired to present a false picture of favorable financial projections resulting from the DirecTV extension to the Starz Board.  Mr. Thomas refused the order, reasonably believing that Tefft's directive violated numerous state and federal statutes.  Ex. 25 ¶¶ 45-46, 54, 58-63.

Starz Retaliates Against Mr. Thomas

Following these events, Starz retaliated against Mr. Thomas and ultimately terminated him on October 7, 2014, effective February 23, 2015. Ex. 25 ¶¶45-57, 64-73.

## II. Defendants' Introductory Statement

This is a single-plaintiff employment case. Plaintiff claims that he was terminated in retaliation for raising several concerns to his supervisor between April 28 and September 4, 2014. Discovery should be routine. But Plaintiff wages discovery like war. Plaintiff asks this Court to compel ESI searches in 56 broad categories (which search for hundreds of different things by searching for this "OR" that "OR" the other thing), from 25 custodians over a seven-year period, resulting in a universe of more than 4.6 million documents. That is more discovery than the usual employment *class action*, even though this is just a single-plaintiff case. Then, Plaintiff seeks to trample on the fundamental privacy of third parties and the confidentiality rights of Defendant Starz Entertainment, LLC ("Starz") by asking this Court to:

(1) modify the entirely standard protective order in this case in a way that would allow Plaintiff to disclose Starz's trade secret information to competitors, affiliates, customers and, importantly, individuals who work for Starz's competitors;

(2) compel third parties who work for Starz to turn over their personal phones and email accounts, with all of their personal contents—including private communications with friends and family members, personal pictures, and a whole host of sensitive information—under threat of being fired if they do not comply; and

(3) compel Starz to search over 4.6 million documents with terms so broad that they are unlikely to yield relevant documents and are disproportionate to the needs of this case, including for confidential personnel files and human resources correspondence for all of its employees with the first or last name "Thomas," even if that information has nothing to do with plaintiff Keno Thomas or his claims.

First, Plaintiff asks that the Court modify the parties' stipulated protective order to prevent Defendants from designating any material as "Highly Confidential." Contrary to Plaintiff's argument, however, such protective orders are commonplace. Plaintiff misrepresents the holdings of the out-of-state authorities on which he relies; indeed, two of the cases that Plaintiff cites as rejecting two-tier protective orders actually granted

them.  Moreover, Plaintiff ignores Ninth Circuit authority that has repeatedly approved of such orders.  There is good cause for such an order here.  Plaintiff seeks sweeping discovery of Starz's most confidential business information, and he seeks to disclose it to witnesses who could exploit it against Starz.

Second, Plaintiff has casually asked this Court to order Starz to seize and search what Plaintiff euphemistically calls employees' "personal electronic devices" and email accounts.  That is an understated way of saying that Plaintiff wants this Court to order the seizure of employees' iPhones, Androids and every other device that the employees own.  Those employees have not been served with any discovery requests, and they had no opportunity to object.  And even though Starz has no legal right to seize those devices, Plaintiff asserts that Starz can fire the employees if they refuse (and, apparently, must do so on pain of contempt of court).

This is ironic:  attorneys that supposedly represent the interests of employees ask this Court to set a precedent that employers may demand that the employee turn over personal property, or else be fired.  Perhaps unsurprisingly, Plaintiff buries this issue 30 pages deep into his motion.  But make no mistake:  Plaintiff seeks to invade fundamental employee privacy interests and to destroy any meaningful limit on what can be deemed within an employer's custody and control.  There is no precedent for it, and the Court should refuse to order Starz to do it.

Third, Plaintiff has rejected Starz's attempts to meet and confer about a sensible search universe and search terms for electronically stored information, and instead seeks to compel Starz to undertake an overbroad and non-responsive data collection of over 4.6 million documents from 25 custodians over 7 years, and to force it to use untested, overbroad, and in some cases illogical search terms in its document review.  Plaintiff's terms seek a massive amount of confidential personnel information from Starz that has nothing to do with this matter.  For example, Plaintiff requests things as broad as "Thomas" and "Report"—which would include any report ever requested or given by anyone with the first or last name Thomas over a seven-year period.

Plaintiff asks the Court to compel discovery that is entirely disproportionate to the parties' legitimate discovery interests.  Notably, Plaintiff fails to cite any single-plaintiff employment case that has ordered such sweeping ESI discovery.  And for good reason.  Discovery must lead to the production of relevant information, and not be a fishing expedition into a party's non-responsive archives or an opportunity to bury an opposing party in discovery demands disproportionate to the issues presented.

Plaintiff has brought this motion in bad faith.  Despite going through the motions of meeting and conferring, Plaintiff has refused to protect Starz's trade secrets, consistently sought electronic data collection and searches that are baselessly overbroad and disproportionate, and casually demanded unprecedented seizure and search of Starz employee's own personal devices.  Defendants have repeatedly attempted to reach some reasonable compromise to avoid judicial intervention.  In the face of unreasonable custodian requests and unreasonable time frames that would have yielded a search universe of over 4.6 million documents, Defendants have gone so far as to agree to collect files from 15 custodians and run modified versions of many of Plaintiff's search terms across a still-massive universe of more than *a million documents*.  Defendants bent over backwards to demonstrate their positions to Plaintiff and to avoid involving the Court.  Yet Plaintiff rejected all of Defendants' proposals, cut short meet and confer efforts, and brought this frivolous motion.

Defendants respectfully request that the Court deny this motion in its entirety and permit discovery to progress in the ordinary course.  After Defendants run proportional searches on more than a million documents, and review and produce responsive documents, the parties will be better able to bring to the Court any remaining disputes.  If a real dispute arises after a record of documents has been produced, it can be resolved at that time.  This, however, is not a real discovery dispute.  It is an attempt to brandish a threatened court order like a weapon, seeking unbelievably broad orders regarding untested keyword searches at the outset of the ESI process, long before parties would normally raise such a dispute.  Plaintiff's motion should be denied.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# DISPUTED DISCOVERY REQUESTS

**I.  Plaintiff's Argument**

    **A.  ESI**

Plaintiff seeks an order compelling Defendants to conduct ESI searches using specific search terms, custodians, and time periods, as set forth below.

    **1.  The Parties' Meet and Confer**

On December 22, 2016, Plaintiff propounded Requests for Production (Set One) to Defendant Starz Entertainment, LLC (Starz).  Olney Decl. ¶ 2, Ex. 1.  On January 6, 2017, Plaintiff sent Defendants a letter proposing that the Parties implement a process of meeting and conferring regarding ESI matters within 1-2 weeks of service of any RFPs.  Olney Decl. ¶ 3, Ex. 2.  Over the following weeks, the parties exchanged a large number of emails and letters, held three telephonic conference, and met in-person for a pre-filing conference pursuant to Local Rule 37-1.  Olney Decl. ¶¶ 3-17, Exs. 2-15.

Over the course of their meet and confer, Plaintiff sent Defendants multiple ESI proposals, beginning on January 27.  Olney Decl. ¶¶ 5, 8, 11, 13, 14, Exs. 3, 6, 11.  Defendants have rejected every proposal on grounds including their assertion that the requests are "unduly burdensome, and not proportional to the needs of the case."  Olney Decl. ¶¶ 6, 12, Ex. 4, 9.  However, Defendants have abandoned their initial promise to provide emails counts for each custodian, information Plaintiff requires to assess the scope of the burden, see how it is distributed among the proposed custodians and searches, and thus permit Plaintiff to make any necessary revisions to his proposals.  Olney Decl. ¶¶ 13, 15-17, Exs. 11, 13-15.  Defendants have also objected that Plaintiff's proposed custodians are duplicative, even though they acknowledge that their software can automatically identify any duplicates.  Olney Decl. ¶¶ 9, 12, Exs. 7, 9.

This issue is ripe for resolution by the Court because Defendants have effectively guaranteed further interminable delay. Defendants are yet to provide any response to Plaintiff's most recent proposal on February 13, stating that they may require *three*

*weeks* or even longer to respond. Olney Decl. ¶ 16, Ex. 14.[1] More problematic, even though the Parties' respective proposals overlap on several points, Defendants have refused to begin conducting *any* email searches using terms, custodians, and time periods to which the Parties had already agreed until every last detail of the ESI parameters had been resolved. Olney Decl. ¶ 15, Ex. 13.

A final point of contention arises from Defendants' refusal to agree to search their employees' personal electronic devices if those devices are used for work-related purposes.  Olney Decl. ¶¶ 7, 11, Ex. 5.

### 2.    Plaintiff's ESI Proposals

Plaintiff's initial ESI proposal included more than 50 custodians concentrated into 6 general searches.  At Defendants' request, Plaintiff has removed half these custodians, and has split his small number of general searches into a larger number of narrowly tailored searches targeted to individual issues and corresponding custodians and dates. Olney Decl. ¶ 13, Ex. 11. In other words, although the number of searches is large, they seek substantially less information than the initial 6 general searches Plaintiff previously proposed. Plaintiff seeks a Court order directing Defendants to perform the ESI searches set forth below, and to require Defendants to search all ESI devices used for work-related purposes by these custodians, including any personal devices.

Plaintiff has proposed 25 custodians consisting of the following individuals:

- 17 custodians agreed to by Defendants, either individually or conditionally as members of groups of two or three custodians that Defendants proposed

---

[1] On February 28, the day after Plaintiff served the initial version of his portion of the joint stipulation, Defendants sent Plaintiff an email containing their first substantive response to Plaintiff's February 13 proposal. Defendants' email discussed new time periods for certain custodians only; it contained no discussion of search terms and provided no timeline for supplying this information. Because Defendants then requested an extension of time to provide their portion of the joint statement, which Plaintiff granted, Plaintiff has updated the joint stipulation to reflect this new development. Olney Decl. ¶ 18, Ex. 27.

Plaintiff choose among;[2]

- 4 additional custodians whose conduct Defendants placed at issue by identifying them as witnesses in their Initial Disclosures;[3]

- Pamela Wolfe, the current head of Human Resources who replaced Sheryl Anderson (a custodian agreed to by Defendants) following her departure;

- Ed Huguez, Plaintiff's former longtime supervisor and a witness whom Defendants placed at issue by identifying him as a subject of testimony by 4 of the witnesses identified in their Initial Disclosures;

- Mandie Litton, the former secretary for both Plaintiff and Defendant Thornton; and

- Gregory Maffei, the Chairman of Starz's Board and the individual whose conduct is at the center of Plaintiff's whistleblowing claim under California Labor Code § 1102.5(b).

Olney Decl. ¶¶ 6, 12, 14, 18, Exs. 4, 9, 11, 27. Because at least 12 of these custodians no longer work for Starz, Plaintiff has agreed that all date ranges will terminate on the date

---

[2] These custodians are: (1) Plaintiff, (2) Defendant Michael Thornton, the direct supervisor who fired Plaintiff, (3) Sheryl Anderson, the former Executive Vice President of Human Resources, (4) David Laughlin, the Vice President of Human Resources, (5) Chris Albrecht, President and CEO, (6) Glenn Curtis, former Senior President; (7) former General Counsel Steve Beabout, (8) former Senior Vice President of Business and Legal Affairs, Richard Waysdorf, (9) Beth Jennewein, Starz's Executive Director for its Project Management Office, and (10) Kara Tefft, Director of Finance. Defendants have also proposed that Plaintiff select specific custodians from among following groups: one custodian from either (11) former Vice President of Sales and Affiliate Marketing, Christine Carrier, or (12) former Vice President, Randy McCurdy; two custodians from among Plaintiff's former three direct reports, who are (13) former Vice President of Sales and Marketing, Tom Gove, (14) Vice President of Affiliate Sales, Tom Wenzel, and/or (15) former Vice President of Affiliate Marketing, Jennifer Schouten; and one custodian from among either (16) former CFO Scott MacDonald or (17) Vice President of Finance, Joe Zamora. By offering custodians even on this provisional basis, Defendants acknowledge their relevance as custodians.
[3] These custodians are Patrick DiBartolomeo, Jamie Dosher, Todd Hoy, and Shree Potts.

1  specified or the custodian's last day of employment with Starz, whichever is earlier.[4]

2  Plaintiff proposes the following specific searches and corresponding time periods

3  for the custodians identified above:

4  *a.*   ***Searches Related to Plaintiff's Termination and***

5  ***ResultingClaims (1-15)***

6  Search Number 1

7  Search number 1 seeks information relevant to Plaintiff's termination.  The first

8  parenthetical captures iterations of Plaintiff's name, and is used in many subsequent

9  searches.  The second parenthetical includes terms referencing Plaintiff's termination,

10  performance, any discipline or lack thereof, and whistleblowing, most of which were

11  proposed by Defendants.  The date begins with the day on which Thornton became

12  Plaintiff's direct supervisor. Ex. 27. Custodians include Human Resources executives

13  (Anderson, Laughlin, Wolfe), and Albrecht, Curtis, and Thornton, all of whom

14  Defendants proposed adding to a nearly identical search. Exs. 8, 9. Tefft is included

15  because Plaintiff was terminated very shortly after he refused her directive to falsify

16  company records. Beabout, Carrier, Gove, McCurdy, Schouten, Waysdorf, Wenzel, and

17  Weil are included because, as alleged in the Second Amended Complaint, they were

18  present for or received complaints regarding incidents motivating Starz's retaliation

19  against Mr. Thomas. Dates for this and every subsequent search that includes Plaintiff's

20  name run through the present because, even though he was terminated in October 2014,

21  any subsequent discussions involving Plaintiff's name are likely of infrequent

22  occurrence and are reasonably calculated to include information relevant to his

23  termination and/or lawsuit.

24  •  **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR

25

26  [4] Because Defendants rejected Plaintiff's attempt to reach an informal compromise,

27  Plaintiff has slightly revised his proposals as set forth in the instant motion to expand several proposals, narrow others, correct several typos, and to make the information

28  more digestible for the Court.  Nonetheless, nearly all of the proposals set forth below remain identical to the proposal Plaintiff sent Defendants on February 13.

"Thomas, Keno" OR KVT OR Keno.Thomas) AND (terminat* OR consolidat* OR "lay off" OR layoff OR "laid off" OR layoffs OR "lays off" OR "layed off" OR fire OR fired OR "get rid of" OR dismiss OR sack OR "let go" OR "Employee Evaluation" OR "Employee Self Evaluation" OR Probation OR Discipline OR "Performance Plan" OR Complaint OR Report OR whistleblow*[5])

- **Custodians:** Albrecht, Anderson, Curtis, Laughlin, Tefft, Thomas, Thornton, Wolfe, Beabout, Carrier, Gove, McCurdy, Schouten, Waysdorf, Wenzel, Weil
- **Dates:** Dates: 8/1/13—present

Search Number 2

Search number 2 seeks ESI related to Plaintiff's whistleblowing regarding Starz's unlawful contract extension with Comcast, which forms the predicate for his statutory claim under California Labor Code § 1102.5(b). Custodians include individuals to whom Plaintiff complained about this deal or who would likely have been informed of Plaintiff's complaints.  This search begins in April 2014, the month when Starz's extension with Comcast was announced.

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND Comcast
- **Custodians:** Albrecht, Anderson, Beabout, Carrier, Gove, Laughlin, McCurdy, Schouten, Thomas, Thornton, Waysdorf, Weil, Wenzel, Wolfe
- **Dates:** 4/1/14—present

Search Number 3

Search number 3 seeks ESI related to Plaintiff's advocacy on behalf of women and minorities, the predicate for his statutory claims under 42 U.S.C. § 1981 and California Government Code § 12940.  It also seeks ESI related to purported reasons Defendants assert were responsible for his termination, such as alleged performance

---

[5] The * symbol is an infinite wildcard in Defendants' ESI software program and will return all words beginning with the root preceding this symbol.

issues, violations of policies and procedures, trips to call centers, office affairs, abuse of Starz's travel policy, opposition to Starz's Originals strategy, and poor management skills.  The date begins with the day on which Thornton became Plaintiff's direct supervisor.

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND ((Advoca* OR Divers* OR Race OR Minorit* OR Black OR African-American OR Gender OR Women) OR Skill* OR Ability OR Capacity OR Perform* OR Competence OR (Violat* AND (Polic* OR Procedure*)) OR "Call Center" OR "Call Centers" OR Travel OR Affair OR (Relationship AND (Personal OR Sexual OR Romantic OR Inappropriate)) OR Original* OR (Leadership AND Diversi*) OR Supervis* OR Manag*)
- **Custodians:** Albrecht, Anderson, Laughlin, Thomas, Thornton, Wolfe
- **Dates:** 8/1/13—present

Search Number 4

Search number 4 seeks ESI related to Plaintiff and Albrecht's and Thornton's directive that Tefft order Plaintiff to falsify revenue and subscriber figures.  The date begins three months prior to the September 2014 meeting in which Tefft ordered Plaintiff to falsify these figures.

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Budget OR Revenue OR Forecast OR Projection OR Subscriber*) AND (Increase OR Raise OR Revise OR Change OR Optic OR Optics))
- **Custodians:** Albrecht, Anderson, Laughlin, Tefft, Thomas, Thornton, Wolfe
- **Dates:** 6/1/14—present

Search Number 5

Search number 5 seeks ESI related to Albrecht's and Thornton's concerns that the optics of Plaintiff's budget did not look good, and their subsequent order to falsify these

figures.  Custodians include Gove, Schouten, and Wenzel, who were each present at the September 2014 meeting in which Tefft, at the behest of Albrecht and Thornton, ordered Plaintiff to falsify these figures.  The date runs through the date on which is termination was ultimately made effective.

- **Terms:** (Revenue OR Budget OR Forecast OR Projection) AND (Increase OR Raise OR Revise OR Change OR Optic*)
- **Custodians:** Albrecht, Anderson, Laughlin, Gove, Schouten, Tefft, Thomas, Thornton, Wenzel
- **Dates:** 6/1/14—2/23/15

Search Number 6

Like search number 5, search number 6 seeks ESI related to the directive to falsify revenue and subscriber information, but is aimed at capturing communications with Human Resources.  Accordingly, search terms include Plaintiff's name and custodians are limited to Human Resources senior executives.  The beginning date is the week of the September 2014 meeting.

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Revenue OR Budget OR Forecast OR Projection) AND (Increase OR Raise OR Revise OR Change OR Optic OR Optics)
- **Custodians:** Anderson, Laughlin, Wolfe
- **Dates:** 9/1/14—present

Search Number 7

Search number 7 seeks ESI related to Plaintiff and Starz's negotiations with DirecTV.  These negotiations are relevant because Plaintiff was excluded from them in retaliation for his advocacy and whistleblowing, and because Defendants' attempt to force Plaintiff to falsify the revenue and subscriber figures was intended to cover up the shortfalls resulting from the executed deal.  Custodians include Plaintiff's direct reports (Gove, Schouten, and Wenzel), two of whom Defendants proposed including as

custodians in a similar search.  The 9/1/13 date coincides with the start of the negotiations with DirecTV.

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (DIRECTV OR DTV) AND Negotiat*
- **Custodians:** Albrecht, Anderson, Gove, Laughlin, Schouten, Thomas, Thornton, Wenzel, Wolfe
- **Dates:** 9/1/13—present

Search Number 8

Search number 8 seeks ESI related to Plaintiff's sale of company stock, which Defendants have identified in their Initial Disclosures as a purported factor in his termination.  The beginning date coincides with Plaintiff's sale of stock.

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Stock OR Share*)
- **Custodians:** Albrecht, Anderson, Laughlin, Thomas, Thornton, Wolfe
- **Dates:** 2/1/14—present

Search Number 9

Search number 9 seeks ESI related to Plaintiff's advocacy on behalf of women and minorities.  Custodians include Plaintiff's former boss, Ed Huguez; his direct reports, and Shree Potts, with whom he discussed his efforts to increase diversity at Starz through hiring practices.

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR (Keno /2 Thomas) OR KVT OR Keno.Thomas) AND (Divers* OR Race OR Minorit* OR Black OR (African AND American) OR Gender OR Women OR Hire OR Recruit OR Promote OR Consolidat* OR LIFO OR "Last In First Out")
- **Custodians:** Albrecht, Anderson, Laughlin, Potts, Thomas, Thornton, Gove, Shouten, Wenzel, Huguez

- **Dates:** 1/1/10 – 2/23/15

Search Number 10

Search number 10 seeks ESI related to me-too evidence of other employees' complaints on topics similar to Plaintiff's complaints, such as harassment and discrimination on the basis of gender or race, retaliation, and falsification of company documents.[6]

- **Terms:** (Complaint OR EEOC OR DFEH OR Hotline) AND (Race OR Ethnicity OR Black OR (African AND American) OR Latin* OR Asian OR Gender OR Harassment OR Discrimination OR Retaliation OR Falsif!)
- **Custodians:** Albrecht, Anderson, Laughlin, Wolfe, Thomas, Thornton
- **Dates:** 1/1/10—February 23, 2015

Search Number 11

Search number 11 seeks ESI related to Starz's 2014 contract negotiations and contract extension with Comcast, which is relevant because the unlawful manner in which this deal was negotiated forms the predicate for Plaintiff's § 1102.5(b) whistleblowing claim. (Search number 2, by contrast, includes Plaintiff's name and focuses only on his whistleblowing regarding this topic.) Search number 11 includes 4 sets of custodians with corresponding dates. Set 1 includes individuals involved in negotiation of the deal, and starts three months before it was executed. Set 2 adds individuals present at April 28, 2014, dinner at which the deal was announced or to whom Plaintiff complained, and includes Beabout, whom Huguez informed of the deal after speaking with Plaintiff. Set 2 starts the day of the April 28 dinner. Sets 3 and 4 add other individuals to whom Plaintiff complained at later dates.

---

[6] During the meet and confer, Defendants expressed skepticism that me-too evidence could be relevant in a retaliation case and/or where the other bad acts are perpetrated by someone other than the Plaintiff's own supervisor. Plaintiff informed Defendants that ample authority demonstrates the relevance of such information, and cited *Goold v. Hilton Worldwide, Inc.*, No. 1:13-cv-00438 JLT, 2014 U.S. Dist. LEXIS 48652 (E.D. Cal. Apr. 8, 2014). Ex. 11.

- **Terms:** Comcast AND (Palm OR "4/28" or "April 28" OR Contract OR "Affiliate Carriage" OR Extension OR Renew! OR Deal OR "Affiliation Agreement" OR Negotiat! OR "Revenue Budget" OR "Marketing Support" OR Maffei OR Charter OR "Charter Communications" OR "Charter Inc." OR "Time Warner" OR "Time Warner Cable" OR TWC OR Merg* OR DOJ OR Spinco OR Subscribers OR "License Fee" OR Maffei OR Greg* OR Chairman OR (Inside* /2 Information))

1. **Custodians & Dates:** Albrecht, Thornton, McCurdy, Maffei: 2/1/14—present
2. **Custodians & Dates:** Beabout, Carrier, Gove, Schouten, Thomas, Wenzel: 4/28/14—present
3. **Custodians & Dates:** Waysdorf: 7/1/14—present
4. **Custodians & Dates:** Curtis, Weil: 8/22/14—present

Search Number 12

Search number 12 seeks ESI related to the DirecTV deal, including discussions related to deal's impact on Starz's budget, which is relevant to Defendants' efforts to force Plaintiff to falsify those budgets once they discovered that the results would fall short of their expectations. Custodians include Plaintiff and his team, who were involved in putting together the budget; individuals involved in the decision to falsify the budget figures; and Zamora and MacDonald, who were broadly responsible for Starz's financial performance and projections. The beginning date coincides with the beginning of the negotiations with DirecTV and runs through the date that Plaintiff's termination became final.

- **Terms:** (DIRECTV OR DTV) AND (Contract OR Extension OR Renew! OR Deal OR "Affiliation Agreement" OR Negotiat! OR "Revenue Budget" OR "Subscriber Projection" OR (Project! /s Revenue) OR (Project! /s Loss) OR "Revenue Forecast" OR "Budget Forecast" OR "Budget Projection" OR Variance OR Perform* OR "License Fee" OR Remov* OR Optic* OR (Plausibl* w/2 Denia*))

- **Custodians:** Albrecht, Thomas, Thornton, Tefft, Wenzel, Gove, Schouten,

---

1   MacDonald, Zamora

2   • **Dates:** 9/1/13—2/23/15

3   <u>Search Number 13</u>

4   Search number 13 seeks the same information as number 12, but is limited to ESI

5   containing Plaintiff's name.  It includes a broader list of custodians and begins with the

6   date Plaintiff's termination became final.

7   • **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR

8   "Thomas, Keno" OR KVT OR Keno.Thomas) AND ((DIRECTV OR DTV) AND

9   (Contract OR Extension OR Renew! OR Deal OR "Affiliation Agreement" OR

10   Negotiat! OR "Revenue Budget" OR "Subscriber Projection" OR (Project! /s

11   Revenue) OR (Project! /s Loss) OR "Revenue Forecast" OR "Budget Forecast"

12   OR "Budget Projection" OR Variance OR Perform* OR "License Fee" OR

13   Remov* OR Optic* OR (Plausibl* w/2 Denia*)))

14   • **Custodians:** Albrecht, Thomas, Thornton, Tefft, Wenzel, Gove, Schouten,

15   MacDonald, Zamora, Carrier, McCurdy, Waysdorf

16   • **Dates:** 2/23/15—present

17   <u>Search Number 14</u>

18   Search number 14 seeks ESI related to the "DirecTV Cross Functional Team."

19   Plaintiff was excluded from communications regarding this team, and possibly from

20   meetings as well, in retaliation for his protected activities. Ex. 25 ¶ 53. Custodians

21   include all Team members known to Plaintiff.  The dates begin the 2 months before the

22   first Team meeting known to Plaintiff and continue through the date his termination

23   became final.

24   • **Terms:** (DIRECTV OR DTV) AND "Cross Functional Team"

25   • **Custodians:** Albrecht, Thomas, Thornton, Carrier, McCurdy, Wenzel, Gove,

26   Schouten, Anderson Jennewein, MacDonald, Curtis, Weil, Anderson, Zamora,

27   Tefft, Waysdorf, Hoy, Wenzel, Litton

28   • **Dates:** 6/1/1/4—2/23/15

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

Search Number 15

Search number 15 seeks ESI related to Starz's "Originals" Strategy. Defendants have identified Plaintiff's purported disagreement with this company strategy as a purported factor justifying his termination. Custodians include Plaintiff's direct reports, who are likely to have information regarding Plaintiff's position regarding the Originals strategy, as well as Carrier and McCurdy, because Defendants identified this topic for both witnesses in their Initial Disclosures.

- **Terms:** Original* /15 Strategy
- **Custodians:** Albrecht, Anderson, Laughlin, Carrier, McCurdy, Thornton, Thomas, Wenzel, Gove, Schouten

**Dates:** 8/16/13—2/23/15

### b.    *Searches Related to Defendants' Witnesses (16-56)*

Search numbers 16-56 seek information relevant to the topics of testimony which Defendants placed at issue by identifying in their initial disclosures for each of their witnesses. Ex. 12. In an attempt to narrow the time period for these searches, Plaintiff proposed that Defendants identify the period of time during which they intend to offer testimony so that he could narrow the period of his ESI searches accordingly. Defendants rejected this proposal, however. Ex. 10 at 3. For this reason, Plaintiff begins each search on January 1, 2010, or on the first known specific known date relevant to the identified topic, whichever is later. Plaintiff remains open to revising the start dates for these searches but has been unable to do so prior to preparing his portion of the joint stipulation because Defendants have rejected his proposal to identify discreet time periods.

Search Number 16

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Perform* OR Original* OR Travel OR Affair OR (Relationship AND (Personal OR Sexual OR Romantic OR Inappropriate)) OR (Leadership AND Divers*))

- **Custodians:** Anderson
- **Dates:** 1/1/10—present

Search Number 17

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Stock OR Share*)
- **Custodians:** Anderson
- **Dates:** 2/1/14—present

Search Number 18

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND Comcast
- **Custodians:** Carrier
- **Dates:** 4/1/14—present

Search Number 19

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Original* OR Huguez OR Ed)
- **Custodians:** Carrier
- **Dates:** 1/1/10—present

Search Number 20

- **Terms:** (Reports OR Subordinates OR Staff OR Tom OR Gove OR Wenzel OR Jennifer OR Schouten OR Tom.Gove OR Tom.Wenzel OR Jennifer.Schouten OR VP OR "Vice President") AND (Skill* OR Ability OR Capacity OR Training OR Perform* OR Competence)
- **Custodians:** Carrier
- **Dates:** 1/1/10—present

Search Number 21

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND Comcast

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

-19-

- **Custodians**: Curtis
- **Dates**: 4/1/14—present

Search Number 22

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Original* OR Perform* OR Competence OR Reputation)
- **Custodians:** Curtis
- **Dates:** 1/10/10—present

Search Number 23

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Stock OR Share*)
- **Custodians:** Curtis
- **Dates:** 2/1/14—present

Search Number 24

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Supervis* OR Manag* OR Lead OR Leader OR Original* OR "Call Center" OR "Call Centers")
- **Custodians:** DiBartolomeo
- **Dates:** 1/10/10—present

Search Number 25

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Supervis* OR Manag* OR Lead OR Leader OR Original* OR "Call Center" OR "Call Centers")
- **Custodians:** Dosher
- **Dates:** 1/10/10—present

Search Number 26

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND Comcast

- **Custodians:** Gove
- **Dates:** 4/1/14—present

Search Number 27

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Tefft OR Kara OR Michael OR Thornton) AND (Budget OR Revenue OR Subscriber OR Project* OR Forecast OR Optic*)
- **Custodians:** Gove
- **Dates:** 9/1/14—present

Search Number 28

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Michael OR Thornton) AND (DIRECTV OR DTV)
- **Custodians:** Gove
- **Dates:** 9/1/13—present

Search Number 29

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND Comcast
- **Custodians:** Hoy
- **Dates:** 4/1/14—present

Search Number 30

- **Terms:** "Revenue Forecast" OR "Budget Forecast" OR "Revenue Budget" OR "Budget Projection" OR Variance
- **Custodians:** Hoy
- **Dates:** 1/1/10—present

Search Number 31

- **Terms:** (Huguez OR Ed) AND (Client OR Employee OR Staff OR Comment OR Behavior OR Inappropriate)

- **Custodians:** Hoy
- **Dates:** 1/1/10—present

Search Number 32

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (DIRECTV OR DTV) AND (Concern OR Complaint OR Negotiat* OR Met OR Meet*)
- **Custodians:** Jennewein
- **Dates:** 8/1/14—present

Search Number 33

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND Comcast
- **Custodians:** MacDonald
- **Dates:** 4/1/14—present

Search Number 34

- **Terms:** "Revenue Forecast" OR "Revenue Budget" OR "Budget Forecast" OR "Budget Projection" OR "Subscriber Projection"
- **Custodians:** MacDonald
- **Dates:** 1/1/10—2/23/15

Search Number 35

- **Terms:** (DIRECTV OR DTV) AND (Revenue OR Loss OR Project* OR Variance OR Actual OR Perform*)
- **Custodians:** MacDonald
- **Dates:** 9/1/13—present

Search Number 36

- **Terms:** Deal AND ((Executive AND (Sr OR Senior)) OR SVP OR EVP OR Thornton OR Albrecht OR Maffei OR Greg* OR Malone OR John OR Curtis OR Glenn OR Myers OR Bill)
- **Custodians:** MacDonald

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

-22-

1  • **Dates:** 1/1/10—present

2  Search Number 37

3  • **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR
4  "Thomas, Keno" OR KVT OR Keno.Thomas) AND Comcast

5  • **Custodians:** McCurdy

6  • **Dates:** 4/1/14—present

7  Search Number 38

8  • **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR
9  "Thomas, Keno" OR KVT OR Keno.Thomas) AND Original*

10  • **Custodians:** McCurdy

11  • **Dates:** 1/1/10—present

12  Search Number 39

13  • **Terms:** (Report* OR Tom OR Gove OR Wenzel OR Jennifer OR Schouten OR
14  Tom.Gove OR Tom.Wenzel OR Jennifer.Schouten OR Staff OR VP OR "Vice
15  President") AND (Skill* OR Ability OR Capacity OR Training OR Perform* OR
16  Competence)

17  • **Custodians:** McCurdy

18  • **Dates:** 1/1/10—present

19  Search Number 40

20  • **Terms**: Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR
21  "Thomas, Keno" OR KVT OR Keno.Thomas

22  • **Custodians:** Potts

23  • **Dates:** 6/1/10—present

24  Search Number 41

25  • **Terms:** "Revenue Forecast" OR "Revenue Budget" OR "Budget Forecast" OR
26  "Budget Projection" OR "Subscriber Projection"

27  • **Custodians:** Tefft

28  • **Dates:** 1/1/10—2/23/15

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

-23-

Search Number 42

- **Terms:** (DIRECTV OR DTV) AND (Revenue OR Loss OR Project* OR Variance OR Actual OR Perform*)
- **Custodians:** Tefft
- **Dates:** 9/1/13—2/23/15

Search Number 43

- **Terms:** (Revenue OR Budget OR Forecast OR Projection) AND (Increase OR Raise OR Revise OR Change OR Optic*) AND (Michael OR Thornton OR Michael.Thornton OR Keno OR Thomas OR Keno.Thomas)
- **Custodians:** Tefft
- **Dates:** 6/1/14—present

Search Number 44

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas OR Christine OR Carrier OR Christine.Carrier OR Randy OR McCurdy OR Randy.McCurdy) AND (Perform* OR Competence OR Skill* OR Ability OR Capacity OR Compare OR Compared OR "Relative to")
- **Custodians:** Tefft
- **Dates:** 1/1/10—2/23/15

Search Number 45

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND Manage*
- **Custodians:** Wenzel
- **Dates:** 1/1/10—present

Search Number 46

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND Comcast
- **Custodians:** Wenzel

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

-24-

- **Dates:** 4/1/14—present

Search Number 47

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Michael OR Thornton OR Michael.Thornton) AND (Threat* OR terminat* OR consolidat* OR "lay off" OR layoff OR "laid off" OR layoffs OR "lays off" OR "layed off" OR fire OR fired OR "get rid of" OR dismiss OR sack OR "let go" OR Complaint OR Report OR Discipline OR "Performance Plan" OR "Employee Evaluation" OR "Employee Self Evaluation" OR Probation)
- **Custodians:** Wenzel
- **Dates:** 8/16/13—present

Search Number 48

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (DIRECTV OR DTV)
- **Custodians:** Wenzel
- **Dates:** 1/1/10—present

Search Number 49

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (Michael OR Thornton OR Michael.Thornton) AND (DIRECTV OR DTV)
- **Custodians**: Wenzel
- **Dates:** 8/16/13—present

Search Number 50

- **Terms:** (Revenue OR Budget OR Forecast OR Projection) AND (Increase OR Raise OR Revise OR Change OR Optic OR Optics) AND (Keno OR Thomas OR Keno.Thomas OR KVT OR Michael OR Thornton OR Michael.Thornton OR Kara OR Tefft OR Kara.Tefft)
- **Custodians:** Wenzel

- **Dates:** 8/1/14—present

Search Number 51

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND Comcast
- **Custodians:** Zamora
- **Dates:** 8/1/14—present

Search Number 52

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno" OR KVT OR Keno.Thomas) AND (DIRECTV OR DTV)
- **Custodians:** Zamora
- **Dates:** 1/1/10—present

Search Number 53

- **Terms:** Ed OR Huguez
- **Custodians:** Zamora
- **Dates:** 1/1/10—present

Search Number 54

- **Terms:** "Revenue Forecast" OR "Revenue Budget" OR "Budget Forecast" OR "Budget Projection" OR "Subscriber Projection" OR ((Revenue OR Project*) AND Bonus))
- **Custodians:** Zamora
- **Dates:** 1/1/10—present

Search Number 55

- **Terms:** (DIRECTV OR DTV) AND (Revenue OR Loss OR Project* OR Variance OR Actual OR Perform*)
- **Custodians:** Zamora
- **Dates:** 9/1/13—present

Search Number 56

- **Terms:** (Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

-26-

"Thomas, Keno" OR KVT OR Keno.Thomas OR Christine OR Carrier OR Christine.Carrier OR Randy OR McCurdy OR Randy.McCurdy) AND (Perform* OR Competence OR Skill* OR Ability OR Capacity OR Compare OR Compared OR "Relative to")

- **Custodians:** Zamora
- **Dates:** 1/1/10—present

### 3. Legal Argument

Plaintiff seeks a Court order directing Defendants to perform the ESI searches set forth above. These searches are narrowly tailored and seek relevant information that is proportional to the needs of this case.

The federal rules provide broad access to discovery. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*

Rule 34(a) provides that a party may serve a request that the other party produce or permit the requesting party to inspect, copy, test or sample materials, including electronically stored information falling within the scope of Rule 26(b). Fed. R. Civ. P. 34(a)(1)(A). This rule is "designed to permit the broadest sweep of access." *U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 236 (S.D. Cal. 2015) (citations omitted). Electronic documents are no less subject to disclosure than paper records, provided the relevance requirement is satisfied. *Id.* at 236 (collecting cases). When assessing relevance, courts recognize that "discovery is not limited to the issues raised in the pleadings," but encompasses any matter related to, or which is reasonably calculated to lead to other matters related to, any issues in the case. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351-52 (1978). "The party who resists discovery has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." *Duran v. Cisco Sys., Inc.*, 258 F.R.D. 375, 378 (C.D.

Cal. 2009) (citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)).

The 2015 amendments to Rule 26 codify the requirement that courts resolving discovery disputes provide access to discovery that is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* This amendment does not shift the burden, which remains on the party resisting discovery to explain how a request is burdensome. *Design Basics LLC v. Best Built Inc.*, No. 14-CV-597, 2016 U.S. Dist. LEXIS 33256, at *9 (E.D. Wis. Mar. 15, 2016) ("[T]he amendment of Rule 26(b) to make the proportionality requirement explicit does not relieve the responding party of the burden to explain how a discovery request is burdensome."); Advisory Notes to Fed. R. Civ. P. 26 (2015 Amendments) ("Nor is the [amendment] intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional.").

Because Defendants have never provided concrete information setting forth the burden they claim Plaintiff's searches would impose, they have failed to carry their burden and their objection should fail. To the extent they produce such information for the first time in response to the instant motion, an analysis of the Rule 26 factors demonstrates that Defendants' proportionality objections should still be rejected because every factor weighs strongly in Plaintiff's favor.

First, Plaintiff brings claims under, *inter alia*, the FEHA, California Labor Code § 1102.5, and 42 U.S.C. § 1981, each of which are broad remedial statutes embodying broad public policy considerations. *Dep't of Fair Empl. & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 752 (9th Cir. 2011) (FEHA); *McVeigh v. Recology S.F.*, 213 Cal. App. 4th 443, 471 (2013) (CAL. LAB. CODE § 1102.5); *Sullivan v. Little Huntington Park, Inc.*, 396 U.S. 229, 237 (1969) (noting "the broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1866" from which § 1981

derives).  The powerful public policies animating these statutes demonstrates the importance of the issues at stake in this case and weigh strongly in Plaintiff's favor.  *See Wood v. Capital One Servs., LLC*, No. 5:09-CV-1445 (NPM/DEP), 2011 U.S. Dist. LEXIS 61962, at *20-21 (N.D.N.Y. Apr. 15, 2011) (holding the first factor weighs in plaintiff's favor because "the court recognizes that strong public policy considerations which led to enactment of the" statute under which Plaintiff brought this claim).

Second, the amount in controversy in this case is substantial.  Plaintiff was a high wage earner at Starz.  In 2014 he earned a base salary in excess of $300,000, a bonus of more than $140,000, and stock options of more than $500,000.  His total lost earnings between his termination and 2023, when he will turn 65, including lost stock options likely exceeds $18 million.[7]  The sizable damages at issue in this case justify a broad array of discovery.

Third, in this case, as in most employment cases, there is a severe imbalance in the Parties' relative access to relevant information.  Defendants have exclusive access to substantially all of the relevant documents in this case, none of which have been provided to date, and represent many of the relevant witnesses, thereby restricting Plaintiff counsel's ability to contact them outside of a deposition.  This further supports Plaintiff's broad access to discovery.

Fourth, Starz is a large corporation which reported $1.5 billion in revenues in 2015 on its SEC Form 10-K and was acquired by Lionsgate in December 2016 for approximately $4.4 billion in cash and stock.[8]  Plaintiff, by contrast, is an unemployed

---

[7] Discovery is in the early stage and Plaintiff has not yet precisely calculated his economic loss.  This figure is a rough estimate offered only for the purpose of providing the Court some guidance with regard to the magnitude of the amount in controversy with regard to the second Rule 26 proportionality factor.  Plaintiff reserves all rights to amend or revise the calculation of his damages as discovery proceeds.

[8] *See See* https://www.sec.gov/Archives/edgar/data/1559270/000155927016000051/starzllc_10-kx12312015.htm (last visited February 27, 2017); http://variety.com/2016/biz/news/starz-lionsgate-close-acquisition-1201937471/ (last visited (February 27, 2017).

1  individual.  Starz has the resources available to easily respond to Plaintiff's discovery

2  demands, and should be required to do so.  *See id.* ("Plainly, Capital One Services and

3  NCO, as large corporations, have resources available to finance the effort that would be

4  required to meet plaintiff's sweeping discovery demands.").

5       Fifth, the discovery Plaintiff seeks is critical in resolving the issues in this case.

6  This action concerns Defendants' motive or motives for terminating Plaintiff.  Plaintiff

7  has alleged several unlawful motives, and Defendant has asserted numerous purportedly

8  legitimate ones.  All of the discovery sought relates, either directly or circumstantially,

9  to motives put forward by either party. Because unlawful motives are rarely stated

10 directly, circumstantial evidence in particular is critical to a case such as this. *See Allen*

11 *v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002) (discussing use of circumstantial

12 evidence in retaliation cases).  In sum, reviewing all of these factors, it is clear that the

13 burden or expense of Plaintiff's proposed discovery does not outweigh its likely benefit.

14 Accordingly, for all of these reasons, Defendants should be directed to perform the ESI

15 searches Plaintiff seeks without further delay.  In the alternative, Defendants should at

16 least be directed to provide Plaintiff with concrete information detailing the number of

17 emails for each ESI search by custodian and search, and the approximate cost or time

18 Defendants claim would be required to perform these searches.

19      In addition to the ESI searches, the Parties also disagree as to the repositories of

20 ESI that Defendants must search.  The Federal Rules of Civil Procedure require

21 production of relevant material in the "possession, custody, or control" of a party.  Fed.

22 R. Civ. P. 26(a), 34(a).  In the Ninth Circuit, "control" includes "the legal right to obtain

23 documents upon demand." *United States v. Int'l Union of Petroleum & Indus. Workers*,

24 870 F.2d 1450, 1452 (9th Cir. 1989).  The determination of "control" under the Ninth

25 Circuit's standard is fact specific. *Miniace v. Pac. Mar. Ass'n*, No. C 04-03506 SI, 2006

26 U.S. Dist. LEXIS 17127, at *6 (N.D. Cal. Feb. 13, 2006).  One fact pattern satisfying

27 this definition is an employer's ability to remove an employee without cause. *See id.* at

28 *8 (granting motion to compel documents in the possession of defendant's current

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

-30-

1  directors because they could be removed without cause).

2      Because Defendants have not responded to Plaintiff's query whether the proposed

3  custodians may be terminated without cause, Plaintiff has propounded discovery

4  requests as to each proposed custodian.  Defendants' responses are unlikely to resolve

5  this issue, however, because Defendants have not agreed that an at-will employment

6  relationship establishes "control" within the meaning of Rule 34 over personal electronic

7  devices their employees use for work-related purposes.  Olney Decl. ¶¶ 7, 11.

8  Accordingly, this issue is ripe for determination by the Court.  Plaintiff therefore

9  requests a Court order directing Defendants to search its custodian's personal electronic

10 devices and email accounts if it is determined that (1) the custodian may be terminated

11 without cause, or any other basis for establishing Defendant's control is identified, and

12 (2) the custodian uses such device or email account for work-related purposes.

13     **B.    Protective Order**

14     The second issue presented by this motion concerns the terms of a protective order

15 in this case.  While Plaintiff seeks the use of this Court's own model order, Defendants

16 demand the use of a two-tiered protection scheme including a restrictive  "Highly

17 Confidential" designation they may apply to all manner of documents to hide them from

18 Plaintiff and deposition witnesses. Use of this provision would severely prejudice

19 Plaintiff's case and is unsupported by law.[9]

20     A protective order may only be entered upon a showing of "good cause."  Fed. R.

21

22 [9] Because Defendants are presently withholding production of documents on the ground
   that no protective order is in place, Plaintiff, in order to move discovery forward, agreed
23 to Defendants' proposed protective order as an interim measure until such time as the
   Court either affirms that order or enters a new protective order in response to the instant
24 motion.  *See* Rutter Group, Fed. Civ. Proc. Before Trial (2016), § 11:1166.1
   (recommending this procedure).  The protective order Plaintiff filed with the Court on
25 February 27, 2017, does not create a heightened standard for such a modification
   because the Parties expressly agreed that the execution of Defendants' protective order
26 would be without prejudice to their ability to seek (or oppose) a new protective order in
27 this case, and there is thus no reliance interest at issue.  *See* Olney Decl. ¶ 31, Exs. 23,
   24 at § 4 at page 6:11-20.
28

JOINT DISCOVERY STIPULATION                    -31-
COMPELLING PROD OF DOCS

Civ. P. 26(c)(1).  "A party asserting good cause bears the burden, for each particular document it seeks to protect, of showing that specific prejudice or harm will result if no protective order is granted."  *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003); *see also San Jose Mercury News, Inc. v. United States Dist. Court*, 187 F.3d 1096, 1102 (9th Cir. 1999) (holding that to gain a protective order the party must make "particularized showing of good cause with respect to any individual document").  "If a court finds particularized harm will result from disclosure of information to the public, then it balances the public and private interests to decide whether a protective order is necessary."  *Phillips v. GMC*, 307 F.3d 1206, 1210-11 (9th Cir. 2002); *see also Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470-71 (9th Cir. 1992) (balancing the interests).  "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test."  *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992).  Courts have broad discretion "to decide when a protective order is appropriate and what degree of protection is required."  *Foltz*, 331 F.3d at 1130 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984)).

Plaintiff does not dispute that some protective order is appropriate in this case. Rather, he contests the extreme remedy of the "Highly Confidential" designation, which is a level of protection inappropriate to this employment retaliation case.  This is because § 7(b) of the protective order limits disclosure of "Highly Confidential" documents to Plaintiff's counsel and experts.  Ex. 24 § 7(b).  As a result, counsel may not show such documents to Plaintiff himself or to deposition witnesses.[10]

A "Highly Confidential" or "Attorney's eyes only" designation such as the one sought by Defendants in this case is "the most restrictive possible protective order[.]" *Arvco Container Corp. v. Weyerhaeuser Co.*, No. 1:08-cv-548, 2009 U.S. Dist. LEXIS

---

[10] "Highly Confidential" materials may be viewed only by counsel, experts, the Court including its personnel and staff, court reporters, professional jury or trial consultants, professional vendors, the document's authors and recipients, persons who possessed or <u>knew the information, and mediators</u>, settlement officers, and their staff.  Ex. 24 § 7(b).

9264, at *14 (W.D. Mich. Feb. 9, 2009) (discussing an "attorney's eyes only" designation limiting disclosure to plaintiff's attorneys and expert witnesses).  As such, it is a "drastic remedy" appropriate only "in rare instances" due to its substantial negative impact on the receiving party. *Ragland v. Blue Cross Blue* its *Shield of N.D.*, No. 1:12-cv-080, 2013 U.S. Dist. LEXIS 99369, at *3, 4 (D.N.D. June 25, 2013).  This severe restriction "limits the ability of the receiving party to view the relevant evidence, fully discuss it with counsel, and make intelligent litigation decisions." *Id.* at *3-4.  It also "limits the ability of a party to provide needed assistance to counsel."  *Id.* at *4; *see also Arvco Container Corp.*, 2009 U.S. Dist. LEXIS 9264, at *15-16 ("It is clear to this court that the indiscriminate use of 'attorney's eyes only' protective orders does pose a significant handicap on the restricted litigant. Discovery, trial preparation, and trial are made more difficult and expensive if an attorney cannot make complete disclosure of the facts to the litigant.").

Because protective orders containing a "Highly Confidential" are so disruptive to a plaintiff's case, courts routinely deny them where the producing party fails to identify "a clearly defined and serious injury to the party seeking extraordinary confidential treatment."  *See id.* at *16-18, 23; *Dorchen/Martin Assoc., Inc. v. Brook of Cheboygan*, No. 11-10561, 2012 U.S. Dist. LEXIS 73791, at *3-4 (E.D. Mich. May 29, 2012); *MGP Ingredients, Inc. v. Mars, Inc.*, 245 F.R.D. 497, 500-02 (D. Kan. 2007); *Medtronic Sofamor Danek, Inc. v. Michelson*, No. 01-2373-GV, 2002 U.S. Dist. LEXIS 27981, at *14-16 (W.D. Tenn. Jan. 30, 2002); *Frees, Inc. v. McMillian*, No. 05-1979, 2007 U.S. Dist. LEXIS 4343, at *14-16 (W.D. La. Jan. 22, 2007); *Burris v. Versa Products, Inc.*, No. 07-3938, 2013 U.S. Dist. LEXIS 21851, at *7-8 (D. Minn. Feb. 19, 2013); *EQ Oklahoma, Inc. v. A Clean Env't Co.*, No. 11-CV-510, 2012 U.S. Dist. LEXIS 159571, at *3-5 (N.D. Okla. Nov. 7, 2012); *Ragland*, 2013 U.S. Dist. LEXIS 99369, *7; *Wanke Cascade Distrib. v. Forbo Flooring, Inc.*, No. 3:13-cv-768-AC, 2014 U.S. Dist. LEXIS 51187, at *33-35 (D. Or. Apr. 11, 2014); *Unico Am.  Corp. v. Crusader Captive Servs. LLC*, Case No. 06-CV-231, 2006 U.S. Dist. LEXIS 60719, at *5-6 (N.D. Ill. Aug. 11,

2006).

Here, Defendants have failed to demonstrate good cause for the "Highly Confidential" designation they seek. "If information or documents are to be withheld from a party or client's review, then there must be an extremely well-defined reason for the withholding (i.e., the specific harm that would result based upon the type of document) and the group of documents to be withheld must be narrowly defined." *Dysthe v. Basic Research, L.L.C.*, No. CV 09-08013 AG (SSx), 2011 U.S. Dist. LEXIS 36754, at *5 (C.D. Cal. Apr. 5, 2011); *see also Ragland*, 2013 U.S. Dist. LEXIS 99369, *7 ("[A]ny party seeking 'attorneys' eyes only' protection will have to . . . demonstrate for each item of material why that extreme restriction upon disclosure is justified, including setting forth the specific legal basis for the claim of confidentiality, a demonstration that the strict criteria for imposition of this designation have been satisfied, and a demonstration that less-restrictive alternatives will not provide adequate protection."). Defendants' protective falls well short of this stringent standard. Section 2.4 of the protective order defines "Highly Confidential" information only as "extremely sensitive 'Confidential Information or Items,' including *but not limited to* contract negotiations, rates, revenue and subscriber numbers, and contract terms, the disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means."[11]  (Emphasis added.)  This open-ended definition is vastly overbroad because it does not clearly identify the specific documents or even the general categories of documents Defendants believe require this extreme level of protection. *See Dysthe*, 2011 U.S. Dist. LEXIS 36754, at *3 (stating that "A protective order must be narrowly tailored and cannot be overbroad. Therefore, the documents, information, items or materials that are subject to the protective order shall be described in a meaningful, specific and narrow fashion," and holding that a list

---

[11] Defendants added these categories only in response to Plaintiff's repeated assertions that the protective order failed to establish good cause.  By adding the phrase "including but not limited to," however, they rendered this phrase open-ended and thus nugatory for the purpose of demonstrating good cause.

of categories preceded by the phrase "including but not limited to" failed to demonstrate good cause justifying even a confidential designation).

Equally problematic is Defendants' failure to identify the "substantial risk of harm" they believe would result if documents could only be designated "Confidential." Defendants have never provided Plaintiff with any particularized showing demonstrating a risk of harm, let alone a *substantial* risk of *serious* harm, arising from the disclosure of such documents. *See EQ Okla., Inc. v. A Clean Env't Co.*, No. 11-CV-510-GKF-PJC, 2012 U.S. Dist. LEXIS 159571, at *4-5 (N.D. Okla. Nov. 7, 2012) ("[A]ll ACE has done is alleged that 'sensitive trade material' should not be disclosed because of 'potential injury.' Other than a generic and broad reference to financial information, ACE has not identified what 'sensitive trade material,' if any, exists, or what the 'potential injury' could be. ACE's mere conclusory and stereotyped statements do not satisfy ACE's burden under Rule 26.").

Defendants' failure to explain why the harm it seeks to avoid could not be avoided through less restrictive means, such as a "Confidential" designation, is particularly problematic in light of the fact that the contracts (and thus the trade secrets they purportedly contain) at issue in this case were negotiated three years ago and the information they contain is likely stale.  Nor is there any evidence that any of the individuals who would be made subject to the protective order would not abide by its terms.  *See DeFazio*, 2007 U.S. Dist. LEXIS 98147, at *8-9 ("[A] good bit of the information to be produced in this case, and which in all probability will be designated 'attorneys' eyes only' will be historical in nature, i.e., of not much interest to a competitor who is primarily interested in the 'now.' Finally, the court has no reason to find at this time that plaintiffs lack the integrity to adhere to this protective order."); *MGP Ingredients*, 245 F.R.D. at 502 ("The protective order requires almost all persons who are granted access to confidential information to sign an agreement stating that they have read the protective order and that they agree not to use, permit the use of, or disclose to anyone else the confidential information for any purposes other than this

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

-35-

1  lawsuit. Thus, the risk of anyone abusing his or her knowledge of confidential

2  information appears to be small.").[12]

3      The cases Defendants have cited to Plaintiff during the Parties' meet and confer

4  are clearly distinguishable and further underscore why a "Highly Confidential"

5  designation is inappropriate here.  Defendants' cases support the proposition that this

6  extreme remedy is sometimes appropriate in cases in which the receiving party is the

7  producing party's direct competitor.  *See Nuratech, Inc. v. Syntech (SSPF) Intern., Inc.*,

8  242 F.R.D. 552, 555 (C.D. Cal. Mar. 20, 2007) (approving use of "attorney's eyes only"

9  designation in case against direct competitor); *Pinterest, Inc. v. Pintrips, Inc.*, No. 13-cv-

10  04608-RS (KAW), 2014 U.S. Dist. LEXIS 149497, at *8 (N.D. Cal. Oct. 21, 2014)

11  (same); *Whitney v. Wurtz*, No. C 04-5232 PVT, 2007 WL 484788, at *1 (N.D. Cal. Feb.

12  9, 2007) (denying plaintiffs' motion to permit plaintiffs, who were former employees of

13  the defendant and current employees of a direct competitor, to view documents

14  designated as attorneys' eyes only because plaintiffs did not need to see the information

15  for their counsel to effectively use the information in the case); *compare Medtronic*,

16  2002 U.S. Dist. LEXIS 27981, at *15 (denying attorney's eyes only designation and

17  stating that "Finally, unlike many of the cases relied upon by Medtronic, including *Safe*

18  *Flight*, Karlin and Dr. Michelson are not directly in competition with Medtronic.").

19      Here, a Highly Confidential designation is inappropriate because Plaintiff is not

20  Defendants' direct competitor: he is unemployed, and thus does not compete with

21  anyone. Defendants' asserted belief that Plaintiff *may*, *someday* become Defendants'

22  direct competitor is speculative and falls short of the particularized and concrete

23

24  [12] Although Defendants may argue that Plaintiff's prior whistleblowing demonstrates a likelihood that he will breach the terms of the protective order, any such assertion would

25  not be well taken.  Plaintiff has alleged a claim under § 1102.5(b) of the California Labor Code, a statute which protects the disclosure of conduct that an employee

26  reasonably believes to be unlawful.  Plaintiff's whistleblowing regarding Starz's *unlawful conduct* provides no basis for concluding that he will disregard a *court order*

27  limiting disclosure of information Defendants provide in *satisfaction of their legal*

28  *obligation* to produce discoverable information in this case.

showing required by Rule 26(b). *See Phillips*, 307 F.3d at 1210-11; *Dysthe*, 2011 U.S. Dist. LEXIS 36754, at *5. Moreover, Plaintiff has repeatedly offered to meet and confer to identify any potential deposition witnesses who are direct competitors of Defendants so that they protective order could specifically preclude them from viewing "Highly Confidential" materials, but Defendants have refused to do so.  Olney Decl. ¶¶ 22, 25. In fact, courts deny the use of Highly Confidential designations even in cases that do involve direct competitors where the need for such as an extreme remedy has not been clearly demonstrated. *See Frees*, 2007 U.S. Dist. LEXIS 4343, at *14-17 (denying two-tiered protection scheme even where moving party was plaintiff's direct competitor).

Here, not only have Defendants failed to articulate the need for a "Highly Confidential" designation, but any need is clearly outweighed by the prejudice this level of secrecy would cause Plaintiff's case.  Plaintiff, who has vast industry-specific knowledge on topics including the negotiation of Starz's contracts, would be unable to assist his counsel in analyzing technical documents regarding these negotiations and other topics requiring detailed industry-specific knowledge to properly interpret. Although counsel could seek to retain experts to perform this role, this would greatly increase the cost of this litigation.  Moreover, the two-tiered designation system would preclude Plaintiff's counsel from using "Highly Confidential" documents at deposition to, among other things, elicit testimony, refresh recollection, and impeach witnesses. Defendants' assertion during the meet and confer that individuals who did not author, receive, or have prior knowledge of the documents' contents would be unable to offer admissible testimony is factually incorrect, because such witnesses might still have personal knowledge about issues to which the document refers. Defendants also apply the incorrect standard to deposition testimony, which need be only reasonably calculated to *lead to* the discovery of admissible evidence.  *Oppenheimer Fund*, 437 U.S. at 351-52.

Finally, the protective order's provision in § 6 for challenging confidentiality designations does not render the "Highly Confidential" classification any less

problematic.  Courts have frequently recognized that open-ended protective orders such as the one sought by Defendants lead to over-designation. *See Meharg v. Astrazeneca Pharms.*, No.1:08-cv-184-DFH-TAB, 2009 U.S. Dist. LEXIS 83847, 2009 WL 2960761, at *1 (S.D. Ind. Sept. 14, 2009) (noting the practice of many counsel to over designate discovery responses as confidential); *DeFazio v. Hollister, Inc.*, No. Civ-5-04-1358, 2007 U.S. Dist. LEXIS 98147 (E.D. Cal. Sept. 5, 2007), at *8 ("[T]he very real specter of over-designation of 'attorneys' eyes only' information exists, and plaintiffs should not be put in a position where they are essentially kept in the dark about the important facts of the case.").[13] Here, Defendants have already demonstrated an intent to over-designate. On February 21, Starz served its responses to Plaintiff's First Set of RFPs in which they stated that *they are withholding every single responsive non-ESI, non-privileged document* on the ground that no protective order has been entered in this case, indicating its intention to engage in the wholesale designation of every one of these documents as either "Confidential" or "Highly Confidential." Olney Decl. ¶ 30, Ex. 28.

In light of Defendants' demonstrated track record of over-designation, this provision simply increases the likelihood of future disputes requiring judicial intervention.  *See Ragland*, 2013 U.S. Dist. LEXIS 99369, at *5-6 (D.N.D. June 25, 2013) ("[T]he court believes that the proposed two-tiered designation of material as either 'confidential' or 'attorneys' eyes only' is likely in this case to lead to more disputes that will need to be resolved by the court rather than less."); *Unico Am. Corp.*, 2006 U.S. Dist. LEXIS 60719, at *4 ("It has been this Court's experience that two-tiered

---

[13] *See also Keen v. Nestle Waters N. Am., Inc.*, No. 1:10-cv-1075-LJM-TAB, 2011 U.S. Dist. LEXIS 148874, at *2 (S.D. Ind. Dec. 28, 2011); *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, No. 12-cv-2582 CW (JSC), 2013 U.S. Dist. LEXIS 27828, at *9 (N.D. Cal. Feb. 28, 2013) (stating that "Defendants overused the AEO designation"); *Scentsy, Inc. v. B.R. Chase, L.L.C.*, No. 1:11-cv-00249, 2012 U.S. Dist. LEXIS 143633, at *11-15 (D. Idaho Oct. 2, 2012) (finding that all 43 documents challenged by plaintiff were improperly designated); *Brandt Industries, Ltd. v. Pitonyak Machinery Corp.*, No. 1:10-cv-0857, 2012 U.S. Dist. LEXIS 121214, at *6-10 (S.D. Ind. Aug. 27, 2012) (holding document was improperly designated as attorneys' eyes only).

1   protective orders can be confusing and frequently invite nonproductive satellite

2   litigation.").  For all of these reasons, Plaintiffs request that the Court modify the Parties'

3   protective order to remove the Highly Confidential designation.

4         In the event that the Court declines to remove the Highly Confidential

5   designation, Plaintiff requests the following alternative modifications, each of which he

6   proposed to Defendants prior to bringing the instant motion:

- Require Defendants to identify all of the individuals authorized to view a document designated as "Highly Confidential" pursuant to § 7(b)(6) of the protective order filed on February 27 (providing access to "the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information") and their contact information within 3 days of any request;
- Shorten the time necessary to bring any motion challenging over-designations pursuant to § 6; and
- Require that the Designating Party be the moving party in any such motion pursuant to § 6.

## II.    Defendants' Argument

### A.    The Court Should Not Modify The Stipulated Protective Order.

19        The Court has already entered a stipulated protective order in this case (the

20   "Protective Order").  (Dkt. No. 103.)  It contains terms that are uncontroversial for

21   protective orders, and was the result of significant negotiation between the parties.

22   Plaintiff asks the Court to remove the portion of the Protective Order providing for the

23   designation of "Highly Confidential" information.  The Court should decline to do so.

24   Discovery in this case will involve significant financial information that constitutes

25   Starz's most valuable trade secrets and which need Highly Confidential protection.

26   (Declaration of Kevin Cross ("Cross Decl.") ¶¶ 4-10.)  Plaintiff seeks the ability to

27   disclose this information to witnesses who were never previously aware of it, who could

28   then use that information competitively against Starz.  Plaintiff's motion should be

1   denied.

2   **1.    The Ninth Circuit Has Approved Two-Tier Protective Orders**

3   **Like The One In Place In This Case.**

4   The leading Ninth Circuit decision regarding two-tier protective orders is *Brown*

5   *Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992) (noting that the

6   decision established Circuit law because "[w]e have not previously determined when

7   protective orders for trade secrets may be appropriate.")  Plaintiff cites it only in passing

8   with a "*see also*" citation and the parenthetical "balancing the interests."  Plaintiff's

9   attempt to gloss over the decision is unsurprising since, in that case, the Ninth Circuit

10   not only discussed the circumstances in which such orders are appropriate, but also

11   expressly affirmed the issuance of a two-tier protective order.

12   *Brown Bag Software* held that issuance of a two-tier protective order depends on a

13   balancing test in which the court "must balance the risk to [defendant] of inadvertent

14   disclosure of its trade secrets to competitors against the risk to [plaintiff] that protection

15   of [defendant's] trade secrets impaired prosecution of [plaintiff's] claims."  *Id.*  The

16   Ninth Circuit concluded that a two-tier protective order "strikes a reasonable balance

17   between those interests by shielding [plaintiff's] in-house counsel from personal

18   knowledge of a competitor's trade secrets, but allowing access to information through an

19   independent consultant."  *Id.* at 1471.  In reaching that conclusion, the Ninth Circuit

20   rejected the plaintiff's argument that the two-tier protective order prevented the plaintiff

21   from prosecuting the case, noting that its counsel was able "to study the trade secrets"

22   and "develop any admissible evidence it could."  *Id.*

23   Similar to here, the Ninth Circuit "stress[ed] that [plaintiff] failed to demonstrate

24   how the protective order actually could have or did prejudice its case."  *Id.* at 1472.

25   "[Plaintiff] never attempted to implement the independent consultant method of access

26   to the trade secrets and never argued the method was unduly burdensome."  *Id.* "Instead,

27   [plaintiff] alleged its unfettered right to the discovery documents and complained of

28   arbitrary discrimination against in-house counsel."  *Id.*  "[Plaintiff's] arguments are

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

-40-

1  unsubstantiated." *Id.* Thus, the Ninth Circuit affirmed issuance of the two-tier

2  protective order.

3      The result should be the same here. On the one hand, Plaintiff offers no

4  evidentiary showing that a two-tier protective order would prejudice his prosecution of

5  this case. Plaintiff makes a general legal argument about the burdens that a two-tier

6  protective order imposes. Plaintiff supports that legal argument with quotations and

7  citations to a number of cases. That is insufficient. There is plenty of language in

8  *Brown Bag Software* (and other cases cited by Plaintiff) that discusses that burden. But

9  as the Ninth Circuit made clear in *Brown Bag Software*, the plaintiff must make a

10 concrete showing of burden, supported by admissible evidence—not, as Plaintiff has

11 done here, simply argue about it.

12     On the other hand, Defendants have made a detailed evidentiary showing of the

13 risk that their trade secrets will be disclosed if the Court modifies the protective order in

14 the manner that Plaintiff requests. Among other things, Starz's contract negotiations

15 (including internal discussions about how to approach a negotiation and external

16 communications with those affiliates) need protection from public disclosure. (Cross

17 Decl. ¶ 4.) Public release of information regarding strategies Starz uses when

18 negotiating its affiliate agreements would harm Starz's ability to implement these similar

19 strategies during future negotiations. (*Id.*) Every affiliate has a unique "carriage" deal

20 structure. (*Id.* ¶ 5.) Sharing the terms of these deals and the negotiation of those terms

21 with Starz's other affiliates, who are not parties to that agreement, will harm Starz's

22 ability to negotiate the best possible terms in future carriage negotiations and future

23 marketing and promotions negotiations. (*Id.*) Due to the nature of these affiliate sales

24 agreements, the risk of harm to Starz is ongoing and severe if these agreements were

25 disclosed publicly, to any affiliate, to any person who is likely to be employed by an

26 affiliate in the future, to any competitor, or to any person who is likely to compete with

27 Starz in the future. (*Id.* ¶ 6.) Financial data concerning revenues, profits, expenses,

28 losses, profit margins, and subscriber information also requires protection. (*Id.* ¶ 8.)

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

-41-

1   These facts are described in far greater detail in the declaration of Kevin Cross, a Senior

2   Vice President in Starz's Business and Legal Affairs Department.  (*Id.* ¶¶ 4-10.)

3       The difference between Plaintiff's *argument* and Defendants' *evidentiary showing*

4   is laid bare in Plaintiff's assertion that "the contracts (and thus the trade secrets they

5   purportedly contain) at issue in this case were negotiated three years ago and the

6   information they contain is likely stale."  Plaintiff offers no evidence in support of his

7   assertion that Defendants' trade secrets are not valuable.  He just pulls "likelihood" out

8   of thin air.  Worse, he effectively asks this Court to conclusively hold that Defendants'

9   trade secrets are not valuable, based on his speculation alone, and therefore modify the

10  protective order so that it no longer protects those trade secrets.  By contrast, Defendants

11  have submitted actual evidence that contracts negotiated three years ago are among

12  Starz's most valuable trade secrets.  (Cross Decl. ¶ 4.)  The contracts are negotiated for

13  terms of multiple years, which in many cases will make a three-year-old contract the

14  current or most recent contract.  (*Id.* ¶ 5.)  In future negotiations, it would be highly

15  detrimental to Starz (and highly advantageous to the parties with which it contracts) if

16  one contract's terms were disclosed to third parties, who could then use that information

17  to negotiate more favorable terms for their own contracts.  (*Id.*)  Unlike Plaintiff,

18  Defendants do not just offer speculation about whether Starz's trade secrets are

19  valuable—Defendants offer evidence that they are.

20      Notably, in arguing that Starz's trade secrets are unworthy of this type of

21  protection, Plaintiff is forced to talk out of both sides of his mouth.  In his operative

22  complaint, Plaintiff alleged that when a former employee of DIRECTV with access to

23  this type of information joined Starz's Board of Directors, the mere fact that he had

24  knowledge of it somehow disqualified him from working in any capacity for Starz.

25  (Carter Decl., Exh. B at ¶ 24.)  Yet Plaintiff now is so unconcerned about this same type

26  of information that he not only argues that former Starz employees should be permitted

27  to join affiliates or competitors, but that Starz should be unable to designate this type of

28  information as Highly Confidential to prevent them from seeing it.  The truth lies in the

1  middle of Plaintiff's two extremes:  employees can change jobs, but the former employer

2  should be entitled to take appropriate measures to protect its trade secret and confidential

3  information.

4      In short, Defendants have made an evidentiary showing that supports maintaining

5  the currently-existing Protective Order in this case without modification.  Plaintiff has

6  made no evidentiary showing that the protective order is unjustified or that it would

7  prejudice his prosecution of this case.  Accordingly, the balancing required by the Ninth

8  Circuit's decision *Brown Bag Software* is easy:  the evidence weighs entirely in favor of

9  maintaining the Protective Order without modification, and Plaintiff's motion to modify

10  it should be denied.

11          **2.**      **Plaintiff's Authorities Confirm That Two-Tier Protective Orders**

12                  **Should Issue To Protect Confidential Business Information.**

13      Plaintiff offers a long, unexplained string cite of ten out-of-state cases that

14  supposedly support his assertion that "[b]ecause protective orders containing a 'Highly

15  Confidential' [sic] are so disruptive to a plaintiff's case, courts routinely deny them . . ."

16  In fact, they do not.

17      Of the ten decisions cited by Plaintiff as "routinely deny[ing]" a two-tier

18  protective order, only one comes from within the Ninth Circuit, and it is directly

19  contrary to Plaintiff's argument:  *Wanke Cascade Distrib. v. Forbo Flooring, Inc.*, No.

20  3:13-cv-768-AC, 2014 U.S. Dist. LEXIS 51187, at *33-35 (D. Or. Apr. 11, 2014).

21  Despite Plaintiff's mischaracterization of the case, *Wanke* actually entered a two-tier

22  protective order.  *Wanke* cited and incorporated by reference the Ninth Circuit's

23  standards set forth in *Brown Bag Software*, *id.* at *3, and held:  "The Court finds good

24  cause exists to enter a two-tier protective order that permits the parties to designate

25  documents as either 'Confidential' or 'Attorney's Eyes Only.'"  *Id.* at *2.  In other

26  words, *Plaintiff falsely cited Wanke as a case in which a motion for a two-tier protective*

27  *order was denied, when in fact it was granted*.  Of course, mistakes happen.

28  Significantly, however, this is not the only one.

1    Plaintiff also cites *Medtronic Sofamor Danek, Inc. v. Michelson*, No. 01-2373-GV,

2    2002 U.S. Dist. LEXIS 27981, at *14-16 (W.D. Tenn. Jan. 30, 2002), as "routinely

3    deny[ing]" a two-tier protective order, but again that Court granted one.  Notably, even

4    though the District Court in that case was in the Sixth Circuit, it cited the "the balancing

5    test set forth in *Brown Bag Software*," and held that "information will be designated as

6    'attorneys' eyes only' and may be viewed only by the persons specified in the court's

7    Protective Order that qualify under that tier." *Id.* at *17.  Strike two for Plaintiff.

8    Plaintiff also cites *Burris v. Versa Products, Inc.*, No. 07-3938, 2013 U.S. Dist.

9    LEXIS 21851, at *7-8 (D. Minn. Feb. 19, 2013), as "routinely deny[ing]" a two-tier

10   protective order, but that is not really true either.  In *Burris*, "[t]he parties did not even

11   ask for the right to produce certain information under a 'Confidential Attorney's Eyes

12   Only' designation." *Id.* at *8.  Since no one even requested a two-tier protective order, it

13   should go without saying that the Court did not rule on the issue.  Strike three.

14   Some of the cases cited by Plaintiff actually did deny a request for a two-tier

15   protective order, but none of them provides any support for modifying the current

16   Protective Order in the circumstances of this case.  For example, in *EQ Oklahoma, Inc.*

17   *v. A Clean Env't Co.*, No. 11-CV-510-GKF-PJC, 2012 U.S. Dist. LEXIS 159571, at *3-5

18   (N.D. Okla. Nov. 7, 2012), the court denied an application for a two-tier protective order

19   where the defendant "provided **no** evidentiary support to this Court.  Nor did ACE

20   articulate any legal argument and cited to **no** legal support for its position." *Id.* at *3

21   (emphasis in original).  By contrast here, Defendants have provided a declaration

22   containing evidentiary support, articulated legal arguments, and cited to Ninth Circuit

23   authority in support their position.  Most of the other decisions cited by Plaintiff are to

24   the same effect:  *Arvco Container Corp. v. Weyerhaeuser Co.*, No. 1:08-cv-548, 2009

25   U.S. Dist. LEXIS 9264 (W.D. Mich. Feb. 9, 2009); *Dorchen/Martin Assoc., Inc. v.*

26   *Brook of Cheboygan*, No. 11-10561, 2012 U.S. Dist. LEXIS 73791 (E.D. Mich. May 29,

27   2012); *Ragland v. Blue Cross Blue Shield of N.D.*, No. 1:12-cv-080, 2013 U.S. Dist.

28   LEXIS 99369 (N.D. D. June 25, 2013); and *Unico Am. Corp. v. Crusader Captive Servs.*

JOINT DISCOVERY STIPULATION               -44-
COMPELLING PROD OF DOCS

1   *LLC*, Case No. 06-CV-231, 2006 U.S. Dist. LEXIS 60719 (N.D. Ill. Aug. 11, 2006).

2   The fact that parties in those cases made no effort to support an application for a

3   protective order with any factual or legal showing is irrelevant here, and provides no

4   support for Plaintiff's argument that courts routinely deny two-tier protective orders

5   because they "are so disruptive to a plaintiff's case."

6         Of the ten decisions cited by Plaintiff, only four involved robust discussion by the

7   parties and the courts:  *Wanke* and *Medtronic*, which as discussed above actually granted

8   two-tier protective orders, *Frees, Inc. v. McMillian*, No. 05-1979, 2007 U.S. Dist.

9   LEXIS 4343, at *14-16 (W.D. La. Jan. 22, 2007), and *MGP Ingredients, Inc. v. Mars,*

10  *Inc.*, 245 F.R.D. 497, 500-502 (D. Kan. 2007).  A review of the latter decisions,

11  however, makes clear that the reasons for denying a two-tier protective order in those

12  cases simply do not exist here.  *Frees* and *MGP* both involved highly specialized

13  technical trade secrets.  In *Frees*, the court found that review of confidential documents

14  by the parties was absolutely essential because they were the only ones who could

15  understand and interpret it for the attorneys:  "Frees' trial counsel are not likely to have

16  such expertise.  Therefore, if Frees' personnel were not allowed to review the discovered

17  information, Frees would be forced to hire an outside consultant which, as Frees points

18  out, would not only be very expensive, but also very difficult because, according to

19  Frees, no experts currently have the particularized knowledge of Frees' technology

20  necessary to properly evaluate the Southeast documents."  *Frees*, 2007 U.S. Dist. LEXIS

21  4343 at *15-16.  Similarly, in *MGP*, the court cited *Frees* and held that a protective

22  order should be denied because the parties' "in-house personnel have substantial

23  experience in a narrow field that cannot be replaced in the 'open market.'"  *MGP*

24  *Ingredients*, 245 F.R.D. at 502.

25        Unlike *Frees* and *MGP*, this case does not involve technical trade secrets at all—

26  much less technical trade secrets that are so specialized that not even experts can

27  understand them, necessitating their review by the parties themselves.  Thus, *Frees* and

28  *MGP* provide no support for Plaintiff's argument.

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS                          -45-

1   Significantly, the distinction between specialized technical trade secrets and trade

2   secrets involving confidential financial and business information was expressly

3   addressed by the Court in *Medtronic*—which, again, is one of the cases cited by

4   Plaintiff.  In that case, one of the questions presented was whether one of the parties, Dr.

5   Michelson, should be permitted access to certain technical information.  Because "all the

6   technology at issue was created by Dr. Michelson," the Court held that he was "uniquely

7   qualified" to review it and that "the danger of Dr. Michelson abusing his knowledge of

8   confidential information is small, as he was the inventor of the technology behind the

9   spinal implants manufactured by Medtronic."  *Medtronic Sofamor Danek*, 2002 U.S.

10   Dist. LEXIS 27981, at *14-15. "In contrast to the spinal fusion technology, Medtronic's

11   financial and marketing data stands on a different footing . . . there is no reason for Dr.

12   Michelson to have access to this information." *Id.* at *16.  Thus, the Court entered a

13   two-tier protective order for the financial information.  The result should be the same

14   here for three reasons.

15   First, this case, like *Wanke* and *Medtronic* and unlike *Frees* and *MGP*, involves

16   financial information rather than technical information.  (Cross Decl. ¶¶ 4-10.)  Like in

17   *Wanke* and *Medtronic* and unlike in *Frees* and *MGP*, neither Plaintiff nor the third-party

18   deponents to whom he seeks to disclose Defendants' Highly Confidential Information is

19   "uniquely qualified" to review that information.  *See, e.g., Medtronic Sofamor Danek*,

20   2002 U.S. Dist. LEXIS 27981, at *17.  Because of the type of information at issue, a

21   Highly Confidential designation is appropriate.

22   Second, as *Wanke* and *Medtronic* make clear, just because some information may

23   not ultimately be subject to Highly Confidential protection is not a reason to deny entry

24   of a two-tier protective order entirely.  In *Medtronic*, the Court held that even though

25   some information could not be designated as attorneys' eyes only, a two-tier protective

26   order should be entered because other information could.  In *Wanke*, the Court deferred

27   consideration of which information should be attorneys' eyes only for another day,

28   holding that "because the protective order the court will enter provides a procedure for

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS                         -46-

removing the AEO designation, Forbo's concerns are adequately addressed and balanced against Wanke's interests in safe-guarding its competitively sensitive information." 2014 U.S. Dist. LEXIS 51187, at *8.

The result should be the same here: the Court should leave the two-tier protective order in place as it currently exists. If Plaintiff objects to particular designations of information as Highly Confidential, he can present those objections on a case-by-case basis. But his attempt to modify the protective order itself fails—ironically, even under Plaintiff's own authorities. Comparing *Wanke* and *Medtronic* with *Frees* and *MGP* is not even a case of comparing Plaintiff's cases with Defendants'. All four of those cases—and, indeed, all of the cases cited in this section of the Stipulation—were affirmatively relied upon by Plaintiff. They simply do not say what Plaintiff claims they do. If Plaintiff cannot make a showing that the Protective Order should be modified even under his own authorities—which ignore the Ninth Circuit's seminal decision in *Brown Bag Software*—it is clear that his request to modify the Protective Order should be denied.

Third, the "Highly Confidential" provision in the Protective Order in this case is far more limited than in the authorities cited by Plaintiff: it is not strictly an attorneys' eyes only provision. Plaintiff asserts that "the protective order limits disclosure of 'Highly Confidential' documents to Plaintiff's counsel and experts. (*supra*, p.34). As a result, counsel may not show such documents to Plaintiff himself or to deposition witnesses." That is untrue. The Protective Order permits disclosure of Highly Confidential information to *seven categories of recipients* including, as most relevant here, "the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information." (Olney Decl., Ex. 24 § 7(b)).

In other words, the Highly Confidential provision is significantly less restrictive than the "attorneys' eyes only" provisions at issue in the decisions on which Plaintiff relies. Under the existing Protective Order, if Plaintiff was an author or recipient of a

1   Highly Confidential document, he can view it.  Similarly, if a deposition witness was an
2   author or recipient of a Highly Confidential document, he or she can view it.  This was
3   already a significant concession on Defendants' part.  Indeed, in many of the cases on
4   which Plaintiff relies, the issue is merely whether to allow such recipients access to the
5   documents, which Defendants have already stipulated to here.

6        By contrast, Plaintiff's requested removal of the Highly Confidential provision
7   would permit distribution of such documents to Plaintiff and to deposition witnesses
8   even if they never sent or received the documents.  In other words, it would permit
9   disclosure of Highly Confidential documents to people with no personal knowledge of
10  their contents under the guise of questioning them in discovery—even though they have
11  no personal knowledge.  Even Plaintiff appears to recognize how egregious that is when
12  he states:  "Plaintiff has repeatedly offered to meet and confer to identify any potential
13  deposition witnesses who are direct competitors of Defendants so that they [sic]
14  protective order could specifically preclude them from viewing 'Highly Confidential'
15  materials."  Yet how would the parties even identify Highly Confidential materials
16  without being able to designate them as such under the Protective Order?  In other
17  words, Plaintiff wants the Court to modify the Protective Order to remove the structure
18  by which Defendants can protect their Highly Confidential information, and then trust
19  Plaintiff to provide some additional consideration on an ad-hoc basis.  Such an
20  arrangement would be unprecedented and unfair.

21          **3.     Courts Consistently Approve Two-Tier Protective Orders For**
22                  **Confidential Business Information Like That At Issue Here.**

23       Plaintiff's own authorities so clearly support imposition of a two-tier protective
24  order that discussion of additional authorities seems superfluous.  Since only one of
25  Plaintiff's ten authorities is within the Ninth Circuit (and, notably, entered a two-tier
26  protective order), however, it is worth noting that courts within the Ninth Circuit
27  routinely enter two-tier protective orders in circumstances similar to those here.

28       For example, *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 822 n.1

---

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS                          -48-

1   (9th Cir. 2011), is an employment action in which the court issued a "protective order

2   allowing [the parties] to designate certain material as 'Confidential' or 'Highly

3   Confidential' and file it under seal." Thus, to the extent that Plaintiff argues that trade

4   secrets can only be protected in trade secret cases, and not in employment actions, he is

5   clearly wrong. Trade secrets must be protected in every type of case, and they have

6   specifically been protected by the Ninth Circuit in employment actions. *See id.* ("We are

7   mindful of PwC's interest in protecting its proprietary business information."); *see also*

8   *Walton v. K-Mart, Inc.*, No. C07-0707 PJH (BZ), 2007 WL 4219395, at *2 (N.D. Cal.

9   Nov. 28, 2007) (ordering the parties in a single plaintiff employment dispute to enter

10  into an attorneys' eyes only protective order).

11       In *Omega S.A. v. Costco Wholesale Corp.*, No. CV 04-5443-TJH (RCx), 2005 WL

12  6411417, at *2–3 (C.D. Cal. June 8, 2005), the Court expressly rejected a plaintiff's

13  claim that a lesser protective order would suffice. In that case, the court had entered a

14  two-tier protective order in which "highly confidential" documents could be viewed by

15  counsel and the parties' representatives. *Id.* at *2. The defendant moved to modify the

16  protective order so that "highly confidential" documents could only be viewed by

17  counsel. *Id.* Balancing the parties' interests as required by *Brown Bag Software* and

18  relying on a declaration by an employee of the defendant regarding the value of the

19  information, the Court held that the protective order should be modified to protect the

20  defendant's "commercial information" from disclosure to party representatives. *Id.*

21       Indeed, in contrast to Plaintiff's failure to cite a single decision from within the

22  Ninth Circuit in which a two-tier protective order has been denied, courts in this Circuit

23  routinely issue such orders. *See, e.g., Oracle Am., Inc. v. Google Inc.*, No. 10-cv-03561-

24  WHA (DMR), 2016 WL 674368, at *1-2 (N.D. Cal. Feb. 19, 2016) (explaining that

25  Highly Confidential designations protect the disclosure of businesses' confidential

26  information); *Advanced Visual Image Design, LLC v. Exist, Inc.*, No. EDCV 14-2525-

27  JGB (KKx), 2015 WL 4934178, at *7 (C.D. Cal. Aug. 18, 2015) (ordering the

28  production of financial documents to be designated confidential or highly confidential as

appropriate, pursuant to the protective order); *M.G. v. Metro. Interpreters & Translators, Inc.*, No. 12cv0460-JM (MDD), 2014 WL 5494910, at *2 (S.D. Cal. Oct. 30, 2014) (ordering the production of financial documents pursuant to "the outstanding Protective Order . . . and classified as 'attorneys eyes only.'"); *AFMS LLC v. United Parcel Serv. Co.*, No. 12cv1503 JLS (NLS), 2012 WL 3112000, at *2 (S.D. Cal. July 30, 2012) (permitting a protective order with a highly confidential designation thus limiting AEO documents to only outside counsel, specifically named in-house counsel at defendants, experts, the court and its staff, litigation support vendors, and the author or recipient of the document or the original source of the information); *Couch v. Wan*, No. 1:08cv1621 LJO DLB, 2011 WL 4474396, at *2 (E.D. Cal. Sept. 26, 2011) (ordering the "existing protective order [to] be modified to include an 'Attorneys' Eyes Only' provision, which allows the designated documents to be disclosed to the authors of the documents, expert witnesses and persons identified by the documents as having previously seen the documents."); *CytoSport, Inc. v. Vital Pharm., Inc.*, No. CIV S-08-2632 FCD/GGH, 2010 WL 1904840, at *4 (E.D. Cal. May 10, 2010) (denying defendant's request to modify the protective order to permit in-house counsel (a competitor) to view AEO material because, among other reasons, it offered no evidence that any actual prejudice would be caused by the order); *San Francisco Bay Area Rapid Transit Dist. v. Spencer*, No. C 04-04632 SI, 2006 WL 3050860, at *1 (N.D. Cal. Oct. 23, 2006) (finding that "[d]efendants' apprehension of the financial records becoming public can be resolved by designating this information as confidential or highly confidential pursuant to the protective order.").

Defendants could provide many more examples, but they grow weary of beating a dead horse. The truth is that the Protective Order in place in this case is routine. That Plaintiff has gone to such extraordinary efforts to attack it reflects nothing but the vitriol with which he has pursued this litigation. Plaintiff does a wonderful job of taking an outlandish position and seemingly supporting it in a reasonable fashion. But he does so by cherry-picking language from out-of-Circuit authorities in a way that both ignores the

1   law of this Circuit and misrepresents the holdings of the cases in which he relies—going

2   so far as to say that two cases denied two-tier protective orders when in fact those cases

3   granted them. To prevent this Court from relying on Plaintiff's outright

4   misrepresentations, Defendants were required to discuss this issue in far greater detail

5   than it otherwise merited. This is an easy issue to resolve: there is a standard protective

6   order in place, and Plaintiff offers no legitimate reason to modify it.

### 4.   Plaintiff's Suggested Burden-Shifting Is Unworkable.

8           Apparently recognizing that he overreaches by attempting to preclude Defendants

9   from designating any material whatsoever as Highly Confidential, Plaintiff alternatively

10  requests that the Court make three other modifications to the Protective Order that would

11  require Defendants to automatically produce additional information when designating

12  materials as Highly Confidential, shorten the time for bringing "any motion challenging

13  over-designations" and require "that the Designating Party be the moving party in any

14  such motion." Those requests are nonsensical.

15          Plaintiff has never explained how those modifications would work, attempted to

16  justify why they should be made, and offered no authority supporting such

17  modifications—either here or in the meet and confer process. Plaintiff's throw-away

18  request wholly fails to satisfy his burden to show any reason why the Protective Order

19  should be modified, and it should be denied for that reason alone.

20          The Protective Order in this case is based on this Court's model protective order,

21  which provides in Section 6.2: "The Challenging Party shall initiate the dispute

22  resolution process under Local Rule 37-1 et seq." *See* AFM Form Stipulated Protective

23  Order (rev 7-14-16), available at

24  https://www.cacd.uscourts.gov/sites/default/files/documents/AFM/AD/AFM%20Form%

25  20Stipulated%20Protective%20Order%20%28rev%207-14-16%29.pdf.

26          This Court's model protective order places the burden on the Challenging Party to

27  initiate the dispute resolution process for good reason: to prevent unnecessary disputes

28  before the Court. Plaintiff's contrary proposal would ensure that this Court would be

---

1   required to preside over dozens of motions regarding confidentiality designations, if not

2   more.  That would create enormous and unnecessary burdens for both the Court and the

3   parties.

4        Given the scope of discovery in this action—more than one million documents to

5   which Defendants have agreed to apply search terms, and more than four million

6   documents to which Plaintiff wants to apply search terms—Defendants may need to

7   designate a significant number of documents as Confidential or Highly Confidential.  A

8   great many of those documents may have little or no relevance to the issues in this case.

9   Certainly, the parties cannot present a million documents at trial.  The question the Court

10   should answer, then, is whether it really wants to resolve otherwise unnecessary disputes

11   regarding the confidentiality of irrelevant documents.  Consider:

12        On the one hand, if the burden is on the party objecting to a confidentiality

13   designation to file a motion with the Court, then that party presumably will only file a

14   motion with respect to documents on which it is truly relying.  That should mean a fairly

15   limited number of motions.

16        On the other hand, if the burden is on the designating party to file a motion to

17   support its designation, then the opposing party can claim an intent to rely on as many

18   documents as it wants, forcing the designating party to file motions to protect all of those

19   documents.  By removing any cost on the opposing party, such a mechanism all but

20   ensures that this Court will be required to preside over countless unnecessary discovery

21   disputes.

22        To avoid the problems that would be created by granting Plaintiff's unexplained

23   request for a modification of the Protective Order's provisions regarding challenging

24   designations of confidential material, Plaintiff's request should be denied.

25        Similarly, Plaintiff offers no explanation or authority for his request that the Court

26   compel a designating party to provide additional information along with designations of

27   confidential material.  Once again, doing so would impose significant burdens on the

28   producing party, as it would be required to conduct exhausting searches for that

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

1  additional information with respect to innumerable documents that ultimately may have
2  little or no relevance to the case.

3       There is a reason why not only the Court's model order but also the Federal Rules
4  regarding document production in general do not require parties producing documents to
5  concurrently produce explanatory information regarding the documents:  doing so would
6  be unduly burdensome.  Nothing prevents the party receiving the documents from
7  conducting discovery regarding the documents and requesting information about them, if
8  the document is significant enough to merit such discovery.  But there is no basis for
9  compelling a party producing those documents to automatically search for information
10  regarding each and every document that it produces.

11      Accordingly, Plaintiff's request to modify the Protective Order in this case, which
12  is based on this Court's model protective order, should be denied.

13  **B.     There Is No Basis For This Court To Order Seizure Of Individuals'**
14  **iPhones and Email Accounts, Especially Without Providing Them A**
15  **Chance To Object.**

16      Plaintiff's request for the *ex parte* seizure of Starz's current and former
17  employees' own, personal smartphones (and other "electronic devices") and email
18  accounts is one of the three remedies that Plaintiff expressly seeks in his conclusion.
19  Yet there is no mention of it in Plaintiff's introduction, which asserts that only two
20  issues are presented.  The issue does not receive its own section of Plaintiff's argument.
21  Instead, Plaintiff buries all consideration of the issue in two paragraphs at the end of his
22  discussion of ESI.  There is good reason for Plaintiff to hide his request:  it is
23  outrageous.

24      Plaintiff correctly states that the Federal Rules of Civil Procedure only require
25  production of relevant material in the "possession, custody, or control" of a party, and
26  that the Ninth Circuit has defined "control" to mean "the ***legal right*** to obtain documents
27  upon demand."  *United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d
28  1450, 1452 (9th Cir. 1989) (emphasis added).  Conversely, "[o]rdering a party to

produce documents that it does not have the legal right to obtain will oftentimes be futile, precisely because the party has no certain way of getting those documents." *In re: Citric Acid Litigation*, 191 F.3d 1090, 1108 (9th Cir. 1999).

Employers do not have any "legal right" to seize employees' iPhones and search their contents.  Because Starz lacks control over its employees' personal smartphones and other electronic devices, they cannot be part of any production order.

Plaintiff asserts that *Miniace v. Pac. Mar. Ass'n*, No. C 04-03506 SI, 2006 U.S. Dist. LEXIS 17127, at *6 (N.D. Cal. Feb. 13, 2006), somehow supports his assertion that employers have control over employees' personal electronic devices.  It does not. *Miniace* has nothing to do with employee's personal electronic *devices*.  *Miniace* deals with work-related *documents* in the possession of current employees or directors.  It unremarkably holds that the company has "the legal right to obtain documents upon demand" from current directors (though not former directors, over which the company lacks any continuing control).  *Id.*[14]  No doubt, companies have the right to demand that current employees or directors produce work-related documents.  But nothing in *Miniace* supports Plaintiff's assertion that companies have the right to demand that employees produce their personal cell phones for inspection.  Companies have no such legal right.

By contrast, the Court considered the exact issue here in *Kickapoo Tribe of Indians v. Nemaha Brown Watershed Joint Dist. No. 7*, 294 F.R.D. 610 (D. Kan. Sept. 23, 2013).  In *Kickapoo*, just like here, the plaintiff "moved the Court to order forensic mirror imaging of computers and other electronic devices personally owned by current and former District Board members, employees, and staff."  *Id.* at 618.  "More specifically, [plaintiff] requests all personal notes, emails, text messages, meeting records, phone logs, documents, and all other materials of any kind requested in RFPs." *Id.*  The Court concluded that, even if those devices contained work-related information

---

[14] Notably, Plaintiff offers no authority that would permit Starz to produce anything held by *former* employees, and even *Miniace* is to the contrary.  Accordingly, the numerous custodians who are former Starz employees are not really at issue, and Defendants will focus on the issues as they pertain to current employees.

that might be responsive to the requests, the employer had no power or obligation to produce them because, "as to the personally-owned computers of current Board members, employees, and staff, the Court finds . . . that the District does not have possession, custody, or control of these items." *Id.*

Although employers' lack of any legal right to demand employees' personally-owned electronic devices is reason enough to deny Plaintiff's demand for them, Plaintiff's demand also implicates significant privacy concerns. The Court in *Kickapoo* continued: "In addition, the Court has significant concerns regarding the intrusiveness of the request and the privacy rights of the individuals to be affected." *Id.* There is good reason for such concerns. *See Riley v. California*, 134 S. Ct. 2473, 2490 (2014) ("it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate."); *United States v. Cotterman*, 709 F.3d 952, 966 (9th Cir. 2013) (making "copies of the hard drives and perform[ing] forensic evaluations" is "essentially a computer strip search.").

Plaintiff fails to cite a single judicial decision permitting a private employer to seize and search employees' personal cell phones, nor has Defendant found any. If this Court makes such an order, it will not only be the first to do so—it will very likely cause alarm amongst millions of Americans who must suddenly fear that, tomorrow, their employers will suddenly assert "control" over their cell phones. The question is not simply whether Plaintiff can get discovery. The question is whether an employer can violate its employees' privacy by forcing them to hand over their personal cell phones merely because a single plaintiff demanded it in discovery. The answer must be no.

"The Court must therefore deny the request for forensic mirror imaging of computers and other electronic devices personally owned by current and former District Board members, employees, and staff." *Kickapoo*, 294 F.R.D. at 619; *see also Matthew Enterprise, Inc. v. Chrysler Group LLC*, 2015 WL 8482256, *4 (N.D. Cal. Dec. 10, 2015) (denying motion to compel production of emails from employees' personal email

1  accounts because employer did not have any legal right to collect emails from those

2  accounts and therefore had no "control" over them); *Cotton v. Costco Wholesale*

3  *Corporation*, No. 12-2731-JWL,  2013 WL 3819975, at *6 n.25 (D. Kan. July 24, 2013)

4  (denying plaintiff's motion to compel production, reasoning that because defendant did

5  not issue cell phones to its employees and therefore did not have "a legal right to obtain

6  on demand" text messages that had been sent "from employees' personal cell phones.").

7       Plaintiff's argument that Starz somehow exercises "control" over current (but not

8  former) employees' personal cell phones and email accounts because it can fire them is a

9  *non sequitur*.  The right to terminate employment does not imply the right to seize

10 personal cell phones or email accounts, and the ability to coerce employees in that

11 fashion plays no part in the statutory test.  The Ninth Circuit has specifically held that "a

12 theoretical possibility that" a party could "gain access" to documents is "insufficient to

13 give [that party] 'control' for purposes of Federal Rule 45(a)."  *In re Citric Acid*

14 *Litigation*, 191 F.3d at 1107.  "[T]he ***legal control*** test is the proper standard under Rule

15 45."  *Id.* (emphasis added).  Plaintiff's argument confuses the ability to extort property

16 with a legal right to obtain it.  Because employers have no ***legal*** right to obtain access to

17 current (or former) employees' personally-owned electronic devices, Plaintiff's request

18 that this Court order their seizure must be denied.

19       **C.**  **Consideration Of Specific ESI Search Criteria Is Premature Because**

20       **Plaintiff Failed To Meet And Confer In Good Faith.**

21       The parties are still early in the meet and confer process regarding ESI.  So early,

22 in fact, that Plaintiff included a never-before-seen proposal in this motion—and then

23 even amended it further after serving this motion.  Specifically, on February 27, 2017,

24 Plaintiff sent a revised proposal of ESI search terms embedded in his portion of the joint

25 stipulation to compel production of ESI, among other things.  (*See supra*, fn. 4

26 ("Plaintiff has slightly revised his proposals as set forth in the instant motion to expand

27 several proposals [and] narrow others.")).  Plaintiff sent a further revised version of his

28 search term proposal embedded in a revised version of his portion of the joint stipulation

on March 1, 2017. (Carter Decl., Exhs. J-K.) In other words, Plaintiff's proposed search terms are in such flux that he felt compelled to change them both at the time of serving this motion and again after serving this motion. That strongly suggests that greater meet and confer efforts were required before bringing this motion.

Plaintiff made his first proposal regarding ESI custodians on January 26, 2017—at which time Plaintiff sought documents from an incredible **50 custodians**. (Carter Decl. ¶ 6.) Plaintiff also sought a response within 24 hours, which was not enough time even for Defendants and their counsel even to figure out who these 50 people were. (*Id.* ¶ 8.) Plaintiff describes this as Defendants refusing "to meet and confer quickly." (*Id.* ¶ 9; Olney Decl. ¶ 5.)

On February 1, 2017, Defendants proposed an initial ESI search of **6 custodians**—a number that is far more proportional to this single-plaintiff wrongful discharge case. (Carter Decl. ¶ 12.) Not every person who has even the slightest bit of knowledge that is tangentially related to this case should be subject to a massive ESI search. Arguably, only 2 custodians are at the heart of this case—Plaintiff and his supervisor, Thornton, who made the decision to terminate Plaintiff's employment. At 6 custodians, Defendants had already offered more than is really necessary.

The next day and again on February 7, the parties conferred regarding ESI discovery. Plaintiff's counsel did not appear to understand certain aspects of ESI review, including that what he was requesting would require Starz to (i) collect tens of millions of documents from its archives (which could take weeks); (ii) migrate that data to software capable of reviewing it (which could also take weeks); (iii) process that data (which could take weeks, if not months); and (iv) run de-duplication software (which could take weeks, if not months). (*Id.* ¶ 14.)

Following the meet and confer, Defendants offered several conditional compromises to Plaintiff, even though Defendants believed that adding custodians was unnecessary and unduly burdensome. (*Id.* ¶ 17.) Defendants offered to provide information regarding the size of the data archives once Plaintiff sent revised search

terms, custodians, and time frames.  (*Id.* ¶ 18.)  On February 13, Plaintiff provided that list, and Defendants began working to collect the information.  (*Id.* ¶¶ 19, 21.)

But just four days later, on February 17, Plaintiff apparently decided that Defendants had not moved fast enough and stated that he intended to bring this motion to compel.  (*Id.* ¶ 21.)  Defendants stressed that a motion was premature.  (*Id.* ¶ 22.)  Deciding otherwise, Plaintiff brought this motion.

Beyond Plaintiff's short-circuiting of the meet and confer process regarding ESI itself, Plaintiff's motion requests ESI searches for documents Defendants did not agree to produce.  This amounts to an end run around the normal process of resolving issues regarding the discovery requests themselves, and an attempt to sneak into ESI searches substantive matters that have not been resolved—and that are improper subjects of ESI searches even if some substantive production might somehow be proper.

For example, Plaintiff's search numbers 34[15] and 35[16] request an ESI review of Starz's Chief Financial Officer's files because Defendants' Initial Disclosures stated that he would provide testimony on "Starz's revenue forecast process, the variance between the projected and actual revenues, the connection between the projected revenue and bonuses, and DIRECTV's performance."  Defendants did not agree to produce this information and do not believe this information will be successfully obtained through an ESI document production.  This is specifically-identifiable information that should be obtained through a 30(b)(6) deposition or by Plaintiff propounding a discrete document request for documents sufficient to show Starz's revenue or budget projection process.  There is no reason to search millions of documents for the words revenue or forecast.

Similarly, Plaintiff's proposed search number 10, requests an ESI review in

---

[15] Plaintiff's Request Number 34 asks for ("Revenue Forecast" OR "Revenue Budget" OR "Budget Forecast" OR "Budget Projection" OR "Subscriber Projection") to be in Mr. MacDonald's archives during a period of four years and two months.

[16] Plaintiff's Request Number 35 asks for ((DIRECTV OR DTV) AND (Revenue OR Loss OR Project* OR Variance OR Actual OR Perform*)) to be run in Mr. MacDonald's archives during a three year and seven month period.

connection with Plaintiff's document requests seeking "me-too" evidence, despite Starz's objection to producing "me-too" evidence.  (Carter Decl., Exh. E, RFP Nos. 38-42.)  In fact, in the parties' most recent correspondence on this issue, Defendants requested that Plaintiff "clarify [whether] Plaintiff [is] stating that he is entitled to me-too evidence regarding any complaint made to Starz Human Resources, the EEOC, or the DFEH, that concerns allegations of discrimination or harassment based on race, ethnicity, gender, and/or retaliation based on any reason from 2010 through present." (Olney Decl., Exh. 13.)  Defendants are still awaiting a response.  But even if Plaintiff is entitled to any "me-too evidence," any production would be through a discrete production of non-privileged, responsive documents, not through an ESI review.

### D.     Plaintiff's Requested ESI Searches Are Not Proportionate Or Designed To Lead To Relevant Documents.

Even excluding the personal electronic devices and personal email accounts of employees, over which Starz has no control, the ESI searches requested by Plaintiff are massive.  The size of the production that Plaintiff's searches would yield is a result of three factors:  the date ranges of the documents, the number of custodians to be searched, and the breadth of the search terms.  Plaintiff's demands of a date range of more than 7 years and 25 custodians yield a universe of approximately 592.75 gigabytes of data and 4,698,151 emails, just including email archives (and not counting other forms of stored data).[17]  Plaintiff seeks to conduct searches of those documents in 56 broad categories that search for hundreds of disjunctive criteria that would return a document as a "hit," whether or not it has any relevance to this case.  That type of ESI search is entirely disproportionate to any legitimate interest in discovery in this single-plaintiff employment action.

---

[17] "Sixteen gigabytes translates to millions of pages of text, thousands of pictures, or hundreds of videos," which the Supreme Court described as "immense storage capacity." *Riley*, 134 S. Ct. at 2489.  Plaintiff's requested search of 592.75 gigabytes brings to the present the Supreme Court's expectation "that the gulf between physical practicability and digital capacity will only continue to widen in the future." *Id.*

Significantly, Plaintiff's argument is premised on his reliance on an older version of the Federal Rules of Civil Procedure, which were amended to address the exact same problem that Plaintiff's motion creates:  vastly overbroad and disproportionate discovery under too loose a standard.  Plaintiff quotes the former version of Federal Rule of Civil Procedure 26—without acknowledging that it is not the current version of the Rule—as stating:  "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  (*See above* at p.27.)  Significantly, however, that language was removed from Rule 26 in the 2015 amendments to the Rule.

The Committee Notes on Rules—2015 Amendment expressly noted that "[t]he former provision for discovery of relevant but inadmissible information that appears 'reasonably calculated to lead to the discovery of admissible evidence' is also deleted." They explain that "use of the 'reasonably' calculated phrase to define the scope of discovery 'might swallow any other limitation on the scope of discovery.'"  Finding that "[t]he 'reasonably calculated' phrase has continued to create problems," the language was eliminated.  In short, "[t]he 2015 amendments thus eliminated the 'reasonably calculated' phrase as a definition for the scope of permissible discovery."  *In re Bard IVC Filters Products Liability Litigation*, 317 F.R.D. 562, 564 (D. Ariz. 2016).

In place of the prior rule allowing discovery of anything reasonably calculated to lead to admissible evidence, Rule 26 now defines the permissible scope of discovery as "nonprivileged matter that *is relevant* to any party's claim or defense *and proportional* to the needs of the case."  (Emphasis added.)  That standard—not the one Plaintiff relies on—is the one that governs resolution of this motion.  *In re Bard*, 317 F.R.D. at 564 ("the 2015 amendment effectively abrogated cases applying a prior version of Rule 26(b)(1).")  And under the governing standard, Plaintiff's expansive date ranges, custodians, and search terms are simply not proportional to the needs of this single-plaintiff employment dispute regarding events that occurred during the six months prior to Plaintiff's termination.

### 1.   Time Period Limitations

Plaintiff proposes date ranges from January 1, 2010 through the "present"—a range of more than seven years—for all but 7 of his 25 custodians.  A seven-year timeframe is not a reasonable starting place for discovery in this action.

The crux of Plaintiff's case is that he was wrongfully terminated on October 7, 2014, in retaliation for "whistleblowing" that allegedly occurred beginning on April 28, 2014—essentially a six-month period.  That means that Plaintiff wants Defendants to comb through documents for a nearly five-year period before he engaged in the protected activities for which he was allegedly terminated, and for a two-and-a-half-year period after he was terminated.  That is unreasonable and disproportional.

Plaintiff's attempt to justify such a broad timeframe elucidates why his proposals must be rejected.  Plaintiff asserts that the Court should compel a search of all documents through the present, even though he was terminated in October 2014, because "any subsequent discussions involving Plaintiff's name are likely of infrequent occurrence."  Plaintiff essentially concedes that such a timeframe is unlikely to turn up relevant documents.  Irrelevant hits are extremely likely, however.  "Thomas" isn't just Plaintiff's name.  It is one of the most common names in the country (and, indeed, throughout the world).  It is so common that *two* of the employees who reported directly to Plaintiff are also named Thomas.  Plaintiff's assertion that emails containing the name "Thomas" are likely to be infrequent is untrue.

Plaintiff is right, however, that, non-privileged relevant emails after October 2014 are likely to be "of infrequent occurrence," if not entirely non-existent.  That is precisely why the timeframe must be narrower.

Similarly, emails with any relevance to this case before Plaintiff's alleged protected activities in April 2014 are likely to be "of infrequent occurrence."  There cannot be evidence that Defendants retaliated against Plaintiff for something that Plaintiff had not even done yet.  But again, keyword searches through documents over a five-year period before that will yield enormous numbers of "hits" to documents that

1   meet the search criteria, but have no actual or anticipated relevance to this case.

2       In short, a seven-year search timeframe is not proportional discovery for conduct

3   occurring over a mere six months.  Proportionate ESI discovery in this single-plaintiff

4   employment dispute—*i.e.*, tailored to obtain the most relevant documents without

5   searching for every tangentially related document during irrelevant time periods—

6   should generally be *less than six months, not more than seven years*.

7       Accordingly, most searches should be run only during the <u>Retaliation Period</u>

8   <u>(April 28, 2014-October 7, 2014)</u>.  This period coincides with Plaintiff's allegation that

9   he experienced retaliation at Starz during a five-month period that began on April 28,

10  2014, after he allegedly complained about information he learned during a dinner that

11  night (the "Comcast Negotiations"), and ended on the date of his termination from Starz

12  on October 7, 2014.  (*See* Carter Decl., Ex. B ¶ 17 ("Mr. Thomas achieved great

13  successes while at Starz, but that all changed after he expressed his concerns about

14  unlawful activities, refused to participate in illegal behaviors, and advocated on behalf of

15  minorities and women.); ¶ 49 ("After the April 28, May 2, and August 22, 2014

16  incidents, Mr. Thomas noticed that Mr. Thornton and other Starz executives began

17  excluding Mr. Thomas from meetings and emails."); ¶ 65 ("Shortly after whistleblowing

18  at the Palm Restaurant in April 2014, Mr. Thomas noticed that other Starz senior

19  management began treating him unfairly and began excluding him from

20  communications.")).  This six-month period more than covers the crux of Plaintiff's

21  claims.  Plaintiff's first allegation of "retaliation" occurred on August 4, 2014, four

22  months after the alleged "whistleblowing."  (*Id.* ¶ 53.)  Most if not all ESI discovery

23  should be confined to this period.

24      The following time periods are broader, but are generally over-inclusive and

25  should be used far more sparingly with respect to specific requests.

26      <u>*The Thornton Period (August 1, 2013-October 7, 2014)*</u>:  This period coincides

27  with Starz's promotion of Defendant Michael Thornton to Chief Revenue Officer

28  ("CRO").  When Mr. Thornton became CRO on August 13, 2016, he became Plaintiff's

1  supervisor, replacing Plaintiff's prior supervisor and close friend, Ed Huguez.  Plaintiff

2  alleges that "Mr. Thornton repeatedly threatened to fire Mr. Thomas, who was largely

3  responsible for the DirecTV negotiations, if the deal was not completed" by the time the

4  prior amendment expired.

5       This time period is facially overbroad.  The entire length of time that an individual

6  is a plaintiff's supervisor can—and in this case does—span a longer period than is

7  relevant.  Thornton was Plaintiff's supervisor before Plaintiff allegedly engaged in

8  protected activities, and long before he allegedly retaliated against Plaintiff.

9  Nevertheless, this period is still six years narrower than Plaintiff's proposals, and could

10  be used sparingly for particular searches out of an over-abundance of caution.

11       *The Post Termination Period (October 7, 2014-March 31, 2015)*.  The period after

12  Plaintiff's termination is irrelevant to this case.  What matters is what happened before

13  and up to the point of Plaintiff's termination.  What happened after is irrelevant.

14  Plaintiff's request for documents during this timeframe appears to speculate that *if*

15  someone at Starz made some statement regarding Plaintiff's termination after he left,

16  that could be used as an after-the-fact admission.  That kind of speculation about

17  whether employees might be gossiping about him cannot justify Plaintiff's far-reaching

18  ESI requests for two and a half years of massive numbers of documents.  Defendants

19  believe that all discovery should be cut off as of Plaintiff's termination date.  But if the

20  Court is inclined to permit discovery beyond that date, it should be limited to a

21  reasonable time after the termination date—three or six months.  Presumably, any gossip

22  about Plaintiff would have occurred in the immediate aftermath of his termination.  After

23  that, any discussions about Plaintiff are more likely to be reflective of Defendants'

24  defense of this lawsuit, and Plaintiff's attempt to obtain them is simply a backdoor into

25  Defendants' privileged legal strategy.  And, more importantly, after that the search

26  results are more likely to be entirely irrelevant to this case, and only returned as hits to

27  the searches because of overbroad search criteria.

28       *The Pre-Thornton Period (January 1, 2010-August 13, 2013)*.  This time-period

1   has no relevance to this case.  The crux of this single-plaintiff case is whether Thornton

2   retaliated against Plaintiff.  What happened before Thornton became Plaintiff's

3   supervisor is irrelevant.  Plaintiff alleges that his prior supervisors believed he was a

4   strong performer.  That allegation is irrelevant.  Even if Plaintiff's prior supervisors

5   liked him, that does not prove that Thornton retaliated against Plaintiff—it only proves

6   that Thornton had a different opinion.  *See, e.g., Rey v. C&H Sugar Co.*, 2012 U.S. Dist.

7   LEXIS 169931, at *13 (N.D. Cal. Nov. 28, 2012) ("a previous supervisor's good review

8   is not enough to show pretext."), *citing Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir.

9   2002) ("Different supervisors may impose different standards of behavior, and a new

10  supervisor may decide to enforce policies that a previous supervisor did not consider

11  important.").  Accordingly, there is no reason to search these files at all.  If the Court is

12  inclined to permit any searches in this time period, however, they should be exceedingly

13  sparing, and limited to Plaintiff and senior human resources executives employed by

14  Starz during that time period, since Plaintiff has not offered any reason why anything

15  else from this long-ago time period could be relevant at all.

16                    **2.      Custodians**

17          Plaintiff proposes that the records of 25 individuals be searched.  Even Plaintiff

18  apparently concedes that he cannot depose that many people in one-day depositions, yet

19  Plaintiff's proposal nevertheless seeks millions of documents from people whose

20  relationship to this case is so minor that they will not even be deposed.  Worse, Plaintiff

21  includes within his demands custodians who served as attorneys for Starz, whose

22  communications and documents will routinely be protected by the attorney-client

23  privilege and attorney work product doctrine, making any search and privilege review

24  extremely burdensome and time-consuming.  Again, that is disproportionate to

25  Plaintiff's legitimate interest in discovery.  Proportionate ESI discovery in this single-

26  plaintiff employment dispute should be limited to *less than a dozen custodians, not more*

27  *than two dozen*.  While Defendants think that 10 custodians would be more than

28  sufficient, Defendants offered to agree to 15 custodians in an attempt to resolve this

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS                              -64-

matter without judicial intervention.

Below, Defendants will address the custodians to which it agreed, and that discussion should make clear that Defendants have agreed to search through mountains of documents for the most relevant documents.  But Defendants begin with a discussion of the custodians most in dispute.

First, Defendants strongly object to Plaintiff's demand for an ESI search of *four Starz attorneys*—including Starz's current and former General Counsel and subordinate members of Starz's in-house legal department:  Steve Beabout *(Former General Counsel),* Todd Hoy *(Vice President, Business and Legal Affairs),* Richard Waysdorf *(Former, Senior Vice President, Business and Legal Affairs),* and David Weil *(VP and General Counsel, Business and Legal Affairs).*

"[T]he [attorney-client] privilege [is] 'fundamental to its legal system' and 'a hallmark of [its] jurisprudence.'"  *Bittaker v. Woodford*, 331 F.3d 715, 721 (9th Cir. 2003) (quoting *People v. Superior Court (Laff)*, 25 Cal. 4th 703, 715 (2001)).  The attorney-client privilege "is 'no mere peripheral evidentiary rule, but is held vital to the effective administration of justice.'"  *Id.* (quoting *Roberts v. City of Palmdale*, 5 Cal. 4th 363, 380 (1993)).

Starz's attorneys' communications are at the heart of the attorney-client privilege, and implicate attorney work product concerns as well.  Plaintiff's attempt to include four Starz attorneys as custodians would require Defendants to review massive numbers of documents not only for relevance, but also for privilege.  And it greatly increases the risk of inadvertent disclosure of privileged information.  There is no justification for including Starz's attorneys as custodians.

Plaintiff glosses over the privilege issues, and blandly asserts that he seeks to include people who are or were Starz's attorneys as custodians "because, as alleged in the Second Amended Complaint, they were present for or received complaints regarding incidents motivating Starz's retaliation against Mr. Thomas."  In other words, Thomas suspects that they may, in some limited fashion, have relevant information.  That is not

nearly enough.  "The attorney-client privilege, like all other evidentiary privileges, may obstruct a party's access to the truth." *Admiral Ins. Co. v. United States Dist. Court*, 881 F.2d 1486, 1494 (9th Cir. 1989).  "Although it may be inequitable that information contained in privileged materials is available to only one side in a dispute, a determination that communications or materials are privileged is simply a choice to protect the communication and relationship against claims of competing interests." *Id.* "Any inequity in terms of access to information is the price the system pays to maintain the integrity of the privilege." *Id.*

If Starz's attorneys are somehow witnesses to this case—and that is a really, really big IF—then there are much less invasive ways to obtain any non-privileged information they might have than an ESI search through all of their privileged communications. Plaintiff can submit written discovery requests and/or elect to use some number of his depositions to ask Starz's attorneys questions that do not invade the attorney-client privilege or work product doctrine.  But what Plaintiff is asking for here—license to run keyword searches through all of the attorney-client privileged communications of three Starz attorneys over a four-year period and a fourth Starz attorney over a seven-year period—is unreasonable, highly intrusive, and should be rejected by this Court.

<u>Second</u>, Thomas seeks to search through seven years' worth of communications from three individuals who are so tangentially related to this case that they are not even mentioned in his Complaint:  Patrick DiBartolomeo *(Senior Director Affiliate Sales)*, Jaime Dosher *(Senior Director Affiliate Sales)*, and Shree Potts *(Former HR Manager)*.

During Plaintiff's employment at Starz, DiBartolomeo and Dosher were Starz employees who reported to Tom Gove, who in turn reported to Plaintiff.  In other words, Plaintiff was their boss' boss.  Again, this case is about the termination of Plaintiff's employment by his own supervisor, Thornton, and the crux of Plaintiff's allegations ask whether Thornton terminated Plaintiff because of some nefarious reason or simply because Plaintiff was a poor performer.  Thornton was DiBartolomeo's and Dosher's boss' boss' boss.

As might be expected, DiBartolomeo and Dosher have pretty limited information about the actions of their boss' boss' boss. They may have some limited information relevant to this case: Defendants mention them in their Initial Disclosures stating that they will testify to (1) Thomas's failure to supervise his team, (2) his opposition to Starz's strategy to create original programming, and (3) Thomas's unnecessary trips to affiliate call centers. But these topics are far too limited to justify what Plaintiff is asking for—a review of all of their communications over a seven-year period as part of an exhaustive ESI search.

Importantly, an ESI search will already include Gove, Plaintiff, and Thornton as custodians. If DiBartolomeo or Dosher had any communication with Gove (their boss), Plaintiff (their boss' boss), or Thornton (their boss' boss' boss), those communications will already be included in the ESI search. Likewise, if they had any communications with any of the other custodians, those will be included. That should already encompass their relevant communications, without including them as separate custodians. What it will not include is seven years of irrelevant communications from two people involved in the periphery of this case.

Shree Potts is similarly involved in the periphery of this case, with no justification for searching seven years of her documents. During his employment, Plaintiff had a relationship with Potts. There are reasons to believe that will be relevant to this case. But there are no reasons to believe it would be reasonable to search through Potts' communications over a seven-year period, when she is not alleged to have any other involvement in the allegations of this case.

Third, Plaintiff seeks to include as custodians three individuals who are not even listed in Defendants' Initial Disclosures as potential witnesses, and who are not even plausibly witnesses to this case: Pamela Wolfe (*Executive Vice President, Human Resources*), Mandie Litton (*Former Assistant to Michael Thornton and Keno Thomas*), and Greg Maffei (*Chairman, Starz*)

Wolfe was hired by Starz in May 2016—more than a year and a half after

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

-67-

Plaintiff's termination. Defendants do not see any reason for an ESI review of her files, considering she was not employed by Defendants during any of the events alleged in the Complaint. If there are specific documents Plaintiff seeks, Plaintiff should propound a Request for Production for those documents.

Litton served as the assistant to Plaintiff and Thornton. Litton is not alleged to have been involved in or a witness to any of the acts alleged in Plaintiff's complaint. Plaintiff has not provided a reason for adding her as a custodian, and Defendants do not see any.

Maffei is the Chairman of Starz's Board of Directors, and as such his communications are among the most valuable and confidential at Starz. But Maffei is not a participant in or witness to any of the allegations of the complaint. Maffei is referenced in the Complaint—but only as a character in a story that Plaintiff allegedly heard from Thornton. Plaintiff does not allege that Maffei and Plaintiff ever interacted or that Maffei took any actions against Plaintiff. Plaintiff merely alleges that Thornton mentioned him. It would be like two employees at Microsoft talking about Bill Gates, and then one of them demanding a review of Bill Gates's files, including his personal cell phone. Being the subject of a conversation is not the same as being a participant in it, and does not justify discovery from the topic of the conversation.

In short, there is no justification for the custodians above. Plaintiff's legitimate interests in discovery will be more than satisfied by ESI searches of the custodians addressed below.

Plaintiff Keno Thomas *(Former Senior Vice President, Sales & Affiliate Marketing)*. Plaintiff's Proposed Date Range: 1/1/10-present; Defendants' Offered Date Range: 1/1/10-3/31/15. There is no real dispute on this point. Since Plaintiff's employment terminated on October 7, 2014, there is little activity in his email account after that date.

Human Resources Employees: Sheryl Anderson *(Former Executive Vice President, Human Resources and Administration)* and David Laughlin *(Vice President,*

*Human Resources)*.  Plaintiff's Proposed Date Range: 1/1/10-present; Defendants' Offered Date Range:  1/1/10-3/31/15.  The most reasonable date range for these custodians is the Retaliation Period, April 28, 2014-October 7, 2014.  To the extent that Plaintiff made complaints and was allegedly retaliated against, that period will cover Plaintiff's claims.  Defendants offered a five-year period, rather than a six-month period, in an attempt to avoid disputes.  Plaintiff's request for Human Resources searches for two and a half years after his termination, however, is unreasonable.

Starz's C-Level Executives:  Chris Albrecht *(President and CEO),* Glenn Curtis *(Former President)*, Defendant Michael Thornton *(Former Chief Revenue Officer).* Plaintiff's Proposed Date Range:  1/1/10-present; Defendants' Offered Date Range: 8/1/13-3/31/15.  These are burdensome searches through Starz's sensitive information. Again, the most reasonable date range is the Retaliation Period.  Defendants provided a broad time frame for these three custodians—the entire duration of Thornton's supervision of Plaintiff through Plaintiff's termination, and for six months thereafter—so that Plaintiff can have full discovery into whether Mr. Thornton ever held an "animus" against Plaintiff, and whether he communicated this to his supervisors (Mr. Albrecht and Mr. Curtis).  It also provides discovery into any assessment of Mr. Thomas's performance during the Thornton Period.  Additionally, it covers the allegations in the Complaint regarding Plaintiff's alleged comments about the Comcast Negotiations, his alleged retaliation, and his alleged refusal to engage in the 2015 budget process in or about early September 2014.  Finally, it will capture conversations regarding Plaintiff's termination.  There is no reason for any earlier time period as to these custodians (before Thornton supervised Plaintiff) or for any later period (long after Plaintiff was terminated).

Plaintiff's Former Peers:  Christine Carrier *(Former Senior Vice President, Sales & Affiliate Marketing)* and Randy McCurdy *(Former Senior Vice President, Sales & Affiliate Marketing)*.  Plaintiff's Proposed Date Range:  1/1/10-present; Defendants' Offered Date Range:  4/24/14-3/31/15.  Plaintiff alleges that Carrier and McCurdy were

at the April 28, 2014 dinner where Plaintiff allegedly learned about the Comcast Negotiations, and that Plaintiff expressed concern about the negotiations to McCurdy in June and July of 2014. Thus, this time period starts on April 28, 2014 and ends three months later. Defendants' proposed time period, however, would also capture any communications regarding Carrier's and McCurdy's evaluation of Plaintiff's former direct reports after Plaintiff's termination, as mentioned on Defendants' Initial Disclosures. Carrier and McCurdy are, at best, witnesses to very limited aspects of this case. There is no reason to search through their documents for four years before the events that they allegedly witnessed, or for two and a half years after Plaintiff was terminated.

Plaintiff's Direct Reports: Tom Gove *(Former Vice President, Sales and Marketing)*, Jennifer Schouten *(Former Vice President, Sales and Marketing),* and Tom Wenzel *(Former Vice President, Sales and Marketing)*. Plaintiff's Proposed Date Range: Tom Gove and Tom Wenzel: 1/1/10-present; Jennifer Schouten: 8/1/13-present; Defendants' Offered Date Range: 4/28/14-3/31/15. Plaintiff alleges he discussed the Comcast Negotiations with his direct reports during the week of April 28, 2014. Thus, Defendants' proposed time period starts on April 28, 2014 and extends six months past Plaintiff's termination to cover the other allegations concerning these individuals. Individuals who were subordinate to Plaintiff are, at best, witnesses to very limited aspects of this case. There is no reason to search through their documents for four years before the events that they allegedly witnessed, or for two and a half years after Plaintiff was terminated.

Custodians Involved in Discrete Events: These last four people discussed below were identified as having, at most, limited knowledge of some tangential interest in this dispute. Defendants do not believe they should be included in ESI searches at all, and that they should be included in the initial list of non-custodians. In an attempt to resolve this matter without judicial intervention, Defendants offered to include them all as custodians—only to have Plaintiff take Defendants' compromise offer as a starting

position for his motion.  Including them here misunderstands the nature of compromise.  Since Plaintiff has filed this motion, Defendants do not believe they should be included at all.  If they are, however, the timeframes for them should be very narrow.

Scott MacDonald *(Former Chief Financial Officer).*  Plaintiff's Proposed Time Period:  1/1/10-present; Defendants' Offered Time Period:  8/22/14-3/31/15.  Plaintiff alleges he made a vague comment regarding the Comcast Negotiations during an August 22, 2014 meeting attended by Mr. MacDonald.  This time period begins at the time Plaintiff allegedly made that comment and continues six months past Plaintiff's termination.  In light of the sensitive nature of Starz's CFO's communications and the fact that he has almost no connection to this case, anything broader is unreasonable.

Kara Tefft *(Finance Director).*  Plaintiff's Proposed Time Period:  1/1/10-present; Defendants' Proposed Time Period:  8/1/14-3/31/15.  Joe Zamora *(Vice President, Finance).*  Plaintiff's Proposed Time Period:  1/1/10-present; Defendants' Proposed Time Period:  8/22/14-3/31/15.  Plaintiff's allegations regarding Tefft begin with a September 4, 2014 meeting and end with Plaintiff's termination less than two months later.  There is no reason to search her communications for seven years.  There is even less to Plaintiff's allegations regarding Zamora.  He is merely identified as Tefft's supervisor.  Defendants do not see how that makes him a witness at all.  Nevertheless, in the spirit of compromise, Defendants had offered to include him for a very brief period.  There is no conceivable reason to search all of his communications for seven years.

Beth Jennewein *(Executive Director of Project Management).*  Plaintiff's Proposed Time Period:  6/1/14-present; Defendants' Proposed Time Period:  7/1/14-8/31/14.  Plaintiff alleges that he was excluded from meetings arranged by Jennewein in retaliation for allegedly complaining about the Comcast Negotiation, and that he later met with Jennewein to express his disagreement with the strategy his supervisor, Thornton, pursued during negotiations with DIRECTV.  Defendants' time period begins a month before the meetings arranged by Jennewein, and ends once Starz signed an amendment with DIRECTV in late August 2014, since at that point, Jennewein's

1   involvement in the alleged events terminated.

2          **3.**     **Search Terms**

3         Defendants firmly believe it is premature for the Court to issue an order on search

4   terms.  Any evaluation of search terms must be made with consideration of the

5   responsiveness rate of a search term through testing those terms in the data set (as

6   defined by custodians and time periods).  Because the parties could not even agree on

7   custodians and date ranges, the parties have had no opportunity to discuss the substance

8   of search terms with the benefit of actual information regarding testing and review.  The

9   Court should not issue an order on search terms until terms have been tested and revised

10  to ensure any document review will be focused on documents likely to be responsive.

11  And even then, documents should be produced before a Court issues an order that

12  additional documents must be compelled.

13        Accordingly, Defendants ask that the Court issue an order regarding custodians

14  and time frames only—and order the parties to meet and confer on search terms after

15  Defendants have had time to test the terms in the data set.  *Romo v. GMRI, Inc*., No.

16  EDCV-12-0715-JLQ, 2013 WL 11310656, at *6 (C.D. Cal. Jan. 25, 2013) ("The court's

17  role does not include the design of legally sufficient electronic keyword searches.  That

18  is for the parties without taking up the court's time."); *see also* L–*3 Commc'ns Corp. v.

19  Sparton Corp*., 313 F.R.D. 661, 667 (M.D. Fla. 2015) (*citing The Sedona Conference*

20  *Best Practices Commentary on the Use of Search and Information Retrieval Methods in*

21  *E-Discovery August 2007 Public Comment Version*, 8 Sedona Conf. J. 189, 193 (2007)

22  ("The party responsible for production . . . will be 'best situated to evaluate the

23  procedures, methodologies, and technologies appropriate for . . . producing their own

24  electronically stored information.'").

25        In the event that the Court is inclined to exhaustively consider the proposals

26  search term by search term—which it should not—Defendants have submitted a

27  comprehensive proposals for limiting Plaintiff's searches to weed out obvious problems

28  with them.  Since Defendants firmly believe the Court should not engage in that

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

1   exercise, Defendants have refrained from further lengthening this monstrous brief by

2   discussing it all here, and instead refer to Exhibit M to the Declaration of Margaret

3   Carter for Defendants' specific suggestions.

4        It is enough to say here that there is a wide and obvious disparity between

5   Plaintiff's description of what he was trying to achieve and the actual search terms that

6   he proffers.  For example, thirty-six of Plaintiff's requests (1, 2, 3, 4, 6, 7, 8, 9, 13, 16,

7   17, 18, 19, 21, 22, 23, 24, 25, 26, 27, 28, 29, 32, 33, 37, 38, 40, 44, 45, 46, 47, 48, 49,

8   51, 52, 56) search for communications containing the word "Thomas."  Not just those

9   that refer to "Keno Thomas," but those that contain the word "Thomas."  In other words,

10  if an email discusses another employee with the first (or last) name Thomas, if anyone

11  named Thomas was a party to the email, or if the email discusses any Thomas in any

12  way, shape, or form, it will be pulled into the set of documents to be reviewed.  This

13  plays out in a problematic fashion with Plaintiff's other search terms.  For example:

14  <u>Plaintiff's Search Number 9</u> requests that Starz run in the archives of ten

15  custodians during a seven year time period "(Keno OR Thomas OR "Keno Thomas" OR

16  "Keno V. Thomas" OR "Thomas, Keno" OR (Keno w/2 Thomas) OR KVT OR

17  Keno.Thomas) AND (Divers* OR Race OR Minorit* OR Black OR (African AND

18  American) OR Gender OR Women OR Hire OR Recruit OR Promote OR Consolidat*

19  OR LIFO OR "Last In First Out")" for the purpose of—"ESI related to ***Plaintiff's***

20  ***advocacy*** on behalf of women and minorities"—and includes custodians "***with whom he***

21  ***discussed*** his efforts to increase diversity at Starz through hiring practices."  However, if

22  Plaintiff seeks Plaintiff's communications with others on this topic, those documents

23  will be in Plaintiff's files—there is no need to search nine other custodians for every

24  communication they may have had that touched upon those subjects.  Furthermore, the

25  search does not seek to capture documents that concern Plaintiff's discussions regarding

26  the hiring, recruiting, or promotion of diverse individuals but, as drafted, seeks any

27  communication that contains the name "Thomas" and that also mentions the word or any

28  deviation of the word "hire" OR "recruit" OR "promote" OR "gender" OR "women" OR

1  "black" and so on regardless whether the email concerned Plaintiff's alleged advocacy.

2  For example, the search would capture an email wherein an employee named Thomas

3  talks about Encore *Black*, one of Starz's channels; a mass email stating that Starz

4  recently *hired* a new account executive; or an email asking for the *consolidated*

5  financials. Plaintiff's search is far too broad to for its asserted purpose.

6      Plaintiff's Search Number 3 requests that Defendants search the archives of six

7  custodians during a period of three years and seven months using the following terms

8  "(Keno OR Thomas OR "Keno Thomas" OR "Keno V. Thomas" OR "Thomas, Keno"

9  OR KVT OR Keno.Thomas) AND ((Advoca* OR Divers* OR Race OR Minorit* OR

10 Black OR African-American OR Gender OR Women) OR Skill* OR Ability OR

11 Capacity OR Perform* OR Competence OR (Violat* AND (Polic* OR Procedure*)) OR

12 "Call Center" OR "Call Centers" OR Travel OR Affair OR (Relationship AND

13 (Personal OR Sexual OR Romantic OR Inappropriate)) OR Original* OR (Leadership

14 AND Diversi*) OR Supervis* OR Manag*)." Plaintiff's rationale for this search is two-

15 fold (1) "ESI related to Plaintiff's advocacy on behalf of women and minorities" and (2)

16 "ESI related to purported reasons Defendants assert were responsible for his

17 termination." (supra, p. 11-12.) Plaintiff's first reason for this search is the same as

18 Plaintiff's reasoning for search number 9, making this part of the search is duplicative.

19 Moreover, Plaintiff's second reason fails to support his broad search terms. This search

20 is designed to capture documents unrelated to the parties' claims and defenses including

21 documents that contain Plaintiff's name (or anyone named Thomas) and the word, or a

22 deviation of the word, "affair," "travel," "original," or "manage," and so on, including a

23 mass email discussing Starz's senior *management*, Starz's new *travel* show, or

24 requesting the *original* file. Again, Plaintiff's search terms are overbroad.

25      Plaintiff's Search Number 40 would require Starz to run Plaintiff's name during a

26 seven year period unattached to any limiter in the archives of Shree Potts, a former

27 human resources manager. As drafted, this search will pull every document in a 7-year

28 period sent between Plaintiff and Ms. Potts or sent between Ms. Potts and anyone else

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

2:15-cv-09239-CAS-AFM   Document 105   Filed 03/14/17   Page 79 of 81   Page ID
#:1584

1   that mentions Plaintiff or anyone named "Thomas," including any non-employee friends

2   she may have named Thomas.  While Plaintiff has not provided a rationale for this

3   search, Defendants assume it is because they stated in their Initial Disclosures that Ms.

4   Potts will testify about "Thomas's workplace affairs."  It is unlikely that an email exists

5   confirming Thomas's workplace affairs, and even if it did, how would finding that email

6   help Plaintiff prove his case.  Thus, this search is designed not only to result in an

7   absorbent number of emails but is designed to capture more, if not all, non-responsive

8   documents.

9        Starz can continue to discuss Plaintiff's searches in the abstract but does not

10  believe that discussion would be beneficial to the parties' goals—identifying a

11  reasonable universe of documents for Defendants to review based on reasonable

12  custodians, time frames, and search terms that have been tested within the files of the

13  agreed upon custodians and time frames.  *Romero v. Allstate Ins. Co.,* 271 F.R.D. 96,

14  109 (E.D. Pa. 2010) (Thomas Y. Allman, *Conducting E-Discovery After the*

15  *Amendments: The Second Wave*, 10 Sedona Conf. J. 215, 217 (2009)) ("Among the

16  items about which the court expects counsel to 'reach practical agreement' without the

17  court having to micro-manage e-discovery are 'search terms, date ranges, key players

18  and the like.'").  The better the parties are able to identify custodians, time frames, and

19  search terms likely to lead to non-privileged, responsive documents, the more efficiently

20  Defendants will be able to review and produce those documents.  Thus, Defendants ask

21  the Court to deny Plaintiff's search term proposal to permit Defendants the time to

22  properly test and structure searches that will result in the documents Plaintiff seeks.  *See*

23  *The (2004) Sedona Principles: Best Practices, Recommendations & Principles for*

24  *Addressing Electronic Document Production the Sedona Conference Working Group on*

25  *Electronic Document Retention and Production*, 5 Sedona Conf. J. 151, 180 (2004)

26  ("When responding to discovery requests, organizations should define the scope of the

27  data needed to appropriately and fairly address the issues in the case and to avoid

28  unreasonable overbreadth, burden, and cost [including] collecting data from repositories

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

1   used by key players rather than generally searching through the entire corporate

2   computer system; defining the set of data to be collected by applying reasonable

3   selection criteria, including search terms, date restrictions, or folder designations; and

4   avoiding collection efforts that are out of proportion to or are inappropriate in the

5   context of a particular litigation.").

6                                    **CONCLUSIONS**

7   **I.      Plaintiff's Conclusion**

8           For the foregoing reasons, Plaintiff requests a Court order (1) requiring

9   Defendants to perform each of the ESI searches set forth above, and produce all

10  responsive non-privileged emails seriatim, completing production no later than April 18,

11  2017; (2) stating that Defendants must search custodians' personal devices if it is

12  determined that the custodian may be dismissed without cause, and uses the personal

13  device for work-related purposes; and (3) modifying the stipulated protective order filed

14  on February 27, 2017, to omit the "Highly Confidential" designation.

15  **II.     Defendants' Conclusion**

16          Defendants respectfully request that the Court (1) deny Plaintiff's request for a

17  modification of the protective order, and leave in place the standard two-tier protective

18  order that has been entered in this case; (2) reject Plaintiff's request for an order seizing

19  the personal devices (*e.g.*, iPhones) and email accounts of Starz's current or former

20  employees, which Defendants have no legal right to seize, and hold that if Plaintiff

21  wishes to take discovery from these individuals, he must do so directly by serving them

22  with subpoenas to which they have an opportunity to object on privacy grounds; and

23  (3) permit discovery to proceed in a reasonable and good faith fashion by denying

24  Plaintiff's request for any order compelling production of any specific discovery at this

25  time, with the understanding that Starz will test search terms across more than a million

26  documents, review the results to ensure the searches are designed to pull more

27  responsive than non-responsive documents, and once it has tested and verified its search

28  terms, it will run those terms, review the documents, and produce non-privileged

JOINT DISCOVERY STIPULATION
COMPELLING PROD OF DOCS

responsive documents.  At that point, the parties can use that production to meet and confer regarding whether additional ESI searches are necessary.

Dated: March 13, 2017                    Respectfully Submitted,

                                         ROBERT D. NEWMAN, ATTORNEY AT LAW

                                         HADSELL STORMER & RENICK LLP


                                         By:    /s/ - Brian Olney
                                                Dan Stormer
                                                Cindy Pánuco
                                                Brian Olney
                                         Attorneys for Plaintiff

Dated: March 14, 2017                    O'MELVENY & MYERS LLP

                                         By:    /s/ - Eric J. Amdursky
                                                Eric Amdursky
                                                Daniel Petrocelli
                                                Margaret Carter
                                                Carly Epstein
                                         Attorneys for Defendants Starz Entertainment,
                                         LLC and Michael Thornton

**I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.**